### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

```
UNITED STATES OF AMERICA, . CRIMINAL NO. 1:15-cr-10323-IT
      Plaintiff            .
                           .
                           . BOSTON, MASSACHUSETTS
           v.              . APRIL 21, 2016
                           .
                           .
GIBSON et al              .
      Defendant            .
. . . . . . . . . . . . . .
```

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE DONALD L. CABELL
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:    Stephen P. Heymann, AUSA
                       United States Attorney's Office
                       John Joseph Moakley Federal
                       Courthouse
                       1 Courthouse Way
                       Suite 9200
                       Boston, MA 02210
                       617-748-3100
                       Stephen.Heymann@usdoj.gov

For Defendant 1:       Martin G. Weinberg, Esq.
Daniel Gibson          Martin G. Weinberg, PC
                       20 Park Plaza
                       Suite 1000
                       Boston, MA 02116
                       617-227-3700
                       owlmcb@att.net

For Defendant 2:       Joshua L. Solomon, Esq.
Mark Kesner            Pollack Solomon Duffy LLP
                       133 Federal Street, Suite 902
                       Boston, MA 02110
                       617-439-9800
                       jsolomon@psdfirm.com

For Respondent:        William J. Lovett
Scott Behman           Collora LLP
                       100 High Street
                       20th Flr.
                       Boston, MA 02110
                       617-371-1000

1          wlovett@collorallp.com

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
          Court Reporter:
24
          Proceedings recorded by electronic sound recording,
25        transcript produced by transcription service.

*Judy Bond*
**Certified Federal Court Transcriber**
**508.984.7003**

3

1  COURT CALLED INTO SESSION

2  (2:00:00 P.M.)

3          THE CLERK:  All rise.  The United States District

4  Court for the District of Massachusetts is now in session.

5  The Honorable Donald L. Cabell presiding.  Please be seated.

6          The case of the United States vs. Daniel Gibson

7  and Mark Kesner, Criminal Action No. 15-10323, will now be

8  heard before the Court.

9          Counsel, please identify themselves for the

10 record.

11         MR. HEYMANN:  Your Honor, Steve Heymann on behalf

12 of the government.

13         THE COURT:  Good afternoon.

14         MR. SOLOMON:  Good afternoon, Your Honor.  Joshua

15 Solomon on behalf of Mark Kesner.

16         THE COURT:  Good afternoon.

17         MR. WEINBERG:  Good afternoon.  Martin Weinberg on

18 behalf of Daniel Gibson.

19         THE COURT:  Good afternoon to you.

20         MR. LOVETT:  And good afternoon.  William Lovett

21 on behalf of Scott Behman.

22         THE COURT:  Good morning, Mr. Lovett.

23         All right.  We're here today for two matters:  the

24 motion to compel with respect to the server and the motion

25 to dismiss or in the alternative for discovery.

4

1          And I thought it might make sense to deal with the

2 motion with respect to the server first, so first let me ask

3 you a question.

4          I know that when we were here last time afterwards

5 you guys repaired to the back room there while we were doing

6 some stuff.  I haven't heard anything from anybody since,

7 but has any of this with respect to the server been further

8 honed or refined since we last got together?

9          MR. LOVETT:  Your Honor, may I address the Court

10 on this issue?

11          THE COURT:  Okay.

12          MR. LOVETT:  I feel like I haven't gotten a

13 chance.  My colleague --

14          We've discussed the issue, and it's our position

15 that Mr. Gibson is not entitled to use privileged

16 communications or confidential client information from his

17 clients without first getting consent from the clients.  And

18 there are two categories of documents --

19          THE COURT:  Well, before you go further, when you

20 say we discussed this, are you about to say what you as a

21 group have discussed and have decided, or are you actually

22 making an argument?

23          MR. LOVETT:  No.  I'll tell you what we've

24 discussed.

25          THE COURT:  Okay.

1          MR. LOVETT:  It seems to me there are two

2 categories of documents on the server.  There's privileged

3 documents and non-privileged documents.  And what we

4 discussed is a procedure; whereby, counsel would provide

5 search terms, the government would run those search terms

6 against the server that it has, would not look at the

7 documents, consistent with the protocol it had entered into

8 with Mr. Behman and Behman Hamilton provide the documents to

9 me, I would review the documents simply for privilege, not

10 for responsiveness, I would produce non-privileged documents

11 to Mr. Gibson, and I would produce a privilege log with

12 information that would be sufficient to allow him to

13 challenge the privilege.

14          It seems to me that that's a practical approach.

15 It gets him what he needs, it preserves the privilege, and

16 it allows him to challenge the assertion of privilege based

17 on the privilege log.

18          THE COURT:  Is this an agreement?

19          MR. LOVETT:  It's not an agreement; it's what I

20 proposed.  They've not accepted the agreement.

21          THE COURT:  All right.

22          MR. LOVETT:  But it seems to me that's sort of the

23 way it would work in any case, and it should be no different

24 in this case.

25          THE COURT:  Well, I think what we're thinking

1  about is a variation on that.  It certainly encompasses some

2  of the same concerns and some of the same practical ideas,

3  but it's probably not -- it wouldn't be preferable to what

4  you've come up with.  It has probably less of a role in

5  terms of you reviewing something and being a part of the

6  process of determining what should get produced.

7          So why don't you --

8          Let me tell you what we've come up with.  I'll

9  hear you.  I'll hear anybody, because I -- you know, I do

10 think you deserve a voice in this, but.

11         This is where we're at.  And if we can't come up

12 with something that everybody agrees to, this is what we're

13 inclined to do.  All right?

14         And in the process, look, we answer a couple of

15 questions that we were posing to ourselves, somewhat

16 rhetorically, but questions that we thought were practical

17 questions and important questions here.

18         And the first was, you recall, we were asking

19 ourselves should we be viewing the server as evidence that

20 is in the government's custody, possession or control;

21 because we think a lot flows from that.  And in our view it

22 is.  We think the server is in the government's custody,

23 possession or control.

24         We acknowledge the agreement between the law firm

25 and the government limiting its use and by which it was

1 provided to the government in the first place, and we credit

2 that even though there's correspondence that contemplated

3 the possibility that a defendant might seek discovery of the

4 server once it was in the government's possession, that was

5 not necessarily a sure thing.

6         It doesn't alter the fact that the government has

7 the server in its custody, possession or control.  It

8 doesn't alter the fact that the server was provided

9 voluntarily and that the agreement by its terms allowed the

10 government access to the entire server, albeit, for a

11 limited purpose and with certain restrictions in place.

12         And we think the first consequence of that is that

13 the government should treat the server as it would treat any

14 other evidence in its custody, possession or control; and

15 that means that the government must consider the evidence on

16 the server for purposes of complying with its Rule 16

17 obligations, its obligation under the local rules and its

18 ongoing Brady and Giglio obligations.

19         And we think, therefore, that those obligations --

20         Well, we think that those obligations trump the

21 agreement that the government had with the law firm

22 underlying the provision of the server in the first place.

23         Having said that, we would leave it to the

24 government to determine what is pertinent, what's material,

25 what's exculpatory and what is responsive.  We don't see

1  that that's our call.  The government understands its

2  obligations.

3         We agree it would be impractical to ask the

4  government to go through and to conduct that search and to

5  make those determinations.  We believe it would be fair and

6  fairest for the defendants -- and perhaps, Mr. Lovett, even

7  yourself -- to provide the government with terms and

8  guidance that it can use to conduct a meaningful search to

9  pull out those materials that would be responsive.

10        Similarly, we think that the defendant, Mr. Gibson

11 and Mr. Kesner's, constitutional rights trump not only the

12 agreement between the government and the law firm, but it

13 also is superior to the fact that some of the documents may

14 be privileged.

15        And we presume that any search is going to yield

16 many documents that are not, -- those aren't going to be at

17 issue; is going to produce responsive documents that are not

18 privileged, those are probably not going to be

19 controversial; but that there will be some documents that

20 are both responsive and privileged.

21        In our view the best way to approach that is to

22 have those documents produced.  And as we explain in a few

23 moments, ultimately all of the documents produced subject to

24 a protective order that we think should be drafted with Mr.

25 Lovett's participation to ensure that any privileged

1 documents receive the maximum protection not only in the

2 context of this case but also to ensure that going forward

3 and outside of this case they would not see the light of

4 day.

5         Assuming this is the way to go, the government has

6 gone through and has done its search and is satisfied that

7 it has complied with its obligations in the same way that

8 the government does that assessment in any other case.  If

9 there are any other items on the server that are outside the

10 scope of responsive documents that the defendants still

11 want, those would have to be sought via a Rule 17 subpoena,

12 because the government has no obligation, that I can see, to

13 produce that information.

14         So, here's what we would order.  We would be

15 allowing the motion to compel to the following extent:

16         Within ten days or a reasonable period that the

17 parties could agree upon the government and the defendants

18 -- and again, we think with Mr. Lovett's participation --

19 should come up with a protective order to determine how

20 privileged documents are to be handled in this case.  If

21 there's disagreement, if you're not able to do that, you let

22 us know.  We'll come up with a protective order.

23         Also within ten days or a reasonable period the

24 defendants -- and again with Mr. Lovett's participation --

25 should come up with a list of search terms to aid the

1 government in conducting a search of the server for

2 responsive documents.

3          In all circumstances, though, it will be the

4 government that determines whether information that is

5 produced subject to these searches is pertinent or

6 responsive and needs to be produced.

7          From comments that were made previously in court

8 --

9          Mr. Weinberg, you indicated that you were not

10 interested in any communications between Behman and his

11 counsel, and I just happened to note that.  So I've noted

12 here that we would specifically be excluding from any

13 information that would need to be produced those documents

14 involving communications between Behman and his counsel.

15          Now, finally, to protect against the possibility

16 that the government might identify documents that are

17 responsive and privileged even though the government might

18 deem them to not be privileged, to protect against that

19 possibility -- because, Mr. Lovett, in my version I don't

20 have you injected formally in this process.  So to protect

21 against that risk, I would recommend that all documents

22 produced as responsive be produced subject to the protective

23 order.  Which is to say, privileged and non-privileged

24 documents should be produced subject to the protective order

25 and afforded the same treatment.

1          And that way I don't think we need to build in the

2 extra step, and I think that your interests can still be

3 protected.

4          MR. LOVETT:  Can I ask a question, Your Honor?

5          THE COURT:  Yes.

6          MR. LOVETT:  Is it envisioned that the government

7 would do this procedure that you just described through a

8 taint team?

9          THE COURT:  I have thought about that, and I had

10 comments on that.  I think I even mentioned something about

11 it the last time we were here.

12          But I think in the end it's the government's call

13 how it conducts its business in-house, and I don't think

14 it's our place or anybody else's place to instruct them how

15 to do that.

16          MR. LOVETT:  So in addition to my communication

17 and my firm's communications with Mr. Behman and Gibson

18 Behman -- my firm represented Gibson Behman -- there's a

19 whole host of documents that are on the server that postdate

20 Gibson Behman, and I would ask that those be excluded, as

21 well.

22          THE COURT:  Well, if they're not responsive,

23 they're not going to be produced in any event.

24          So are you talking about documents that otherwise

25 would be considered either a statement of the defendant or

1 Brady or material to preparation of a defense, or are you

2 saying these have nothing to do with this matter?

3        MR. LOVETT:  I'm talking about documents belonging

4 to Behman Hamilton that were created after the firm

5 dissolved.  Mr. Gibson left the firm in March or April of

6 2011.

7        THE COURT:  All right.  But if I understand you

8 correctly, if these documents have absolutely nothing to do

9 with the lawsuit, no bearing on anything, they're not going

10 to be deemed to be pertinent.  They're not going to be

11 responsive, and they won't be produced in any event.  So

12 those, I like to think, won't be an issue at all, because

13 they won't be produced.

14        MR. LOVETT:  Your Honor, I understand your ruling,

15 but I would ask for the following caveat.  Before anything

16 gets produced, I would like the opportunity to review it.

17        THE COURT:  I can't endorse that as a blanket

18 proposition, because I have no idea how much information

19 we're talking about.  And I can just imagine that's going to

20 --

21        Number one, I don't know the mechanics.

22        Now, if you want to talk to Mr. Heymann and he's

23 prepared to share with you what he intends to turn over as

24 responsive, I'm not here to say that's a bad idea.  I'm just

25 not -- I just don't know enough to know that it's practical

1  for us to order that.

2          And honestly, because this is evidence that's in

3  the government's possession, I'm trying to analogize it to

4  any other type of scenario, and we wouldn't usually have a

5  third party -- a non-party coming in and saying, well, let

6  me decide for you whether to turn that over.

7          MR. LOVETT:  The concern I'm trying to get at is

8  my client has his own clients, and those communications and

9  those information is on that server.  My client has an

10 ethical duty to protect that information, and there may be

11 an obligation to notify those clients if that information's

12 going to be turned over.

13         THE COURT:  All right.  So I've got two responses:

14         One is it seems to me in a vacuum most of those

15 documents would not be responsive, so they wouldn't be

16 produced;

17         And secondly, -- and maybe it's part of the first

18 -- is if the defendants were going to seek that, you'd still

19 have your day in court, because they'd have to seek that

20 through the Rule 17 subpoena, because the government's not

21 going to be producing that.

22         I can't imagine -- unless somebody tells me --

23         Please, for my edification, are there documents

24 like that that could be deemed to be responsive?  Because in

25 the civil setting I think Mr. Lovett's right.  We would give

1 the non -- that third party, non-party, whatever we want to

2 call him, we would give him a chance to come in and say

3 whatever you do here, don't let them see that.

4        I know, Mr. Weinberg, you were going to say

5 something, but Mr. Heymann was popping up a couple of times.

6        MR. HEYMANN:  Your Honor, the problem with the

7 proposal is this.  If relieved of our obligations under the

8 agreement as the Court has described, it would be the

9 government's intention under these circumstances simply to

10 turn over a copy of the server to the defendants.  You know,

11 it contains immense amounts of information, and it otherwise

12 simply invites a --

13        First of all, I don't know the nuances, and we'll

14 never know the nuances until trial of the defendants'

15 arguments as to what they need and why they need and why

16 it's therefore helpful to them in the preparation of their

17 defense.  We would, of course, separate those things that we

18 intend to use or have otherwise been highlighted.  So it's

19 not just a massive disclosure, but in the normal course of

20 things we would be overly inclusive.

21        We would provide the server to them.  We might

22 reach an agreement with all the parties that we put in -- we

23 essentially created a subset where there was absent a

24 specific request by the defendants anything after the

25 dissolution of the firm, because there's no material

1 information as far as I know that relates to the offense

2 here after the dissolution of the firm.

3          We would find a date.  Whatever the date was, we

4 would find a date so there would be a later preclusion.

5          But otherwise, what the government would do to

6 ensure that the defendants got what they needed to prepare

7 for trial and had an opportunity to go through it is we

8 would create either a full image of the server or a -- you

9 know, an image that excluded later dates, that excluded the

10 Behman Hamilton successor firm period, and also maybe

11 excluded attorney-client things.

12          But that is the only way that the government can

13 ensure it's fulfilling its obligations, and it would just do

14 it.  In fact, it would have done it by now but for the

15 agreement and --

16          THE COURT:  Okay.  I guess I'm curious then,

17 because I tabbed it -- the correspondence with Mr. Lovett

18 contemplated this possibility, and back in July he said in

19 the event that the grand jury returns an indictment, defense

20 counsel may request copies of the mirror images.  In the

21 event that such a request is made, I would request that any

22 production of information be subject to the same protocol

23 described above to avoid disclosure.

24          So but it sounds like you're proposing just

25 turning the whole thing over not subject to the protocol

1 that you had reached with Mr. Lovett; is that right?

2          MR. HEYMANN:  Right.  The protocol contemplated

3 his reviewing for privileged material, --

4          THE COURT:  Right.

5          MR. HEYMANN:  -- and the Court is replacing that

6 with a protective order.  And that it's intended to protect

7 the same -- protect the rights consistent with it.

8          THE COURT:  Oh, I see.  Okay.

9          MR. HEYMANN:  So we would in the normal course --

10          THE COURT:  I thought you were proposing doing

11 that in lieu of.

12          Okay.  So you're saying with the protective order

13 in place your intention would be just to turn over a copy of

14 the server.

15          MR. HEYMANN:  Unless an agreement could be reached

16 to simply carve out a -- you know, put in a date ending

17 point to ensure that Behman Hamilton which is using the same

18 server doesn't have their stuff turned over, that it's only

19 the earlier period.  But if it couldn't, we'd turn over the

20 whole server.

21          THE COURT:  Okay.  And I guess -- you know, I mean

22 --

23          It's curious I find myself now in the position of

24 advocating for the non-party here, but it seems then that

25 all of --

1          It seems then that unless we really build

2 something in that's not built in by this, nonresponsive

3 privileged material is going to be turned over to the

4 defendants.

5          MR. HEYMANN:  The problem is that the government

6 is not in a position to determine what is useful to --

7          I forget what the magic words of Rule 16 --

8          THE COURT:  Right.  We make them up as we go on

9 here.

10          MR. HEYMANN:  For the defense here when there has

11 been as broad a description of that as Mr. Weinberg has

12 given and Mr. Solomon has adopted.  And that also is -- you

13 know, there are, I don't know, tens of thousands, hundreds

14 of thousands, of potential documents and records that could

15 fit that description; and so therefore -- maybe more.  But

16 therefore, we would simply turn it over to allow them to

17 evaluate it.

18          We would, of course, do our own independent

19 evaluation of things that we're looking for on the same set

20 of server -- same portion of the server, but in terms of

21 making sure that the defendants had what they needed, we

22 would turn over the whole thing.

23          MR. LOVETT:  Your Honor, may I respond?

24          MR. WEINBERG:  May I be heard, Your Honor?

25          THE COURT:  Yes.  Let me here Mr. Weinberg first,

1 Mr. Lovett; and then you can respond to both.

2         MR. WEINBERG:  You know, I agree with Mr.

3 Heymann's recommendation to the Court.  Under Rule 16 under

4 other circumstances absent this agreement which Your Honor

5 has correctly zeroed in on in the language that there was a

6 voluntary turnover and it was foreseeable to Mr. Behman at

7 the time that there was going to be criminal law

8 obligations, Mr. Behman was cooperating in a criminal tax

9 investigation that I would suggest Mr. Lovett and Mr. Behman

10 incited.

11         This server which they gave to the government was

12 going to become Rule 16.  The breadth of relevance is quite

13 large.  It cuts through the dichotomy of non-client and

14 client files.  Where I think it doesn't cut through is --

15         I think that two cuts can be made, and it can be

16 done through almost a dichotomy in the search; which is,

17 this should have been a separate server.  Mr. Behman without

18 any authority on his own -- I'm sure without Mr. Lovett's

19 knowing consent -- essentially took one law firm's private

20 confidential information and disclosed it to another law

21 firm with new lawyers, new employees, new clients.  So in an

22 odd way Mr. Lovett is standing up for the Gibson Behman

23 clients, but they were largely Mr. Gibson's clients, and he

24 has agreed to a protective order.  He is going to be

25 obligated to this Court to maintain the confidentiality of

1  anything he sees that relates to a former client.

2          I would suggest he's got more rights to see that

3  not only as a criminal defendant but as a prior lawyer than

4  a secretary at Behman Hamilton.

5          The clients have never waived --

6          THE COURT:  I'm with you that he's got the right

7  to see it, but.

8          MR. WEINBERG:  And I don't want to disclose it.

9  --

10         THE COURT:  Right.  The problem is right now it

11 seems like everybody is saying let's just -- now nobody is

12 distinguishing between pertinent, responsive, privileged,

13 non-privileged.  Now it's just all going over; and

14 meanwhile, Mr. Lovett --

15         I think he does make one valid point.  There are

16 some clients who have absolutely nothing to do with this,

17 whose dirty linen is now going to be provided to everybody.

18         And what I was trying to do was at least build in

19 a few steps that allowed us to weed out that with everybody

20 paying some attention to it, and that's now being

21 eliminated.

22         So how do we ensure --

23         I mean, it bothers me in a sense that nobody's

24 even going to be even passing on whether what I'm handing to

25 you now is Brady, what I'm handing to you now is pertinent

1 or not.  Nobody has to make that determination, because

2 we're just turning the entire server over.

3          It also eliminates the options that somebody like

4 Mr. Lovett would have in a Rule 17 context to get somebody

5 to go through and make some distinctions so that stuff that

6 clearly shouldn't be seeing the light of day doesn't see the

7 light of day.

8          I guess if I'm going endorse this, it means, boy,

9 that protective order really needs to be strong.

10          MR. WEINBERG:  And I would say this, Judge.  You

11 know, there's a very big difference between a very narrow

12 universe of people looking at a file, looking at a law firm

13 server and not disclosing it than those people being able to

14 disclose it.  So you may have a hundred documents or a

15 thousand documents that would be theoretically client

16 protected.

17          Mr. Gibson, as their lawyer, although disbarred,

18 but with confidentiality obligations; you know, he wants to

19 be a lawyer again, and he's going to sign a protective order

20 and put himself at risk of contempt much less an enhanced

21 sentence were he to disobey it, culls from those documents

22 what's exculpatory.

23          Then, Your Honor, and Mr. Lovett would have all --

24 we'd all have a chance.  Mr. Gibson would say the following

25 ten documents by Bates stamp or by identification are the

1 only ones that are conceivably facially privileged that I

2 think the Sixth Amendment requires be counter weighed by my

3 constitutional right to a defense instead of having

4 privilege logs or taintings.

5         Or the worse thing would be Mr. Behman who's a

6 deeply biased whistle blower having any control over what a

7 criminal defendant -- when he helped make the case against

8 the defendant.  He can't get the server back and be the

9 referee.

10        THE COURT:  Well, as I understand it, he's not

11 asking to be the referee.  He's just asking to be one who

12 participates in determining whether a document is

13 privileged.  In which case special care should be given

14 before that document is turned over.

15        MR. WEINBERG:  But there's a certain audacity to

16 Mr. Behman who has exposed it to a hundred people saying I'm

17 going to be the guardian now --

18        THE COURT:  But I'm not getting into any of that.

19        MR. WEINBERG:  -- of the privilege.

20        THE COURT:  I'm trying to just view this as kind

21 of a law school exercise here.

22        So it sounds like -- maybe the government --

23        MR. LOVETT:  Your Honor?

24        THE COURT:  Hang on.

25        That the government and the defense are kind of on

1  the same page as to how to proceed, so.

2          MR. WEINBERG:  And just so I'm clear, I agree with

3  the two cuts.  I'm not interested in Bill's conversations

4  with his client.  I'm not interested in Behman Hamilton --

5          Of course I'm interested, but I can't -- it's not

6  Rule 16 for the post Gibson Behman materials that are the

7  Behman Hamilton server to be turned over.  But I do believe

8  that the most appropriate way of addressing it is the Rule

9  16 with my getting the server with a very tight protective

10 order, and with Mr. Mr. Gibson or Mr. Kesner not being able

11 to disclose or use a document other than allowing their

12 lawyers to see it without notice to everyone, notice to the

13 clients, an opportunity at that point --

14          I think that's the only appropriate role for Mr.

15 Behman.

16          THE COURT:  And that was the -- you intimated -- I

17 mean, you started to talk about this, so please don't sit

18 down.  Just finish your thinking on that last part.

19          So what happens if at the end of it you come up

20 with ten documents that are extra crucial to you, and they

21 are arguably privileged?  You want to make use of them in a

22 proceeding.  What is it that you're contemplating?

23          MR. WEINBERG:  So at that point I don't disclose

24 them except perhaps by identification of a Bates stamp.  I

25 provide the Court with notice.  I provide Bill Lovett with

1 notice.  I think we provide the client with notice that they

2 can intervene, the government with notice.  And then Your

3 Honor would have a very engaging delicate challenging

4 balance.

5          The cases I provided you are not the only cases.

6 There's a kind of intersection in the law between privilege

7 and the Sixth Amendment and can Mr. Gibson support a

8 constitutional argument where in a document-by-document

9 basis the privilege would be outweighed.  Your Honor would

10 make those difficult legal rulings.  But better we're

11 dealing with ten pages of documents than hundreds, and

12 that's why I'm --

13          THE COURT:  I like that idea.  Just so it's clear,

14 but that would probably ultimately be Judge Talwani's call

15 because -- unless --

16          Well, you'd probably be using it in either a major

17 pretrial proceeding or trial, in which case it would be

18 Judge Talwani making the determination rather than myself.

19          But I like that approach, Mr. Lovett, because

20 ultimately it still gives you and your clients a chance to

21 come into court to say we don't think that document should

22 see the light of day.  So what do you think of that?

23          MR. LOVETT:  The privilege is waived once it goes

24 over because Mr. Kesner will need it.

25          THE COURT:  Wait.  Before you go on.  I'm not

24

1 sure.  I meant to bring the rules with me.  I was looking at

2 Rule 502.  I don't know if any of you have it here.  I want

3 to say --

4          That might give the Court authority to actually

5 say no waiver occurs by the disclosure of use.  I just don't

6 have it here in front of me, and I meant to kind of

7 incorporate that into it.  But I think we can do what we can

8 so that there is no waiver affected by the use of any of

9 these.

10          MR. LOVETT:  So I have a couple of points.  One,

11 my brother's made a lot of the fact that these documents now

12 reside on a Behman Hamilton server.  When Gibson Behman was

13 dissolved, there was a protocol put in place by Gibson's

14 then counsel and myself to notify clients, and the client

15 made the choice:  We're going with Gibson; we're going with

16 Behman.  And the files were transferred based on the

17 client's instructions.  So the files that are --

18          And Mr. Behman had every right to take those files

19 for the clients that stayed with him, and most of them did

20 stay with him.

21          My second point is the government's Rule 16

22 position violates the agreement they have.  They are now

23 going to take --

24          THE COURT:  It might, but it trumps the agreement.

25 At least that's my conclusion.

1          MR. LOVETT:  And my position is the government is

2 bound by that agreement.

3          THE COURT:  Well, I don't think the government can

4 make an agreement that dissolves it of its responsibilities

5 to comply with the discovery rules; and moreover, I should

6 say --

7          If you want to have that discussion, I mean -- I'm

8 not going to say it's overt, but I think an argument can be

9 made you knew there was a risk when you provided material

10 like this to the government that the government might have

11 to turn around and disclose it in the context of a criminal

12 proceeding.  And what you asked for was the chance to see

13 whatever it is they might want to produce before it got

14 produced.  It wasn't an agreement that we will never turn

15 this over.

16          MR. LOVETT:  The risk is that the government would

17 identify Rule 16 material and turn it over.  The

18 government's proposing now not to go through that exercise

19 and just turn the entire server over.

20          The information in this server goes back to the

21 early 2000s.  There's tens of thousands of emails.  There's

22 tens of thousands of documents.  There could be other

23 communications between my client and other counsel.  It is

24 --

25          THE COURT:  As a problem solver, how else would

1   you then ensure that the defendants in this case get access

2   to responsive non-privileged material on the server?

3          MR. LOVETT:  I would follow the protocol that I've

4   laid out in our brief, which would be the way you would do

5   it in any other scenario.  It would be search terms.  It

6   would be data range.  Those documents would be produced.

7   We'd review them for privilege, provide a privilege log,

8   produce the documents.

9          THE COURT:  Do you have any authority where that

10  was done in a criminal context?  in a criminal case in this

11  sort of setting where the --

12         Because, in essence, you're asking yourself as a

13  non-party to be allowed to make the determination -- at

14  least part of the determination as to what should be

15  produced and --

16         MR. LOVETT:  And I don't have an issue with what

17  you described earlier where the government makes the

18  determination, but the government's determination appears to

19  be here's the entire server, and that doesn't work from our

20  perspective.

21         I mean, I think the government if they followed

22  the protocol that you outlined initially, they would have a

23  taint team.  They would review the documents based on what's

24  discharged in the indictment to determine what's relevant

25  and exculpatory, and then would produce it.

1          I mean, that's the way it works in every criminal

2  case.  I don't think the government can now credibly say,

3  "We're not going to engage in that exercise.  We're just

4  going to turn the entire server over."

5          So I think that --

6          What I just described is the middle ground.  I

7  agree with you.  I realize it's a long process.  I realize

8  that it's, you know, onerous on the government.  I've

9  offered to do it if they produced the documents to me.  I

10 understand counsel has an issue with that.

11         But at the end of the day, this is how the process

12 works when the government seizes a server and there's

13 privileged information on the server.  This is; albeit,

14 because the server's from a law firm and most of the

15 information on that server by definition is privileged, but

16 there's a way to do this while respecting the client's

17 privilege, and my client's privilege and providing the

18 information that Mr. Gibson feels he needs to defend this

19 case.

20         I've said this before.  There was extensive

21 discovery in the civil proceeding, and we went through this.

22 We did search terms.  We produced emails.  The individual

23 that were identified in Mr. Gibson's motion, those email

24 boxes were turned over.  Behman's emails that had anything

25 to do with the finances of the firm were turned over.  There

1 were tens of thousands of documents that were produced.

2          And frankly, I don't know what else is on the

3 server that would be in any way relevant to any of this.

4          I appreciate the motion and what the response is,

5 but there needs to be a way to do this without just handing

6 the server over.  I'm concerned my client is going to be

7 cross examined on my communications with him, and certainly

8 that's not appropriate.

9          THE COURT:  As we're contemplating, that couldn't

10 happen; right?

11          MR. LOVETT:  I understand the order.  I don't know

12 that couldn't happen.  This is a technical problem, and I

13 don't know how you would go about extracting all that

14 information from the server.

15          I've looked into this.  After the hearing -- the

16 last hearing I provided my copy of the server to a discovery

17 vendor, and they told me just to get the server up so you

18 could look at the documents it was going to cost $5,000.

19 And then they would then have to identify what is on the

20 server that could be searched.

21          There are documents.  There are emails.  But

22 there's also software.  There's operating systems.  There's

23 things that have nothing to do with any of this.

24          So there needs to be a way to search for relevant

25 documents and emails that Mr. Gibson can use in his defense.

1          And as I've said, we've produced email boxes, we

2 produced Garrity's, we produced Nancy Jones', we produced

3 Gibson's email box.  He has those.  We've searched for

4 documents related to the finances of the firm.

5          It seems to me that we can conduct a similar

6 search or the government can conduct a similar search, and

7 we arrive at the same place without implicating my client's

8 privilege and his client's privilege.

9          THE COURT:  When you did this in the prior civil

10 proceeding, how long did the process take?

11          MR. LOVETT:  It took a fair amount of time, and it

12 cost a lot of money.

13          THE COURT:  What's a fair amount of time, and how

14 much money?

15          MR. LOVETT:  I think we did discovery over a

16 period of at least a year.

17          THE COURT:  And what was the cost?  Roughly.

18          MR. LOVETT:  You know, I would say that the cost

19 to my client was probably about $50,000 between my time --

20          THE COURT:  I mean, the benefit -- yeah, the

21 benefit of what they're talking about here --

22          And I'm not disagreeing with any -- I'm not

23 disagreeing with the logic of what you're saying, but the

24 benefit of what they're talking about here is we save that

25 year, we save the fifty grand, and we still protect your

1 rights so that documents shouldn't be used --

2          MR. LOVETT:  Well --

3          THE COURT:  At least as they're envisioning it.

4 And I'm not asking you to respond.  I'm just saying that

5 there's some competing interests here.  I'm trying to

6 balance them --

7          MR. LOVETT:  I understand that.  I don't think the

8 process you've just described should take a year, but I

9 object to having a server just handed over to defense

10 counsel.  It's not to what we agreed to by the government.

11          My client owes an ethical duty to his clients not

12 to have that happen.

13          He certainly doesn't want his communications with

14 me turned over.

15          THE COURT:  Yeah, I mean, if it were -- I'm not

16 trying to inject myself in this to this extent.  If it were

17 ordered by me, the government wouldn't be violating

18 anything.

19          And I suppose that when I was thinking about this,

20 I was trying to think about this not from the point of view

21 of doing it pursuant to or in harmony with the agreement

22 that you had with the government.  I wasn't trying to

23 contravene it on purpose.  But I do think the primary

24 interest here is the defendant being entitled to receive

25 that evidence that's in the government's possession that the

1 government is obligated to disclose.  I think that has to

2 control.

3          MR. LOVETT:  And I appreciate the Court's decision

4 on that.  I think the issue is that the government's

5 response to that is to satisfy their Rule 16 obligations,

6 the government isn't going to look through the server and

7 determine what's relevant or exculpatory or material to

8 defense; they're just going to hand the server over.

9          THE COURT:  Well, one thing I've never been able

10 to quite appreciate is whether that's too Herculean a task

11 to ask anybody to do.  There may be just too much

12 information on there in too unspecified of a format by

13 review of file names for any one person to determine what

14 should be produced and what should not.

15          Maybe this is the only way that it can be done,

16 which is to turn it all over, and then trust everybody to be

17 on their best behavior to protect the integrity of the

18 evidence.

19          MR. LOVETT:  I appreciate that.  But again, the

20 way this would work normally is you would want search terms.

21          THE COURT:  I know that.  I know that.

22          MR. LOVETT:  I can't run the risk of having my

23 communications with my client turned over to the defense,

24 and I can't run the risk of having my client's clients --

25          THE COURT:  Well, let me ask you this.  Couldn't

1 we do some searching before you turned over the entire

2 server; such that, we can actually identify categories of

3 stuff that really are never going to be relevant in any way

4 in this case, communications between Mr. Lovett and other

5 folks; such that, what you ultimately do turn over wouldn't

6 have that?  Isn't that possible?

7           MR. HEYMANN:  If I may just briefly, Your Honor?

8           THE COURT:  Yeah.

9           MR. HEYMANN:  First, I am concerned that whatever

10 resolution that we reach, if it involves turning over

11 anything without prior review for attorney-client privilege,

12 puts the government at odds -- candidly, defense counsel, as

13 well -- potentially with the rules of professional

14 responsibility by facilitating Mr. Lovett to violate his

15 client or Mr. Behman's violation of his clients'

16 attorney-client privilege.

17           Whatever mechanism we come up with I think I'm

18 going to personally ask for an opportunity to return to the

19 Court if once provided to the Professional Responsibility

20 Advisory Office in main justice.  If they say, no, this is

21 problematic, to come back to the Court and say I can't

22 ethically do it, but we're working at what that solution is.

23           THE COURT:  All right.

24           MR. HEYMANN:  And the defense counsel may well

25 want to speak to the Board of Bar Overseers in the same

1  regard, an advisory opinion that says it's fine.  But we

2  can't seek an advisory opinion until we know what we're

3  seeking an advisory opinion for.

4           The second piece is that is the following.

5           THE COURT:  Before you go on, just to spin that

6  out, though, are you saying, therefore, that it's possible

7  you might come back and say somebody actually has to look at

8  the contents of the server, identify attorney-client

9  communications and separate those before disclosures are

10 made?

11          MR. HEYMANN:  Before disclosure is made to a third

12 party, counsel has to have the opportunity to review them

13 for privilege, and then if necessary seek the client's

14 review.

15          What I was going to suggest as an alternative, but

16 it can only be done with the agreement of defense counsel,

17 is the following.  When you have a server, you have to

18 search for something.  I have already set in motion to have

19 a copy of the server sent up -- I believe it's to New York,

20 but don't hold me on the New York part -- to a separate

21 agent, a separate forensic agent who could undertake

22 searches.

23          The purpose simply being that as benign as it may

24 be to search for the word "bill," I did not want there to be

25 a question as to whether or not the word that was being

1 searched for defense counsel was in some way informing the

2 government.

3          THE COURT:  Okay.

4          MR. HEYMANN:  We could collect those words.  How

5 long it takes to do the search will depend on whether

6 there's 25 words or 250 words, but we could collect those

7 words.  They could be transmitted directly by defense

8 counsel to the filter forensic agent.  That could be run.

9          I don't know how many documents that will produce.

10 Those could be provided to Mr. Lovett on a very -- not a

11 one-year time frame, but if we're trying to make this work,

12 it would have to be a constrained time frame.  And then we

13 would know whether there was a claim of privilege to a

14 thousand documents or a claim of privilege to ten documents

15 and what the nature of the claim of privilege was.

16          Defense counsel may be able to push aside a big

17 bunch, but we'd at least have a finite problem, and there

18 would not be any premature -- not premature, but disclosure

19 without client approval of any privileged communication.

20          And the location -- the locating of the documents,

21 first of all, wouldn't be at anybody's expense other than

22 the government's.  We've mounted it.

23          But second of all, it would not be any different

24 than what defense counsel would be doing with their own

25 people, because you have to search for something.

1          THE COURT:  Right.

2          MR. HEYMANN:  And so that is the sort of

3  alternative mechanism that avoids the potential professional

4  responsibility or professional conduct problem and keeps it

5  tight.

6          THE COURT:  All right.  So in this investigation

7  the vendor gets a search term that's provided to the vendor

8  by, say, defense counsel, and that term comes up with a

9  bunch of documents.  And when you say they would then be

10 shown to Mr. Lovett, what would be shown to Mr. Lovett:  the

11 actual documents, the file names, or what?

12         MR. HEYMANN:  He would be provided with a disk

13 that contained the actual documents, a constrained period of

14 time identified by the Court to review them and to create a

15 privilege log.  The privilege log would be provided to

16 defense counsel.

17         THE COURT:  Right.

18         MR. HEYMANN:  They, in turn, would simply say,

19 look, these ones that came up we don't need to have any

20 worry about.  These subset we do.

21         And then there can be a question of what the

22 access is going to be to that much smaller set or use of

23 that much smaller set.

24         THE COURT:  Okay.  But what about then with

25 respect to what's really driving this, those documents that

1  are material to the defense -- I'm not talking about

2  privilege documents, but, you know, responsive material,

3  exculpatory, pertinent.  Just things that the defense would

4  be interested in seeing because it might help them think

5  about how to present their case.  How are those documents

6  identified and turned over?

7          MR. HEYMANN:  They are identified by the --

8          You know, this is why I said it had to be by

9  agreement.  Defense counsel would have to agree that the

10 government running these search terms satisfied those

11 obligations.  In the absence of that, the government still

12 has to turn over everything, because there's just way too

13 much for any human being or any group of human beings to

14 review, and it's way too impossible to figure out what the

15 utility is going to be of a particular document to or range

16 of documents to the defense.

17         THE COURT:  So when you say the government running

18 the searches, are you talking now about your office, or all

19 of this being done by the vendor?

20         MR. HEYMANN:  I'm just thinking it could be remote

21 vendor.  I'm just taking --

22         THE COURT:  Okay.

23         MR. HEYMANN:  I'm taking the cost away from the

24 defendants --

25         THE COURT:  Right.

1          MR. HEYMANN:  -- and Mr. Lovett by saying, look,

2  we will mount this.  We will get this mounted on a part of

3  the -- an IRS -- on the part of the IRS and looked at by

4  part of the IRS that has no contact with us in the case.  So

5  there's no issue of --

6          It's essentially a filter team.  You know, so

7  there's no issue of our understanding what they're searching

8  for.

9          But unless there's an agreement that that

10 satisfies it, then there is so much on the server we have to

11 turn it over, and we just have to get permission or

12 recognition in advance that it's not violative of the rules

13 of professional responsibility.

14         THE COURT:  Yeah.  And also I'm not sure that in

15 that version you're talking about, though, that that person

16 -- whomever that vendor is would be in a position to

17 identify truly pertinent documents.  I could see where they

18 could with search terms be able to figure out, okay, this is

19 an attorney-client communication.  You know, we're going to

20 put this aside so people can look at it.  But they wouldn't

21 necessarily know an email from Sally to Mary --

22         MR. HEYMANN:  In that version whoever's doing it

23 is a dumb machine.  They are simply producing -- they are

24 producing everything that has the search term in it that's

25 provided there, so there's no pertinenance review.

1          THE COURT:  Right.  Mr. Weinberg?

2          MR. WEINBERG:  Just a couple of things.  One, I do

3 think that Mr. Behman's counsel may have inadvertently

4 misspoke.  My understanding is that the Gibson Behman server

5 was migrated to the Behman Hamilton server.  I think Mr.

6 Lovett suggested that only those parts of the Gibson Behman

7 server that had clients that chose to be Mr. Behman's

8 clients were migrated.  I've seen emails, you know, that

9 indicate that there was a wholesale transfer of the Gibson

10 Behman server which included past and current clients that

11 didn't become clients of Behman and Hamilton who didn't give

12 their permission for another set of lawyers to look at their

13 confidential files.

14          If I'm wrong, Mr. Lovett can say so.  But I've

15 seen emails that are not emails with Behman's later clients,

16 emails with Gibson's prior clients.  And that's just a

17 factual correction.

18          But I have a couple of other points that I think

19 should be made.  One is that whatever the privilege log

20 procedures that might be used with others, Mr. Gibson wasn't

21 their lawyer, was a two-thirds owner of Gibson and Behman.

22 The server is his as much as it's Mr. Behman, but for the

23 unauthorized integration of the Gibson and Behman property.

24 And I think he's at different footing than a stranger.

25          THE COURT:  I would agree with you if we were

1 talking about the server that he's got in his hand, but

2 we're not.  We're talking about the server the government

3 has in its hands.

4        MR. WEINBERG:  But the government should they give

5 me --

6        THE COURT:  They didn't get it from Gibson.  I

7 know what you're saying, but I'm not thinking about it the

8 same way.  So that only gets you so far.

9        MR. WEINBERG:  But should the government give me

10 the server narrowed to the Gibson Behman portion of the

11 server, they're giving it to the lawyer that was the

12 principal shareholder in the law firm.  They're not giving

13 it to some third party to look at client files that Mr.

14 Gibson didn't have complete authority to look at through the

15 duration of the law firm.

16        Third, is that in terms of Brady, in terms of

17 relevance, I think Mr. Heymann -- we're not going to come to

18 an agreement on narrowing what I ought to look at.  Not

19 disclose, but look at.

20        I think we can extract out technically anything to

21 do with Bill Lovett.  We can figure out a way to do that.

22 If there's any gray, we can figure out a way to have Bill

23 part of that process.

24        But he should not be part of a relevance process.

25 We should be dealing with this as a criminal case that

1 there's much on that server that cuts across client and

2 non-client files and goes beyond civil litigation.  That

3 there's relevant information in client files.  There's

4 relevant information that demonstrates Mr. Gibson had zero

5 to do with tax compliance.  That requires me to look at

6 different files.

7         What I want to disclose, again, Your Honor, may be

8 anything from zero to ten to fifteen, but it's going to be a

9 small subset and a manageable subset of the universe of

10 relevant materials.

11         THE COURT:  All right.  I'm not sure we can

12 resolve this today, but this is helping.  So here are the

13 parts of it I like.

14         Hang on, Mr. Lovett, and then tell me what you

15 think.

16         I do like the concept of at the front end before

17 anything is disclosed to anybody, we're now talking about

18 the server the government has -- that searches are conducted

19 to identify categorically things that everybody can agree

20 are never going to be of any value to anybody in this case.

21 No pertinenance.  So communications between Mr. Lovett and

22 others, clients of the firm that are fortuitously on the

23 server that have absolutely nothing to do with this whose

24 interests should not be a part of this law firm.  If

25 searches can be conducted to identify that information such

1   that it can be removed or separated from the server, that

2   should be done.  That should be done as an initial matter.

3        As a second phase, I'm warming to -- still with

4   some ambivalence but warming to the notion of the government

5   then -- because it's most practical -- turning over the

6   server to the defense.  That has its drawbacks, but I think

7   it's the best way to ensure that anything that is responsive

8   and should be turned over does get turned over.  And that

9   it's done pursuant to a very restrictive protective order,

10  which thirdly, as Mr. Weinberg suggested, would have

11  conditions in place such that the defense would have to show

12  that information to the government, to yourself, and court

13  permission would have to be given before those limited

14  documents could be used.

15        And I think then we are talking about some

16  privileged documents that somehow made it through the

17  front-end search, but these would be privileged and

18  responsive, and so I suppose they would have always made it

19  through.

20        But you would still have the ability to fight in

21  some fashion.  I can't say what the dynamics would be at

22  that point, but it's contemplated you and the government and

23  the defense would all be able to hash out whether that

24  information should be used.

25        So broadly speaking, I like that approach.  I

1 think it balances -- there's a real practical consideration

2 here.  It balances the time and money that otherwise we

3 would have to expend if we were going to do this the

4 traditional way, Mr. Lovett.  But I also think it protects

5 your core interest which is your clients not having to worry

6 and you not having to worry about communications that

7 shouldn't be used or shouldn't be seen being exposed or

8 disclosed in this case.

9          MR. LOVETT:  And I appreciate, and I to some

10 extent agree with that approach.  What I don't know is how

11 you accomplish the first part, which is identifying --

12          THE COURT:  You smart people can get together and

13 work that out; can you not?

14          MR. LOVETT:  Well --

15          THE COURT:  Hasn't that already been done?  I

16 mean, that's all I've been hearing is that --

17          MR. LOVETT:  We've been trying.

18          THE COURT:  -- search terms were used.  People are

19 given search terms.  It's identifying files and then --

20          MR. LOVETT:  But there's a threshold issue, it

21 seems to me, that's here.

22          And we briefed the issue of when an attorney can

23 disclose a client confidence or a privileged communication

24 to defend against a criminal case.  The ethical rules limit

25 that disclosure to when the attorney's accused of a crime by

1  a client, when the crime involves the activities of a client

2  or --

3          THE COURT:  Are you talking about when somebody in

4  Mr. Gibson's position, for example, would be able to use it?

5          MR. LOVETT:  Yes.  Assuming he still had his law

6  license.

7          THE COURT:  Okay.  But we've built that in.  That

8  would be litigated before it could be used, and you would be

9  able to -- or whomever would have standing to kind of

10  advance that.

11          But certainly if your client's interests or your

12  interests were at stake in the disclosure of that

13  information, you'd be able to articulate your concern.  So I

14  think this would still give you the ability to say this is

15  not one of those instances where he should be permitted to

16  use that material.

17          MR. LOVETT:  So just so I understand what the

18  Court is proposing, it would be two cuts.  Perhaps three

19  cuts.  Things that would just be completely removed from the

20  server.

21          THE COURT:  That's the first cut.

22          MR. LOVETT:  So the first cut would be anything to

23  do with Behman Hamilton.

24          THE COURT:  Well, I don't know what the scope of

25  it is, but there would be a first cut.  Anything that

1 shouldn't be used.

2          I don't know if it's too much for me to hope that

3 we could have unanimity on that, on what should not be at

4 play in this case, but that would be the first cut.

5          MR. LOVETT:  Okay.  So my communications, my

6 firm's communications with my client, as I understand it,

7 there would be a cut of clients that had nothing to do with

8 this case.

9          THE COURT:  First cut, whatever everybody agrees

10 --

11          You know, it just happens to be on the server,

12 wish it wasn't on the server, we don't need it, everybody

13 agrees:  Take it off.  That's the first cut.

14          Then there would be if you want to call it a demi

15 cut at the very end; that small set that the defense says --

16 has identified as material it wants to use.  Before anybody

17 can use it, that would be litigated.

18          MR. LOVETT:  Okay.  So I appreciate that approach,

19 and I agree with it to some extent.

20          I think as a practical matter what we're not

21 talking about the server.  We're talking about documents and

22 emails on the server.  I'm not aware of anything else that

23 --

24          THE COURT:  I don't know what's on it.

25          MR. LOVETT:  Well, I know there are documents and

1  emails, but I'm not aware of any other data on the server

2  that could potentially be relevant.  So if we could narrow

3  this to a more manageable scope, documents and emails.

4          THE COURT:  Well, now you're starting to do what I

5  was being kind of told we can't do, which is almost --

6  you're moving towards what's pertinent, and I'm not sure we

7  can do that here.

8          Now, if what you're telling me is if you take out

9  documents and emails, there might be software, there might

10 be JPEGs, there might be videos; but because of the nature

11 of this case and because of what everybody understands about

12 this case, we all know that any photographs and videos on

13 there are of absolutely no relevance whatsoever, and we can

14 then exclude anything in that format from the search, if

15 that's what you're saying, I mean, as long as everybody

16 agrees, I don't have problem with that.  But that's got to

17 be something everybody agrees to.  I don't know enough to

18 know that anything outside of documents and emails would be

19 irrelevant.

20         MR. LOVETT:  Frankly, I don't either.  I haven't

21 looked at everything that's on the server.  I've looked at

22 documents and emails.

23         THE COURT:  Yeah, I'm just not sure you're going

24 to get people then to agree if nobody can say with certainty

25 that --

1           I mean, do you guys know that outside of documents

2  and emails there wouldn't be anything of relevance on the

3  server?

4           MR. HEYMANN:  I can't say that, Your Honor.  I

5  mean, there are photographs that are going back and forth.

6  They may well be relevant in the case.  I mean, I didn't

7  come in focused on that question, but there are --

8           I don't recall any videos in this one, but I do

9  recall photographs that are potentially relevant.  There's

10 certainly photographs that are part of emails that are

11 potentially relevant.

12          So there is -- it would not be possible to make

13 that kind of cut.  I can also --

14          You know, there's also the question of whether the

15 metadata associated with the emails showing when it left,

16 when it didn't, who had access to various computers.  I

17 don't think it would be possible to limit it in that way.  I

18 am --

19          I do want to just return to the fact that at least

20 I feel obligated to contact the Professional Advisory

21 Responsibility Advisory office simply because while there is

22 no disclosure to the public, as it were, of any privileged

23 document without -- or potentially privileged document

24 without argument, there is an internal disclosure that's

25 going on in a complicated way to somebody who is no longer a

1 member of the bar, who's disabled -- I mean, it's an

2 indefinite suspension which under the -- makes him no longer

3 part of the bar for this purpose, and to somebody who has

4 never been part of the bar, Mr. Kesner.  It's not just -- so

5 there is that.  And would I like --

6          There are certain rules -- again, I don't have

7 them on the top of my head -- for which there are exceptions

8 when they're court authorized and others which they're not,

9 and we would just need to make sure that this is for all of

10 our sakes in accommodation with those.  But we now have the

11 structure to present in that regard.

12          THE COURT:  All right.

13          MR. LOVETT:  Your Honor, if I could perhaps make a

14 proposal, it might facilitate a discussion, a further

15 discussion?

16          If the government has a way to provide us the

17 structure of the server and at least what the programs are

18 and something -- a document that we all look at and say,

19 okay, here's what's on the server, not the actual substance

20 of the document, but here's the file structure; that may be

21 a starting point where we can eliminate probably most of the

22 data, because most of the data's probably software, and we

23 can get it down to what we're really fighting for.

24          THE COURT:  Okay.  I mean, yeah, I suppose that

25 can be done at anytime, and that will help everybody have

1 the discussion.

2          But Mr. Heymann, if you wanted to speak to PRAO

3 about that and maybe -- you know, as part of that --

4          I mean, I know they're good with guidance and

5 everything, but as part of that, I assume they'll know of

6 the prior correspondence with Mr. Lovett; that is, the

7 circumstances that led to the government having the server

8 in the first place and whether in their view that bears on

9 anything.  I'm just interested in knowing whether --

10          I know you're talking about a slightly different

11 issue about providing potentially privileged communications

12 to somebody who's not a member of the bar, but it seems to

13 me if you're talking to them, you know, they might be able

14 to give you more general guidance too.

15          Because, you know, I think Mr. Lovett at one point

16 raised the question, and that you had -- there was an

17 understanding that you weren't going to turn over material

18 without going through a few hoops, and we're now

19 contemplating you turning over material without going

20 through those hoops.

21          I'm still of the view that if we order it, you're

22 not violating anything, because you're not doing it

23 voluntarily in violation of your agreement, you're doing it

24 because the Court is ordering you to comply with your

25 obligations.

1           But I would be curious just to know what they say

2  in passing on that.  But if you do talk to them, I would say

3  we're contemplating this, an arrangement where on the front

4  end there were be search terms used to try to identify truly

5  irrelevant material, and that includes privileged irrelevant

6  material so that it never would be disclosed.  Even when the

7  server is then turned over by the government, that

8  information would be somehow separated.  And in that we're

9  talking about turning over the remainder of the server

10 subject to a protective order that will ultimately require

11 the defendants to identify privileged communications they

12 seek to use and will allow for the government and for

13 non-parties to litigate their interests in the disclosure or

14 not on that material before it's used, and that

15 determination ultimately will be made by the trial judge.

16 All right?

17           And then we'll just have to reconvene on this.  I

18 mean, I know you guys want to resolve it as soon as possible

19 so you can move on with it.  So you can just kind of report

20 back when you think --

21           And what we'll do is we'll set a date to come back

22 relatively soon, and we'll see where we're at on that.

23 Okay?

24           MR. WEINBERG:  Thank you, Your Honor.

25           THE COURT:  All right.  Now, Mr. Lovett, we

1 actually have another matter.  I'm not sure it pertains to

2 you.

3          MR. LOVETT:  Can I be excused?

4          THE COURT:  You may.

5          MR. LOVETT:  Thank you very much.

6          THE COURT:  Thank you.

7          All right.  It's five after three.  Let's see how

8 quickly we can get through this.

9          All right.  Now turning then to the motion to

10 dismiss the indictment, Mr. Solomon.  And just as a way to

11 orient -- because obviously whatever you want to say.

12 Having read through everything, having looked at the cases,

13 I'm not quite sure this is an instance of actual

14 vindictiveness as that term is used.  I suppose there's a

15 question of whether there is objective evidence of the

16 likelihood of vindictiveness.  So in terms of your comments,

17 I'd like you to kind of focus on that and --

18          Also it seems that the government has kind of a

19 general response to your argument which is that in focusing

20 on the first six or seven or eight days of October, you're

21 kind of missing the point, or you're kind of viewing things

22 too narrowly, and they kind of push -- they broaden the

23 landscape to include early spring of 2015, and they say,

24 look, you go back to March and April of 2015.  At that time

25 we were seeking to get people to come in before the grand

1  jury including Mr. Kesner, Ms. Jowder (phonetic).  We made

2  it clear it was still an open question as to where we were

3  going with this.  We put you on notice that there might be a

4  possible conflict of interest with you representing both,

5  and the investigation continued.  We, in fact, immunized Ms.

6  Jowder (phonetic), and we continued to collect evidence, and

7  we continued to process.  And so by the time one gets to

8  October, we've evolved.

9           So the narrative that the defense is seeking to

10 paint by focusing on those first several days distorts what

11 actually was taking place.

12          MR. SOLOMON:  There's a lot in there, Your Honor.

13          THE COURT:  I know, but I just wanted to --

14          MR. SOLOMON:  I appreciate that.  I'll make sure I

15 hit on each of those points, but I think I can resolve a

16 piece of I guess where Your Honor started pretty easily.

17          We have not a made an argument in the motion that

18 of actual vindictiveness in the way that Your Honor uses it

19 correctly in accordance with the case law which is to say

20 direct evidence which is very rare and usually takes the

21 form of an admission really.

22          THE COURT:  Right.

23          MR. SOLOMON:  And short of that -- and the Supreme

24 Court has said for that very reason that's why it allows for

25 this presumption in the burden shifting, because it's so

1  difficult to prove actual vindictiveness.

2          So we're talking here about a case of sufficient

3  evidence to demonstrate a reasonable or realistic likelihood

4  of vindictiveness to shift the burden to the government to

5  rebut that.

6          I think it's fair to say the government has not

7  rebutted it if we assume the -- if we get to the point of

8  the presumption.  I don't think Mr. Heymann -- he can

9  correct me if I'm wrong -- but I don't think they've even

10 attempted that.  They have not come forward with evidence of

11 why they made the charging decision when they did, and why

12 there was this dramatic change from October 2 to October 8

13 --

14          THE COURT:  Well, except that -- that's why I

15 started the way I did.  Except one general response is

16 you're starting the story too late.  You need to start back

17 in March and April.

18          MR. SOLOMON:  I think the story actually starts

19 much earlier than that in 2012.

20          THE COURT:  It starts much earlier, but there's

21 this long period --

22          Right.  And I understand 2012, 2013, 2014 and --

23          But my point being that I think that one of their

24 responses is that if you look at this from a six-month

25 window instead of a six-day window, if it doesn't undermine,

1  it lessons this notion of objective evidence of a

2  likelihood.

3      MR. SOLOMON:  And I don't want to suggest that the

4  only relevant period is the six-day.  Quite to the contrary

5  I think that -- I think the six-day period is particularly

6  telling and particularly powerful for the reasons we've laid

7  out in the brief, and I'll talk a little bit more about.

8      But I think you have to look at the entire period

9  including the March and May and June 2015 and including back

10 to 2012, because the over arching point here, the most

11 important point, is that for three and a half years

12 consistently, clearly and expressly Mr. Kesner was told we

13 view you as only a witness; we do not view you as a target.

14 The case agent said that repeatedly.  There's been no

15 dispute about that.

16      And even when the U.S. Attorney's Office gets

17 involved, and that's the period that they want to look at as

18 Your Honor focuses on in March or so of 2015, their first

19 action is to serve Mr. Kesner with a grand jury witness

20 subpoena.  No target letter.  It's hand delivered by the

21 exact same agent who has been delivering this message

22 consistent for three and a half years.  He's clearly being

23 treated as a witness still at that point.

24      And then we have a discussion, and I raise -- For

25 the first time with the U.S. Attorney's Office I raise the

1  Fifth Amendment, and I say Mr. Kesner is not going to

2  testify -- or at least I'm inclined right now to not have

3  him testify.  We can talk about it, but I'm inclined to not

4  have him testify, and I'm inclined to not have him come in

5  for a proffer session for the same reason.

6          And what the government has depicted as putting

7  him on notice is actually in our view another indication of

8  their retaliatory motive.

9          That's the very first point, the first time I

10  raised Fifth Amendment concerns, the first time I say I

11  don't think he's going to come in to testify, I don't think

12  he's going to come in.  That's the first time in over three

13  years that anyone on the behalf of the government suggests

14  that they might look at him as something other than a

15  witness.  Almost immediately upon my saying that I get an

16  email saying we're actually looking into him and --

17          THE COURT:  Let me play devils advocate for just a

18  minute.  All right?

19          MR. SOLOMON:  Sure.

20          THE COURT:  And, please, I'm just asking, --

21          MR. SOLOMON:  I understand.

22          THE COURT:  -- because it helps us think about it.

23  All right?

24          You've been practicing a long time, and you know

25  the way the criminal process works.  You know the way it

1 works in this courthouse -- or up in the U.S. attorney's

2 office.

3        So for the longest time an agency investigates a

4 case.  An agent is in charge.  They do all sorts of things

5 to get the information.  They cajole, they threaten, they do

6 what they do.

7        The case gets shopped to the U.S. Attorney's

8 Office.  The prosecutor gets involved.  There's somebody

9 different in the driving seat.  And usually then a set of

10 considerations take place that may not have taken place

11 previously, and somebody who was being looked at in one

12 light previously all of a sudden might be -- they might

13 revisit that and look at people in a different light.

14        Why shouldn't we just view this -- because it all

15 seems --

16        I mean, everything you're talking about is

17 consistent with the prosecutor now getting involved and

18 saying, okay, well, you're right.  This person may not be

19 the biggest fish, but it doesn't mean this person doesn't

20 have exposure, and we should do be clear with their lawyer.

21        MR. SOLOMON:  And I think that analysis would be

22 accurate and fair if when the U.S. Attorney's Office got

23 involved that was their first step.  But it wasn't.  It was

24 to continue the treatment of him as a witness.

25        And even after that initial -- that initial email

1 that was a reaction or came immediately after --

2        To put it in non-loaded terms, it came immediately

3 after my invoking Fifth Amendment.  They went back to

4 treating him as a witness again.

5        And this is where we get to the October period and

6 why I think it's so important.  I don't mean to focus on it

7 exclusively, but why it's so important.

8        THE COURT:  No, no.

9        MR. SOLOMON:  Because we're at October 2.  Now

10 months have gone by.  They're coming to the end of the grand

11 jury process.  And I get an email that's very clear.  We

12 need him to come in to testify as a witness, and it has to

13 be on a date certain.  I think it was October 21.  It's

14 inflexible, because we're coming to the --

15        It didn't say why, but the reason we now know is

16 because they were coming to a statute of limitations date,

17 and they needed to wrap things up with Mr. Gibson.

18        And I then call several times and to point out

19 once again he's not going to come.  Nothing's changed over

20 the past several months.  We're still in the position we

21 were back in -- I think by the time we finished those

22 discussions -- April or May.  He's not going to appear.

23        And then six days after saying he is going to be

24 required to appear on a date certain I get another call

25 saying we're not going to require him to come in as a

1  witness because he's a target.

2          And obviously we don't have targets come in to the

3  grand jury.  The fact that he was going to be coming into

4  the grand jury on October 2, that it's obvious on October 8

5  that he's not because he's a target says very clearly

6  something changed between October 2 and October 8.  He goes

7  from being a witness that they need to somebody who's now a

8  target.  And there's been no suggestion that anything

9  changed.

10          Yes, when the U.S. Attorney -- the Assistant U.S.

11  Attorney gets involved, then sometimes facts develop

12  differently.  They have a different view than the case

13  agent.  But that didn't happen until that six-day period.

14          But no new evidence came to light.  There's no

15  indication of any change in thinking other than they now

16  know throughout the end of the process they're not going to

17  get Mr. Kesner's testimony because we've made clear he's not

18  going to come in.  And so they decide to charge him, and

19  it's from that whole period, the three-and-a-half-year

20  period, but with particular importance to that six-day

21  period and the change in those six days with no new evidence

22  that gives rise to a showing in our view that that warrants

23  the shifting of the burden; and then the burden is on them

24  to rebut the presumption.

25          THE COURT:  Okay.

1          MR. SOLOMON:  And that's why ask Your Honor to

2   recommend to the district judge in the report and

3   recommendation that the indictment be dismissed.

4          They had an opportunity to rebut it.  They didn't.

5   They made a perhaps a tactical decision not to make

6   arguments about what inferences to draw, but not to come

7   forward with information about why Mr. Kesner was focused

8   on, why the change in that particular period.  They didn't

9   rebut the presumption, so the indictment should be

10  dismissed.

11         And I also don't want to -- while that's the

12  relief we request, I don't want to lose track of the fact

13  that in the alternative if Your Honor disagrees with that,

14  that conclusion, we've also asked for, failing that route,

15  discovery on this point, and the burden there is even lower.

16  We just need some evidence of a retaliatory motive, and that

17  entitles us to discovery.

18         We've narrowed it based on case law to a very

19  narrow set of discovery that we're looking for in that

20  event.

21         I don't think you get there, because I think the

22  indictment should be dismissed in the first instance.  But

23  if Your Honor disagrees, then that's the alternative we

24  would seek.

25         THE COURT:  And I wish I could pose this as a

1  hypothetical, because I really don't mean to be saying this

2  is what was at play in this case, but what about a scenario

3  where all along the government has whatever it has in terms

4  of evidence against an individual and is on the fence.  And,

5  you know, every other day is just thinking what are we going

6  to do about this person.  And the person chooses, as is

7  their right, to not participate in grand jury, not to come

8  in if they're asked to come in or whatever.  And as the

9  statute of limitations period nears, the government has to

10  make a decision as to what to do with that person, and they

11  just ultimately choose to indict.

12       Now, I'm not saying that's the case here, but are

13  you saying and in any instance like that the decision by the

14  individual to say, "You know what?  I'm just going to take

15  my chances.  I don't want to come in and try to explain

16  myself.  I don't -- you know, I'm just choosing to sit

17  back," that any subsequent decision would be vindictive, or

18  are you arguing here that there's something more than the

19  timing?

20       Because I'm sure there's no real dispute with

21  respect to what you say.  I mean, the facts are what they

22  are.

23       A subpoena was issued or -- a subpoena was issued

24  in spring.  It was a clear from the emails there was going

25  to be another subpoena delivered.  I think you agreed to

1  take service of it.  I'm not sure whether it was ever

2  actually served.  And then at some point the government

3  says, oh, you don't have to come in, and then the indictment

4  ensues.

5        And is your argument that that fact alone that

6  they said, you know, we would like you to come in or come in

7  on this date, and did you unequivocally say no?  I know you

8  said you'd accept service, but I want to talk to you.  Did

9  you signal unequivocally he will not testify?

10       MR. SOLOMON:  I think it was unequivocal, but I

11  could tell you what actually was said, because we never

12  actually spoke.

13       Mr. Heymann -- I don't mean to speak pejoratively

14  -- didn't return the calls.  You know, I wrote back, and I

15  said I'm happy to accept service, but we need to talk about

16  this.  Which I think was obvious in context given that we

17  had just had in lengthy period of about --

18       THE COURT:  That it was going to be the same.

19  He's not going could come in and testify.  He's going to

20  invoke his Fifth --

21       MR. SOLOMON:  And the lengthy period ended with

22  Mr. Heymann saying, well, since you've represented to me

23  he's going to take the Fifth, I won't make him come in to

24  take the Fifth.

25       THE COURT:  All right.

1          MR. SOLOMON:  So I'm reaching out to say, "Well,

2   that's what's going to happen, so are you really going to

3   make him come in to take the Fifth?"  And I think that was

4   clear.

5          Mr. Heymann can speak for himself whether he

6   interpreted it as anything different.  But I reached out I

7   think after getting that email asking me to accept service

8   three times in order to have this discussion.  We can't have

9   the discussion, because we didn't connect.

10         But I think it was unequivocal what my purpose

11  was.

12         To Your Honor's hypothetical, the answer is no.

13  If it were just simply the government were on the fence,

14  there was invocation of the Fifth, they charge,

15  automatically there's a presumption.

16         But that's not what we have here, and that's why

17  I'm not relying on just those six days.  I'm going back this

18  three-and-a-half-year period where over and over and over

19  again you're a witness not a target.  You get served with a

20  grand jury subpoena by the same agent who made that

21  representation.  And then on October 2 --

22         Again, if they were on the fence and it was just a

23  matter of you're coming to the end so they need to make a

24  decision, why on October 2 are we told we're sending a

25  subpoena, another subpoena.  It has to be on a date certain.

1 Nothing changes in the interim other than my trying to reach

2 him which makes clear, to me, that he's not going to

3 testify.

4          And then there's a complete 180.  Now he's a

5 target, so obviously we don't want him to come in.

6          That's very different from the hypothetical, I

7 suggest, that Your Honor put forward where it's just a

8 matter of timing.

9          And the case law is clear.  You can't base an

10 argument like this on just timing.  It can't be as simple as

11 you invoke the Fifth, you get charged; therefore, there's a

12 presumption.

13          But that's not we have here.  We have a lot more

14 than that.

15          THE COURT:  All right.  Thank you.

16          MR. SOLOMON:  Thank you.

17          THE COURT:  All right.  So Mr. Heymann, let me

18 kind of pose it to you the same way.  And I'll start with

19 October, but I think as Mr. Solomon points out, we've got

20 kind of a history of the few years prior.

21          So in October of 2015, beginning of the month,

22 you're seeking to get Mr. Kesner to come in and testify

23 before the grand jury as something other than a target, and

24 it becomes apparent that he's not going to do that, and then

25 a number of days later he becomes a target, and he's

1 indicted.

2          And against that backdrop, you have this assertion

3 that seems somewhat apparent from the record that the state

4 of the evidence that the government had, you know, in terms

5 of who did what and when was relatively unchanged; that is,

6 what the government knew in October of 2015 right before it

7 indicted was pretty much what the government knew a number

8 of years back, and that really the only two -- the two most

9 notable things that took place in 2015 were Mr. Kesner on

10 two occasions, two separate occasions, saying, "I'm not

11 going to testify.  I'm going to invoke my rights."

12          Why should we not view the decision then to turn

13 around right beforehand and make him a target where just

14 days before he was being asked to come in as a witness, why

15 should that not be seen as objective evidence of the

16 likelihood of vindictiveness?

17          MR. HEYMANN:  Your Honor, in this case Mr. Kesner

18 --

19          There was an email exchange in March that said Mr.

20 Kesner's on the bubble here.  We don't know where he is.

21 That's the effect of --

22          As you're aware, Mr. Kesner facilitated,

23 participated in and encouraged or conspired with Mr. Gibson

24 to file false tax returns is an open question in our

25 investigation.  There is demonstrative objective evidence

1 then.

2        The government was well aware from that date that

3 there was -- that Mr. Kesner was going to assert his Fifth

4 Amendment privileges.  Mr. Solomon was very clear about

5 that.  He was very clear he wasn't going to make a proffer.

6        That fact simply doesn't change for the next six

7 months.  He also says it with respect to the second person

8 who he's representing at the time, Ms. Jowder (phonetic),

9 and the government clearly knew from that time that if it

10 wanted either witness to testify, it was going need to

11 immunize them.  And, of course, there's a mechanism for

12 going to the Department of Justice.  It takes a couple of

13 weeks.  You get the immunity order, and they're immunized.

14        And the government did that with respect to Ms.

15 Jowder (phonetic), the more junior of the two.  A very

16 common investigative step.  You start with the more junior,

17 and you get their testimony.

18        The reason that there is nothing to -- no --

19 nothing to be drawn from the last three weeks is that those

20 decisions as to whether somebody -- how somebody is going to

21 be handled, how somebody is going to be addressed, whether

22 they're going to be prosecuted, whether they're going to be

23 a witness, whether they're go going to be required to ask to

24 plead guilty for a lesser sentence and then sought the

25 testimony are often being focused on and analyzed in those

1  last few weeks.  And with the deadline here of a statute of

2  limitations, it was a matter of simultaneous courtesy to

3  defense counsel to let him know that this was going to be a

4  fixed date.

5          If this person was called in to testify, it was a

6  symbiotic necessity to the government.  It couldn't shift.

7          And so giving this warning --

8          No subpoena ever had issued, but that this was a

9  date that was going to have to happen.  While the decision

10  was being made as to need, reviewed, analyzed, and without

11  --

12          The government has quite intentionally only relied

13  in its responses on those records that are -- that were part

14  of the defendant's submission to show that there is no need

15  for an evidentiary hearing here, and the records as the -- I

16  know Mr. Weinberg, and I don't recall whether Mr. Solomon

17  also made this argument -- are voluminous.  That's why this

18  case has a -- is set up as a large case for the purposes of

19  the speedy trial act.

20          It's not just a question of whether the records --

21  whether you physically have the record, whether you

22  physically have the evidence, but also a question of

23  reviewing that, analyzing it, piecing it through, going back

24  through it, putting the case together and then discussing it

25  internally.

1         So there is no magic to that last three weeks.

2  There is no new assertion of a Fifth Amendment right.  There

3  was always from back in March that same assertion.  There

4  was always the recognition that we would need to get an

5  immunity order for the testimony.

6         We showed that they were prepared to get the

7  immunity order in the right circumstance in the case, and

8  that was always a possibility.  But there is this question

9  of resolving what to do on people who, as it were, were on

10  the bubble who -- for whom the evidence supports

11  prosecution, but it may be instead a decision to use them as

12  a witness.

13         Now, the <u>Bouchey</u> case which the defendant cites

14  for sort of the standard is one where the First Circuit --

15         Well, first of all, the First Circuit says you

16  should presume good faith on behalf of the government, and

17  you should be very, very slow to move to anyplace else in

18  this context because of the separation of powers in this

19  matter in the decision of whether to prosecute.

20         But factually, <u>Bouchey</u>, in part, the Court comes

21  and says you should -- anything that goes on six months

22  earlier -- and <u>Bouchey</u>'s creating what's a rat which is

23  creating enormous problems for all of the government.

24  There's no parallel sort of reason to suggest that a reason

25  for vindictiveness here.  That happened six months earlier.

1 And the decision to in that case file a superseding

2 indictment is six months later.  It's too attenuated.

3          THE COURT:  Here's, though, one aspect of this

4 case which is a little different from some of these others

5 factually.  I think it's October 2, and whatever --

6          MR. HEYMANN:  Roughly.

7          THE COURT:  Yeah.  The government is saying we'd

8 like you to come in and testify as a witness.

9          Now, either the government -- if we take the

10 government at its word, the government is still thinking of

11 him as a witness.  He says no.  And then within a really

12 short span of time -- I mean, I think this is one of the

13 things -- it's a couple things.  A really, really short span

14 of time the government turns around and says, okay, you're

15 now a target.

16          MR. HEYMANN:  If I may pause, the Court --

17          THE COURT:  Before you go on, let me just --

18          MR. HEYMANN:  -- factually is wrong.

19          THE COURT:  All right.  And then correct my facts.

20 Spiritually I know what I'm saying.  I might be wrong on

21 some of the details.  All right?

22          But a real short span of time towards the end he's

23 asked -- he's being treated as a witness, and when he

24 declines to participate in the process the way the

25 government wants, very quickly he is told you're a target,

68

1 and then he's indicted.

2        Now, what's coupled with that and I think what

3 helps color this is there's not really even much

4 communication between you and Mr. Solomon in terms of

5 keeping him abreast of what's going on, and it just raises

6 this notion that all of a sudden a decision has been made to

7 treat him differently and to you'll find out, you know, as

8 opposed to keeping him in the fold as to what's going on.

9        MR. HEYMANN:  A critical point here, Your Honor,

10 is that there is no communication by Mr. Solomon to me after

11 November -- after October 2 that his client won't testify.

12 There is no communication.  And Mr. Solomon just said that.

13 There is no communication that goes on between the two of us

14 between October 2 and my quick turnaround to tell him that

15 there's been a change of position.

16        Whatever communication there is, "my client will

17 not testify without immunity," takes place in March, six

18 months earlier, is always out there.  It's also with respect

19 to his other client.  The government respects both of them.

20        Unlike the Dwyer case, there's no motion to compel

21 saying that there's no reasonable basis for asserting the

22 Fifth.  There's no approving a third party to go in and talk

23 to them.  There's no statement to him with respect to the --

24 Mr. Kesner.  There is with respect to Ms. Jowder (phonetic)

25 who we do immunize.  There's no statement with respect to

1  Mr. Kesner that it's an unprincipled assertion of the Fifth.

2         There's none of that background that's going on in

3  Dwyer suggesting that there's any contention other than he

4  has the right to assert the Fifth, he's claimed that right,

5  he has a right to say he won't proffer, he's claimed that

6  right, and that's simply going to be the state of play.

7         And there's nothing that changes.  No

8  communication that changes.  No reassertion of it.  No

9  challenge of it.  That goes on all the way until the end.

10 It distinguishes it from Dwyer, and it just changes the

11 facts as you understood them or at least presented them.

12        THE COURT:  All right.  So pointing this out,

13 though, why should somebody come in --

14        I don't know how much of this you can reveal.  I'm

15 not asking -- you know, I'm not trying to pry into the

16 internal decision-making.

17        But what would be the benefit of subpoenaing Mr.

18 Kesner in the beginning of October where you already knew he

19 had some concerns about his exposure and thus was not going

20 to testify unless given immunity?

21        What's the benefit of continuing to treat him in

22 that same way in the beginning of October if you kind of

23 knew what the result was going to be, especially where we

24 know from the events here that several days later you, in

25 fact, when it became somewhat clear that he wasn't going to

1  come in, --

2            And I know what you just said about there not

3  being an actual communication between you and Mr. Solomon,

4  but you got the response of, "I'll accept service, but we

5  need to talk about this," which suggested it might be the

6  same.

7            -- he's then viewed very quickly as a target?

8            MR. HEYMANN:  So I want -- I will describe --

9            I think I want to answer this in a hypothetical

10 form rather than the answer to the description of what the

11 give and take that was actually going on.  But I answer it

12 in the hypothetical form solely to show that it is

13 objectively consistent with -- it totally -- it's a set of

14 behaviors that go on over and over and over again everywhere

15 in a prosecutor's office in every prosecutor's office.

16           In the last few weeks of a case when there's a

17 deadline, there's a tight focus on the evidence, tight focus

18 on drafting the indictment, tight focus on whether or not

19 you can not just meet probable cause standard, the standard

20 for constitutionally being okay.  I mean, we can't lose

21 sight of that.  But constitutional standard is the probable

22 cause; but rather, can we establish beyond a reasonable

23 doubt the case?  Does it merit within the guidelines -- the

24 internal office guidelines, the guidelines within the tax

25 division for consistent application of the law?

1           There is a tight focus going on that within the

2  last few weeks when there is a limitations deadline as there

3  was uncontestedly in this case.  When that's going on, and

4  you have somebody who is on the bubble who could be in,

5  could be outside of the case appropriately, who could be a

6  witness appropriately, but the cost would be that you would

7  be immunizing somebody for whom you have substantial

8  evidence of culpability; then you need to protect their

9  appearance at the grand jury if you decide to immunize them

10 and use them as a witness.

11          But that doesn't create any presumption of

12 entitlement.  It doesn't create any actual entitlement.  All

13 that does is that it preserves an option that is being

14 weighed as the case goes closer to -- goes through the

15 approval process, going through the analytic process, goes

16 through the ultimate presentation.

17          So all it does is act as a place holder.  There is

18 no new pressure created by it.  You know, the understandings

19 are the same.  It eliminates any ambiguity as to whether the

20 earlier grand jury subpoena continues when you've not

21 required them to come in.

22          Another differentiation by Dwyer.  There was no

23 requirement that they come in.  It's a place holder.

24          And that is all that the evidence objectively

25 reflects.  When you get rid of the background noise, when

1  you get rid of sort of all of the caustic comments, all that

2  you have is notification six months earlier that the

3  person's on the bubble, assertion of the Fifth Amendment,

4  assertion that won't make a proffer, and a decision that has

5  to be made by as it turns out by the end of October, and a

6  literal somebody who counsel also represents who gets

7  handled in a different way.

8           THE COURT:  Just one more question, Mr. Heymann.

9           MR. HEYMANN:  Yes.

10          THE COURT:  So we know that Ms. Jowder (phonetic)

11  testified with immunity, right, --

12          MR. HEYMANN:  Yes.

13          THE COURT:  -- in March/April of 2015.  Would you

14  agree generally with the proposition that aside from that,

15  and crediting everything you've said about the kind of

16  analysis and crunching that goes on in those last few weeks

17  and months before a decision is made, would you agree with

18  the proposition that the quantum of evidence remained

19  essentially the same from 2013 to 2015?  And by that --

20          Actually, quantum is not the exact word, because

21  maybe some additional people were spoken to, evidence

22  obtained from some other sources.

23          But what that evidence suggested was essentially

24  unchanged throughout that time period.  Would you --

25          That's something that the defense kind of asserts.

1 The government doesn't really respond to it except that you

2 have a sentence I think in your memorandum that says, you

3 know, we've got new evidence, or it came into -- where you

4 talk about I think Ms. Jowder (phonetic), you also talk

5 about new evidence. But beyond that there really isn't

6 anything.

7          MR. HEYMANN: No, Your Honor, there's a variety of

8 things that are happening.

9          First of all, as even reflected in the exhibits

10 that are attached to the defendant's motion, again there are

11 a variety of people that are being interviewed. There are

12 also a variety of people that are being put in the grand

13 jury. And of course what they will testify to in the grand

14 jury, how that comes out, what the wording is is critical to

15 a decision.

16          There are also -- I don't think it's telling any

17 state secrets. There are also grand jury subpoenas going

18 out for large numbers of documents in a variety of sources.

19          In fact, we heard just earlier this afternoon from

20 Mr. Lovett about how we subpoenaed records from him, how

21 there was a whole filter -- you know, how there was a whole

22 --

23          THE COURT: Is this activity --

24          MR. HEYMANN: -- filter person --

25          THE COURT: I'm sorry. Is this activity in 2015?

74

1          MR. HEYMANN:  This activity is -- well, the grand

2  jury investigation doesn't begin --

3          THE COURT:  Until then.

4          MR. HEYMANN:  -- until then.

5          THE COURT:  All right.  So.

6          MR. HEYMANN:  I can't remember the exact month

7  that the first subpoena went out.

8          THE COURT:  So you disagree with the proposition

9  that really --

10          I know that he says nothing changed during that

11  first week of October, but you would say we learned new

12  things beyond what the case agent shopped to us.

13          MR. HEYMANN:  We certainly had new records come

14  in.  We certainly talked to people to ask questions that

15  were on the top of our mind.  We are at the same time

16  analyzing records in a different context, in a different

17  light.

18          I hesitate as I sit here -- you know, as I stand

19  here without coming in prepared to answer the questions of

20  the Court to be able to give a very clean analysis of what

21  is going on.

22          But we are subpoenaing.  Again, Mr. Solomon in his

23  recitation describes receiving subpoenas.  He is then

24  representing Ms. Jowder (phonetic), Mr. Kesner, Mr.

25  Morrissey and the accounting firm.  He describes receiving

1 subpoenas on behalf of all of them and producing records on

2 behalf of all of them.  All the way -- you know, I think two

3 tranches.  And there are witnesses being interviewed

4 throughout this process, and a few being put in the grand

5 jury as well.

6          THE COURT:  All right.  And so you would say then

7 ultimately properly understood the fact that there may not

8 have been a great collection and analysis -- or maybe an

9 influx of evidence from the beginning of October to the

10 following week when the indictment was returned is of no

11 consequence or relevance for purposes of this issue.  Right?

12          That's the kind of the central argument here which

13 is there was nothing new from the time you treated him at

14 the beginning of October as somebody you weren't really

15 interested in prosecuting versus a week later when you

16 turned around after he said he wasn't going to come in.

17          And I understand you're going to be saying that

18 misses the point.  It's we were collecting -- we were

19 looking at evidence, we were doing stuff, and this was a

20 decision that was made around then.  But --

21          I'm not trying to put words in your mouth, and

22 you're just staring at me.  But you're saying --

23          MR. HEYMANN:  No.  It misses the point in a couple

24 of regards, Your Honor.  The first is the IRS had obviously

25 done a substantial investigation before.  They do the

1  investigation, they bring the investigation to us, and then

2  based on that first round of evidence and that first -- some

3  of which again is attached to his filing where Jowder

4  (phonetic), the junior account, and says I didn't do any of

5  this stuff without the direction of my boss who ends up

6  being charged.

7          That background of information which is

8  unquestionably a significant background leads to the email

9  which says your guy could be in any of these categories.

10 There is then additional evidence brought in, additional

11 analysis that's done, additional testimony, additional

12 documents, additional integration of it, additional analysis

13 in the context of the law; all of that goes on over the

14 succeeding months which refines what is known and subjects

15 it to testing obviously not only by me, but by multiple

16 levels of approval within the office in the tax division.

17          THE COURT:  All right.  Any response, Mr. Solomon?

18          MR. SOLOMON:  Yes.  Thank you.  Just a few brief

19 points, Your Honor.  I think I'll start with the questions

20 Your Honor was asking regarding any new evidence that

21 developed.

22          I think it's undisputed there was no new evidence

23 in that October time period, but I'd suggest at least to the

24 extent we know we've been given in discovery that there's no

25 material new evidence with regard to Mr. Kesner during the

1 entire grand jury investigation.

2          The example that Mr. Heymann just gave of Ms.

3 Jowder (phonetic) testifying at the grand jury, I suppose

4 that Mr. Kesner was the one who signed off on her.  She

5 wouldn't have made any of these adjustments without him.

6 They'd known that since 2012.  They interviewed Ms. Jowder

7 (phonetic) in 2012.

8          The IRS agents did at that interview as well, just

9 as they did with Mr. Kesner throughout, we said we don't

10 think the problem came from this building.  Meaning the

11 accounting firm.  They knew it from Mr. Kesner himself.  He

12 talked to them before he was represented by counsel when

13 they interviewed him.  And Mr. Kesner's role to the extent

14 alleged in that regard has never been in question in the

15 government's mind.  That's something that they've been told

16 and have believed from the very beginning of this.

17          The memorandum of interviews that they produced

18 show that from the very beginning the first interviews in

19 2012 right into actually November, everybody's focused on

20 this being a case against Mr. Gibson.

21          There was nothing new in 2015 regarding Mr.

22 Kesner.  His role remains the same as revealed to the

23 government throughout the entire process.

24          Mr. Heymann is correct that there was no subpoena

25 actually issued in October, but I think the characterization

1  of it as a courtesy, a place holder, you know, make sure

2  everyone knows to hold that date, it's inconsistencies with

3  the email itself.

4            And I know the Court's seen it, so I won't spend

5  too much time on it.  But it says unambiguously I'm going to

6  be subpoenaing your client, Mr. Kesner, to the grand jury on

7  Wednesday, October 21.  The date, I am afraid, is

8  inflexible.

9            That's not a please hold that date in case we want

10  him.  That's this is happening.

11            There's no doubt that on October 2 Mr. Kesner is

12  being viewed as he had been for three and a half years as a

13  witness, not as a target.  If he weren't, there would have

14  been no need for that call on October 8 that said never

15  mind.  He doesn't have to come in on October 21, because

16  he's now a target.  There was clearly a change.

17            The other last point I think I want to mention is

18  this notion of the telling him that he's on the bubble

19  through this email, it is not the case that the first thing

20  the U.S. Attorney's Office does when it gets involved is

21  notify counsel that -- or Mr. Kesner that Mr. Kesner's on

22  the bubble.  The first thing they do is send a subpoena, and

23  then they have a conversation where I invoke the Fifth.  And

24  it's only at that point, not even in that conversation do

25  they mention, by the way, I know I'm talking to you about

1 him coming in, you should know we're looking at him.  That

2 doesn't happen in that call.  It's not until after I make

3 clear the Fifth Amendment's really an issue here.  I'm not

4 inclined to have him come in.  I'm not even inclined to have

5 him proffer.  That's when we first get this email that Mr.

6 Heymann describes as notification on the bubble.

7         But then again, they go right back to treating him

8 as a witness October 2, and that's why that October 2 to

9 October 8 period is so important.

10         THE COURT:  All right.

11         MR. SOLOMON:  Thank you.

12         THE COURT:  All right.  Thank you.  All right.

13 Obviously we have to take that under advisement, because we

14 have to prepare a report for the Court.

15         How much time before we want to come back to talk

16 about --

17         How do you want to proceed?  Do you want to -- on

18 the server issue, do you want to submit something first, or

19 do you want to set a date to come back to discuss it first?

20 I don't want to have us come back without us having

21 something meaningful to discuss, so what do you think makes

22 sense?  I'm putting this to everybody generally.

23         MR. WEINBERG:  I think first there are two steps.

24 One is that Mr. Heymann gets some validation from the DOJ

25 that he's not walking into a ethical minefield; and then

1  two, that we meet and see whether there's common grounds on

2  categories that we can exclude.  It's kind of like the

3  reverse of the civil search terms where they're for

4  relevance.  We're going to be serving for search terms'

5  irrelevance.  I think we can do that.  At least I know Mr.

6  Heymann and I can do it.  Whether we can get consensus from

7  Mr. Lovett is a more open issue.

8           MR. HEYMANN:  There's no reason that those two

9  can't go on in parallel, --

10           THE COURT:  Right.

11           MR. HEYMANN:  -- and there's no reason that I

12  shouldn't be able to turn the answer around from the PRAO

13  within a two-week period, which is roughly the same that I

14  would expect that we could deal with the other issues.

15           THE COURT:  So nobody's going to have to be hired

16  from the outside to help kind of identify like the types of

17  communications that we're going to try to separate from the

18  beginning, so communications between Mr. Lovett and so and

19  so.  Do you think that can be accomplished just by coming up

20  with good search terms, and is it you guys and the people

21  that work with you that are going to be doing that?

22           MR. HEYMANN:  I wouldn't think of this as an

23  outside project at first blush.

24           THE COURT:  All right.

25           MR. HEYMANN:  I would hope that we could do it.  I

1  mean, the big first cuts are date cuts --

2          THE COURT:  Right.

3          MR. HEYMANN:  -- and people cuts --

4          THE COURT:  Right.

5          MR. HEYMANN:  -- and while what I originally had

6  as a server directly didn't have everything expanded, it

7  would be an expanded server director.  You know, the first

8  two or three cuts would be -- we may not agree with them,

9  but they wouldn't require any outside expert to get those

10 down.

11         And so I don't see it as an outside thing.  I see

12 it simply as --

13         THE COURT:  All right.  So within thirty days?

14 Sooner than that?  Thirty days?

15         MR. HEYMANN:  Thirty days would also give an

16 opportunity for the drafting of the protective order, which

17 I think is probably longer than a ten-day period given the

18 differences of view.

19         THE COURT: And you're going to loop --

20         MR. HEYMANN:  Yes.  And we'll loop in Mr. Lovett

21 --

22         THE COURT:  -- Mr. Lovett in on that; right?

23         MR. HEYMANN:  -- in on that.  But would I think

24 thirty days.

25         THE COURT:  Okay.  All right.  Let me give you a

1  date.  I know I'm out the week of May 15, so.

2         THE CLERK:  The next week, May 25, at ten o'clock

3  in the morning?

4         MR. WEINBERG:  May 25 is a bad day for me.  I've

5  got commitments -- conditional commitments in Florida.  It

6  depends on the preliminary decision, but I'm reserving that

7  day.

8         THE CLERK:  If you're in Florida, you leave

9  Florida when?

10        MR. WEINBERG:  I will be leaving the night of the

11 24th, so that would be a good day.

12        THE CLERK:  Afternoon of the 24th.  No?  How about

13 the 23rd?

14        MR. WEINBERG:  The 23rd is perfect.

15        THE COURT:  Okay.

16        MR. HEYMANN:  That is he Monday the 23rd?

17        THE CLERK:  Monday the 23rd.

18        MR. HEYMANN:  I'm wide open.

19        MR. SOLOMON:  I apologize, but my wife's

20 graduating from graduate school that day, so that would be a

21 real bad day for me.

22        THE CLERK:  Let's see.  The next day?

23        THE COURT:  What about the week before I go?

24 What's that week looking like?  I don't know.  That might

25 not give you enough time.  What's like that Friday like

83

1  before I go?

2          THE CLERK:  It is the 13th.  You can do it at ten.

3          THE COURT:  How about would the 13th give you

4  enough time?  That's not a month.  That's really three

5  weeks.

6          MR. HEYMANN:  On the 13th I'm afraid I'm driving

7  to a wedding.

8          THE COURT:  All right.  You know, let's shoot then

9  for the week after Memorial Day, because I'd rather give us

10 a little more time than not enough time.

11         THE CLERK:  How about Tuesday, May 31, at 10:15?

12         THE COURT:  That's the first day back from

13 Memorial Day weekend, so I know some people still take that

14 day off, so.

15         MR. HEYMANN:  The morning of the 31st?

16         THE CLERK:  Or we could do the afternoon.

17         MR. HEYMANN:  I'm open all day on the 31st.  I

18 could do it either one.

19         THE CLERK:  Okay.  10:30 on the 31st if it's okay

20 for everybody.  We don't know about Mr. Lovett.

21         THE COURT:  We'll put it out on the docket, and

22 then if he has an issue with that, I'm sure he'll get back

23 to me.  Okay?

24         All right.  Thank you everybody.  We'll be in

25 recess.

84

1       MR. WEINBERG:  Judge, before we leave, is two

2 o'clock available?

3       THE CLERK:  On the 31st?

4       MR. WEINBERG:  Yes.

5       THE CLERK:  Yes, it is.

6       MR. WEINBERG:  Could we do it then just in case --

7       THE CLERK:  No problem.

8       MR. WEINBERG:  -- we go away, and I want to drive

9 back that morning?  Thanks.

10       MR. HEYMANN:  That's a very hard night on Sunday

11 night.

12       MR. WEINBERG:  It's Monday night we're worried

13 about.

14    [laughter].

15       THE COURT:  All right.

16       MR. WEINBERG:  Those days are beyond me, Steve.

17    (Court adjourned at 3:52:03 p.m.)

18

19

20

21

22

23

24

25

85

1                           CERTIFICATION

2        I, Judy Bond Gonsalves, a court approved transcriber,

3   certify that the foregoing is a correct transcript from the

4   official electronic sound recording of the proceedings in

5   the above-entitled matter.

6

7

8   _____   June 12, 2016
    Judy Bond

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25