UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

***************************

UNITED STATES OF AMERICA,
        Plaintiff

vs.                            Case No. 1:15-cr-10323-IT

DANIEL GIBSON et al,
        Defendants

***************************


TRANSCRIPT OF SECOND INTERIM STATUS CONFERENCE
BEFORE THE HONORABLE DONALD L. CABELL
AT BOSTON, MASSACHUSETTS
ON APRIL 6, 2016


APPEARANCES:

For the Government:
Stephen P. Heymann, Assistant United States Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, Massachusetts 02210
617-748-3100

For Daniel Gibson:
Martin G. Weinberg, Esquire
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
617-227-3700


Transcriber:  Karen M. Aveyard,
              Approved Federal Court Transcriber

------------------------------------------------------

**TRANSCRIPTION PLUS**
**1334 ELM STREET**
**LEOMINSTER, MASSACHUSETTS 01453**
**(978) 466-9383**
**www.transcriptionplus.com**

APPEARANCES (continued):

For Mark Kesner:
Joshua L. Solomon, Esquire
Pollack Solomon Duffy, LLP
133 Federal Street, Suite 902
Boston, Massachusetts 02110
617-439-9800

For Scott Behman:
William J. Lovett, Esquire
Collora, LLP
100 High Street, 20th Floor
Boston, Massachusetts 02110
617-371-1000

1                      P R O C E E D I N G S

2

3            THE CLERK:  The United States District Court for the

4    District of Massachusetts is now in session, the Honorable

5    Donald L. Cabell presiding.  The case of the United States

6    versus Daniel Gibson and Mark Kesner -- you may be seated --

7    Case No. 15-10323 will now be heard before this Court.

8            Will counsel identify themselves for the record.

9            MR. HEYMANN:  Your Honor, Steve Heymann on behalf of

10   the Government.

11           THE COURT:  Good afternoon.

12           MR. SOLOMON:  Good afternoon, your Honor.  Joshua

13   Solomon on behalf of Mark Kesner.

14           THE COURT:  Good afternoon.

15           MR. WEINBERG:  Good afternoon.  Martin Weinberg

16   appearing for all purposes for Defendant Gibson.

17           THE COURT:  Happy to hear that.

18           MR. LOVETT:  Good afternoon, your Honor.  William

19   Lovett on behalf of Behman Hambleton, LLP, as well as Scott

20   Behman.

21           THE COURT:  Good afternoon to you too.

22           All right.  We're here for the interim status

23   conference and there are a number of things I know that need to

24   be addressed.  I'm not sure we're going to be able to address

25   them all satisfactorily today.

1          I did see in your joint memo that you want very much

2     for us to resolve the computer issue, just as we do, and the

3     hope was that we could resolve it today, and up until yesterday

4     our thinking was we would be able to resolve that today.  But I

5     have to tell you, the more we've looked at it, the more we have

6     some questions about aspects.

7          And so I know we've got the Motion to Dismiss

8     scheduled for hearing for April 21st, so at a minimum we'll be

9     addressing that then.

10          With respect to the computer server, I think the most

11     I can do today -- I've tried to put down some coherent notes --

12     is to kind of give you an idea of what we're thinking; where we

13     may have some questions.  I don't know what we really want to

14     try to address them today.  We do have another matter at 2:30,

15     but it could be that based on this, it starts a conversation of

16     where we can resolve the issue between now and the next time we

17     meet or between April 21st.  Alternatively, it will help, I

18     think, for purposes of us resolving this by or on April 21st.

19          And then let me start with the easy part first.  You

20     do ask that we come back in 60 days for an interim status

21     conference.  Let me propose a date and time for that just to

22     make sure we can get everybody on the same page.

23          THE CLERK:  How about June 8th at ten o'clock?

24          MR. SOLOMON:  That works, your Honor.

25          MR. WEINBERG:  That will be good.

1          THE COURT:  Okay.

2          MR. LOVETT:  One second.

3          (Pause.)

4          MR. LOVETT:  That would be fine.

5          THE COURT:  Okay.  So let me first give you my notes

6    on the computer server, what I've been thinking, and then I

7    want to make sure we also leave a time to talk about the Motion

8    for Bail that's pending as well.

9          MR. HEYMANN:  I'm sorry, your Honor, but what time was

10   it on June 8th?

11         THE COURT:  Oh, I'm sorry, ten o'clock.

12         THE CLERK:  Ten o'clock.

13         MR. HEYMANN:  Ten o'clock, thank you.

14         THE COURT:  And I assume no objection to excluding the

15   time?

16         MR. WEINBERG:  No objection, your Honor.

17         MR. SOLOMON:  No objection.

18         THE COURT:  Okay.  So on the computer server, I kind

19   of start with the end first, and that is I'm persuaded that

20   Mr. Gibson has a valid basis to seek a copy of the server, and

21   I'm trying to be careful.  I'm not necessarily saying getting

22   it all, but certainly has a valid basis to seek a copy of the

23   server.  There might be Brady material, Rule 16 statements.  As

24   Mr. Weinberg represents, there may be material that is used for

25   cross-examination, and just information that's otherwise

1    material to the preparation of the defense.  And if we assume

2    that there is material on the server that should be disclosed,

3    it raises the question what should not be disclosed, and our

4    thinking at this point is privileged material should not be

5    disclosed.  But I'm hard pressed to identify as a category

6    subject matter beyond that that ought not be disclosed.

7         Obviously, pertinence, relevance, whatever you want to

8    call it, is a consideration, but given the dynamics in this

9    case, I'm not sure the firm is in the best position to be

10   making a determination as to pertinence.

11        I'm less concerned about the Government being in that

12   position because the Government already has obligations that

13   are imposed upon it, and so would have to be constrained to

14   honor those obligations, those rules, those considerations, in

15   making any determination.

16        Now, as it relates to the server that has been

17   provided to the Government, I'm not convinced it's as simple as

18   the defendant contends, namely that it's because the

19   Government -- because it's located somewhere on the ninth or

20   tenth floor, that it's in the possession, custody or control of

21   the Government.  It's clear the Government was provided with a

22   copy of the server, and to that extent they unquestionably

23   possess it and they have custody of it, but it was provided to

24   them pursuant to an agreement which restricted their use of it,

25   and this is the part we've been looking at, I just don't know

1    to what extent, if at all, that agreement affects whether the

2    server should be deemed to be in the Government's custody,

3    possession or control.

4         So put a different way, is that phrase a term of art

5    that is defined in context or does it mean what the words would

6    appear to mean?

7         So if we say that the Government accepted the server

8    after promising to use it in a limited fashion, might we still

9    conclude that their discovery obligations that exist in any

10   case, not just this case, but in any case, trump that promise?

11        And another way of looking at that, might we say that

12   a nonparty or somebody that wants to work with the Government

13   and provides them agreement -- provides them information

14   subject to an agreement that limits its use runs the risk that

15   the Government might, as a result of its own independent

16   obligations, be forced to disclose that information to a

17   defendant it subsequently indicts?

18        And if we say that the Government possesses the server

19   and must turn it over, there's still the concern about the

20   privileged material and how we go about determining what's

21   privileged and what should be withheld from disclosure to the

22   defendant.  Should that be done by a taint team that the

23   Government sets up?  Is there another practical way?

24        One of the ways we were thinking about was I know

25   sometimes in the civil context you give notice to the privilege

1    holder that information might be disclosed.  I don't think that

2    would work at all here.  So I'm still trying to figure out what

3    we would do at that stage, but it seems to me having the

4    Government create a taint team so that the prosecution, the

5    immediate prosecution, is not affected by anything that might

6    be on the server, might be the best way to approach that.

7        And then somewhat alternatively, but still along the

8    same line, it seems to us that ultimately this is an issue that

9    is really more between the defendant and the law firm rather

10   than it is between the defendant and the Government.  It's

11   almost fortuitous that the Government happens to have a copy of

12   the server, and if they didn't have the server and if the

13   defendant wanted this information, the defendant would be

14   seeking a subpoena under Rule 17(c), and we would be analyzing

15   and litigating the issue there where the firm could more fully

16   make its argument and it wouldn't even have to begin with you

17   shouldn't be doing this because there's this agreement I had

18   with the Government limiting its use.

19       And so ultimately that leads us to thinking there are

20   three options, three ways of approaching this.  One is we try

21   to deal with these issues and we decide the motion, and just

22   try to figure out the correct answers along the way to the

23   questions we've posed to ourselves.  The second is that the

24   parties themselves sit down and take that draft of the

25   protective order that's been floating around, and I understand

1    the Government says if that was going to control, it would need

2    to be tweaked, but it seems to me that perhaps really being

3    practical, that would be the best way to approach this.  Just

4    have the parties agree to have the information on the server

5    disclosed, but subject to an agreement, and if along the way

6    the parties could work out a tenable way to identify privileged

7    material and to kind of keep that from even seeing the light of

8    day, that would be great.  But if not, maybe the protective

9    order or the confidentiality agreement that you could all talk

10   about would address that as well.

11           I'm really trying to keep us from playing any role in

12   reviewing anything because it seems to me that the breadth of

13   documents is probably too large to make that a workable option.

14           But then finally, the third option would be to just do

15   this via the Rule 17(c) process, making no guarantees what the

16   outcome of that would be, but approaching it that way, because

17   it seems to me spiritually this is more of an issue that one

18   would deal with in that context rather than as a discovery

19   motion, where again, yes, the Government has it, but really

20   almost by happenstance the Government happens to have a copy of

21   the server.

22           So that's kind of where we're at.  We're still a

23   little bit, as you can see, kind of all over the place.  We

24   really think that if the parties could reach an agreement as to

25   how to address this, that would be best.  But otherwise, worst

1   case scenario is by April 21st when we come back into court, if

2   we haven't heard anything from anybody, we will be prepared to

3   kind of have answered these questions and tell you what we want

4   to do, okay.

5         All right.  Now, the Motion for Bail, I know it's

6   assented to.  I had on my own, not because I had any great

7   concerns, but on my own just because it seemed to me the

8   general practice was, I had asked Pretrial just to take a look

9   at it and to see what they said because normally they weigh in.

10  And so that, we had just a brief conversation, but I just want

11  to just now, now that we've got everybody here, make sure I

12  understand kind of what the -- if there are any concerns and

13  what, if anything, we can do to address them.

14        So does Pretrial have any concerns?

15        MS. OXFORD:  Your Honor, the limited information that

16  we received, Mr. Gibson had mentioned in February that he was

17  going to do that, and then he was going to provide some more

18  information.  So the first I had seen was when it was filed on

19  ECF and that there was some -- a docket entry about that.

20        And so I looked at the tickets and there's four

21  flights going to Hong Kong and (inaudible).

22        THE COURT:  Just stop for one second.  I just want to

23  make sure -- I know there was a motion with respect to

24  something under seal.

25        MR. WEINBERG:  Yes.

1          THE COURT:  I just want to make sure we're not talking

2    about anything that's not --

3          MR. WEINBERG:  You're not, your Honor.  I just placed

4    under seal an exhibit that I gave to Mr. Heymann but that I

5    regrettably didn't get it to Ms. Oxford and will, but has the

6    detailed hotels and properties and credit card information.

7          So that I gave to Ms. Russo to give to the Court.

8          THE COURT:  Okay.  And we just won't mention that out

9    loud as we sit here right now.

10         MS. OXFORD:  So the only thing, as I said, the four

11   tickets going out (inaudible), but I only saw Mr. Gibson

12   returning.  There's no flight information at all about the

13   family, and my concern always is that perhaps from that port,

14   when you give someone their passport back --

15         THE COURT:  Right.

16         MS. OXFORD:  -- that gives them really the liberty to

17   fly anywhere in the world.

18         So my concern was how are we going to establish some

19   kind of guarantee that he and his family will be returning back

20   here, and we'll resume the supervision as it was stated by the

21   Court (inaudible).

22         THE COURT:  All right.  Is that something,

23   Mr. Weinberg, that you --

24         MR. WEINBERG:  Yes.  My understanding, and again the

25   understanding comes from the Gibson Family, is that the other

1   three members of the family, or at least two of them that are

2   traveling, Mrs. Gibson and one of their -- two of their

3   children, are coming back separately, and I don't know why.  I

4   believe that it was a result just of availability of flights,

5   cost of flights, things like that.  But I will get to both

6   Mr. Heymann and Ms. Oxford the other tickets so that we at

7   least will have a common history that they too have return

8   flights.  They're not planning on spending their lives

9   (inaudible).

10          THE COURT:  All right.  I mean, I think that subject

11   to that, I will allow it.  There's always the -- one could

12   always muse, well, geez, maybe we should increase the amount of

13   the bond or whatever, but I think that we have a track record.

14   There hasn't been any -- never been any problems thus far.  By

15   all accounts, it seems that everybody agrees this is a

16   legitimate event, so I'm not too concerned about that.

17          So we'll allow it, but we'll understand, Mr. Weinberg,

18   that you're going to provide that information to Pretrial.

19          MR. WEINBERG:  Thank you, your Honor.

20          THE COURT:  All right.  So is there anything else that

21   we need to address or can address today?

22          MR. WEINBERG:  Just, you know, and I understand the

23   Court does not want affirmative argument on the (inaudible).

24          THE COURT:  Put it this way, we can argue as much you

25   want until 2:30.

1        MR. WEINBERG:  I'll take advantage of all of

2   Mr. Heymann's time.

3        I wanted to just note a couple of issues that I think

4   should be on all of our radar in the event that we can't reach

5   an agreement amongst the parties.  You know, one just occurs to

6   me that when your Honor makes a dichotomy between privileged

7   information and material information, that Brady may cut across

8   that dichotomy, and there's, I think, an engaging legal issue

9   about Mr. Gibson's entitlement to use Brady information that

10  may otherwise be deemed to be privileged.

11       THE COURT:  Well, is that an issue here?

12       And for my identification, correct me -- I just want

13  to make sure I have this right.

14       So the server is provided to the Government, so the

15  Government gets a working copy.  The Government makes the first

16  cut in determining whether there are items on there that are

17  responsive to its own subpoena.  Then that list is shown to the

18  firm and the firm identifies whether there are things on that

19  list that should be withheld from disclosure because they're

20  privileged.

21       MR. WEINBERG:  Or because the firm determines that the

22  Government was overinclusive in terms of its selection of

23  pertinent information with the exemplar, if you will --

24       THE COURT:  Right.

25       MR. WEINBERG:  -- being a carefully architected Grand

1      Jury subpoena rather than Mr. Gibson's Rule 16 rights.

2              THE COURT:  All right.  But if we presume that -- oh,

3      okay.  If we presume though that with respect to what the

4      Government identified, the Government understands Brady

5      obligations and complied with them, your only concern with

6      respect to that universe of material is the sliver that where

7      the firm may have said oh, these files or these names or these

8      things that were identified we think ought not be included, and

9      where the Government hasn't necessarily looked behind the

10     curtain to see what those are, those might be things that you

11     would be concerned about?

12             MR. WEINBERG:  No.  My concerns are far more

13     expansive.

14             THE COURT:  You're also talking about all of the other

15     unchartered territory that hasn't been --

16             MR. WEINBERG:  Yeah.

17             THE COURT:  Right.

18             MR. WEINBERG:  Because my real concern is the

19     Government established a protocol with Mr. Lovett and in the

20     protocol, the very start is the IRS will make two complete

21     images of the server, they'll maintain one in a sealed bag, and

22     access it only if it is necessary to do so in a subsequent

23     criminal proceeding.  And then they went on to talk about Grand

24     Jury subpoena compliance.

25             THE COURT:  Right.  We saw that language too, and I

1    thought that meant -- was meant to mean if they had to

2    authenticate information to show it actually came from the

3    imaged server.  That's what I took that language to mean, maybe

4    I was wrong, because otherwise it would make no sense because

5    the next paragraph goes on to talk about a working copy of the

6    imaged server.  So why would there be a need to tap into that,

7    you know, break the seal on that first copy.

8              MR. WEINBERG:  Yeah.  I think the remaining paragraphs

9    are dealing with this narrow or, you know -- it's not a Rule 16

10   subpoena, it's a subpoena where the Government is searching

11   through the Grand Jury for financial information, and the

12   remaining paragraphs are trying to establish a protocol whereby

13   Mr. Behman's counsel will have an ability to look at the disk

14   before Mr. Heymann receives it for (a) pertinence, (b)

15   privileged.

16             THE COURT:  Right.

17             MR. WEINBERG:  But it didn't address the more

18   fundamental question that Mr. Behman's counsel chose to give

19   the Government the server.  He could have well kept the server,

20   not provided it to a quasi adversary, although I would argue in

21   this case he did so to facilitate his response to a Grand Jury

22   subpoena, and Mr. Behman's wearing multiple hats, one of which

23   is:  I'm Mr. Behman, whether individually or a member of Behman

24   & Hambleton, want the Government to be happy with me.  I'm

25   seeking immunity.  I'm a whistleblower.  I want monetary

1     benefits.  I hate Mr. Gibson and hope he's convicted because if

2     he's convicted, there will be restitution, and my whistleblower

3     benefits will kick in.

4          So this was a voluntary act by an adversarial party

5     for his own purposes.  Having given the Government the server

6     voluntarily, because he didn't have to, Mr. Heymann didn't

7     subpoena the server --

8          THE COURT:  Right.

9          MR. WEINBERG:  -- Mr. Behman gave him the server.

10         And as a footnote, the idea that Mr. Behman, you know,

11    aggregated his next law firm's client files to the Gibson &

12    Behman server is simply an act that, whether it's legal or

13    ethical or proper, it certainly doesn't diminish Mr. Gibson's

14    rights or the Gibson & Behman rights.  That was a law firm that

15    was subject to Mr. Behman managing its, you know, winding down

16    subject to a wind-down committee.  Nobody, to my knowledge,

17    ever told Mr. Behman oh, by the way, you can take the asset of

18    Gibson & Behman, which contains all the Gibson & Behman files,

19    and use the same server for your own purposes.

20         THE COURT:  All right.  So two --

21         MR. WEINBERG:  You know, I don't want Behman &

22    Hambleton files, I want Gibson & Behman files, but I don't want

23    just the subset of the subpoenaed files --

24         THE COURT:  Right.  No, I -- okay.

25         So two questions.  Number one, what does this do in

1     other cases where the Government has an investigation and the

2     Government is going to subpoena some documents from an

3     entity --

4           MR. WEINBERG:  Yeah.

5           THE COURT:  -- and the entity says I really want to

6     cooperate with you, but you're asking for some things -- either

7     you're asking for some things that we don't think you're

8     entitled to, even with your grand subpoena power, or you're

9     ask -- the only way we can respond to your subpoena is to give

10     you some other things that are not responsive, because the way

11     in which the information is stored is such that that's the only

12     way we can give it to you.

13           So we'll give it to you, but you've got to promise

14     you're going to be careful how you use it, you're going to

15     limit how you use it.

16           Aren't you asking us to essentially say that once the

17     Government then thereafter indicts somebody, those prior

18     agreements it makes with others are kind of null and void, or

19     at least subordinate to the Government's obligations.  That's

20     one.

21           But then more practically, why can't you just do this

22     through Rule 17, because your issue is really not with the

23     Government here?

24           MR. WEINBERG:  I don't agree, respectfully.  My issue

25     is with the Government.

1          THE COURT:  All right.  But do the -- answer the first

2     part first just because I'd like the benefit of your thinking.

3          MR. WEINBERG:  The first part is it's the caselaw

4     which says pretty clearly that a party can't, for instance,

5     selectively waive the privilege, and I know that that's not

6     (inaudible).  They can't give the Government some documents,

7     sign a confidentiality agreement and somehow limit the later

8     rights of a criminal defendant to ask the Government to provide

9     all the documents that the Government has been provided.

10         So that if -- oftentimes it happens in the selective

11    waiver context, the subpoenaed party, for its own purposes,

12    trying to get a benefit, gives the Government privileged

13    materials, and then the defendant seeks the same privileged

14    materials and the party that gave them said no, I have an

15    agreement with the Government.  I was only giving the

16    privileged materials to the Government to try to convince them

17    of facts A, B and C, and the First Circuit in U.S. v. MIT --

18    and I'll provide a supplement if your allows me, to my prior

19    pleadings that will bring it into focus.

20         THE COURT:  A brief one, brief one.

21         MR. WEINBERG:  But the caselaw is fairly clear,

22    certainly before Rule 502, that the rights -- the two parties,

23    the Government and a witness, can't contractually effect and

24    diminish rights under Rule 16 or constitutional rights of the

25    target who is thereafter indicted.

1          More broadly, you know, is that -- that same concept

2    would apply even more so to a voluntary turnover of a server

3    that could have been, at least we live in a computer age.

4    Mr. Lovett could have responded, as so many corporations do, so

5    many law firms do, could have given them the responsive

6    materials, and if there was a responsive material that was

7    privileged, he had an obligation to provide a privilege review

8    log, and that's the way the law requires these things to be

9    litigated.  But you don't turn over client files to the

10   Government and additional information to the Government, and

11   then the Government asserts that they have no Rule 16 powers.

12         So your Honor also asks about the interplay of Rule 16

13   and 17, and I can deal with it on three levels.  One is, with

14   all respect to Mr. Lovett, who is a terrific lawyer, he

15   represents an adversary of Mr. Gibson.  They have as ugly a

16   corporate divorce as I've ever seen.  Mr. Behman today is a

17   whistleblower who wants money that will come to him with more

18   certitude if Mr. Gibson is convicted than acquitted.

19   Certainly, a conviction brings immediate restitution, and an

20   acquittal might bring some open-ended subsequent civil

21   litigation.  So he's got a monetary motive.

22         Three is Mr. Behman, as I've said in prior pleadings,

23   Mr. Lovett has looked like, from the Government discovery, that

24   he has aided and abetted in architecting some of the IRS

25   criminal investigation.  He's been named as someone that was

1    going to go talk to Paul Levinson and he was going to provide

2    expert accounting opinions, and went beyond the I'm a lawyer as

3    a conduit for a fact witness to I'm a lawyer trying to help the

4    IRS make a case against Gibson, I'm sure at Mr. Behman's

5    request.

6            So he is not a party that the appearance of justice or

7    the law would allow to be the arbiter of materiality.  I trust

8    Mr. Heymann has Rule 16 obligations, Brady obligations, and

9    it's real.

10           I could say, for instance, Mr. Gibson has a right

11   without limit to his own statements.  He has been given an

12   e-mail folder of his statements in 2010 and 2011.  But all of

13   the other people at the law firm have e-mail folders.

14   Ms. Garrity's goes back to 2004, Ms. Jones' to 2008, but

15   there's 20 other people that go back before '10 that would have

16   Mr. Gibson's sent e-mail that Mr. Gibson's folder, for reasons

17   I don't know, does not have.

18           THE COURT:  Okay.

19           MR. LOVETT:  Your Honor, well, I happily --

20           THE COURT:  I want to hear from Mr. Heymann, and

21   Mr. Lovett, you're going to have to -- we may have to wait

22   until -- this is what I didn't want to do.  I know you're

23   chafing at the bit.  I've really got something at 2:30 I have

24   to attend to, so Mr. Heymann.

25           MR. HEYMANN:  Well, I yielded 12 minutes to

1    Mr. Weinberg.  I would like to just take the two to three that

2    remain.

3              THE COURT:  Okay.

4              MR. HEYMANN:  The first thing is that I think

5    Mr. Weinberg would be in a very different arguing position if

6    what had happened was his client had consented to the search of

7    a limited portion of things and the Government was now claiming

8    the right to all of them.  There is a reason that scope of

9    consent is critical to these kinds of decisions.  Both

10   directions, not just the direction that is before the Court

11   right now, will be true with defendants going forward.

12             The second is that the basis for the challenge right

13   now is the fact that it was retained to ensure Mr. Weinberg's

14   understandable request that things wouldn't change, so he would

15   be able to argue for things.  That does not -- should not be

16   able to be leveraged into a well, you did protect it, and

17   therefore I should have access to it.

18             The third is this, and this has been the position of

19   the Government from the very beginning, if we had possession,

20   custody and control, the first thing we would be doing is

21   simply making it available.  I do not agree with all of the

22   claims of Brady and things like that, but we would typically be

23   making all of it available as a matter of comedy, as a matter

24   of overabundance is better than underabundance.

25             But here we're stuck with this other problem and the

1    size -- it has been requested by now by Mr. Weinberg and his

2    client, it's asking for the Government to essentially review

3    the entirety of a server of a whole 40-person law firm without

4    any contours to what that would be and what would be

5    appropriate and what not appropriate, and that is an

6    extraordinarily large task without any contours, without any of

7    the refinement, and for which Rule 17, as the Court analogized

8    most appropriate to define it.

9            MR. WEINBERG:  If I could have 20 more seconds, your

10   Honor.

11           MR. LOVETT:  May I be heard?

12           THE COURT:  You've got Mr. Levitt in the back.  He's

13   going to grab those 20 seconds.

14           MR. LOVETT:  Your Honor --

15           THE COURT:  Here's what I'm going to do, and after

16   this -- so here's what -- we're coming back on the 21st.  If

17   anybody wants to file anything supplemental by the 14th, I'm

18   happy to receive it, but we'd like to have it by then just so

19   we can kind of digest it in case we do have to actually still

20   discuss this some more and resolve any issues on the 21st.

21           So you have about two minutes, Mr. Lovett.

22           MR. LOVETT:  This server, by definition, contains

23   privileged material.  There's client material between Gibson

24   Behman and its clients, Behman Hambleton and its clients,

25   communications with myself and my client, and that material

1    should not be disclosed.  It hasn't been disclosed to the

2    Government.  We took steps in light of Attorney Weinberg's

3    request that the server be preserved based on some challenge

4    to -- a future challenge to authenticity of documents.  We

5    accommodated the Government's request to mirror image the

6    server pursuant to our agreement.  They didn't look at any of

7    the documents on the server until I had reviewed them to

8    determine responsiveness to the subpoena.  And privilege, we

9    produced the documents.  Those are the documents that are in

10   the Government's possession.

11        What Attorney Weinberg is proposing is that privileged

12   communications, which I don't have the ability to waive,

13   Mr. Behman doesn't have the ability to waive with respect to

14   the clients, we handed over so Mr. Gibson can determine whether

15   those communications are helpful in his defense.  He's not

16   entitled to that.  There's been a case recently decided by

17   Judge Sorokin in SCC v. Prigen (PHONETIC).  He's not entitled

18   to privileged communications to mount a defense.  What he's

19   entitled to are documents that are material to the defense.

20        I think the Court's third proposal, which is a Rule 17

21   subpoena, is the right result here.  If counsel would like to

22   provide search terms and whatnot as the Government did, then we

23   could accommodate that request.  But searching an entire server

24   with records that date back to at least 2004 in determining

25   what's privileged when most of it is privileged is just

1  unworkable.

2       This case and the case we cite in our papers, Stein,

3  it was one of the KPMG cases, where there was a deferred

4  prosecution agreement with KPMG.  They required KPMG to produce

5  documents to the IRS upon request.  There was a carveout in

6  that agreement and it was a carveout for privileged materials,

7  and when the defense tried to get the privileged materials, the

8  Court recognized the Government doesn't have possession,

9  custody and control over those documents because of the

10  carveout.

11       We're in the same position here.  We have an agreement

12  with the Government.  The Government says we're not going to

13  look at these documents unless counsel reviews them for

14  privilege first.  So the Government doesn't have custody and

15  control.  They may have possession of the server in the event

16  authenticity becomes an issue, but it doesn't give the right to

17  the Government to go in and look at those documents now.

18       And for that reason, I think the Rule 17 subpoena is

19  the appropriate result.  If counsel can make a showing that

20  those elements of Rule 17 are met, the Court can authorize the

21  issuance of the subpoena and we can respond in kind.

22       MR. WEINBERG:  Of course Mr. Gibson is two-thirds

23  owner of Gibson & Behman, which is the party with

24  responsibilities to the client.  I'm not looking for anything

25  having to do with Mr. Behman's new firm.  It shouldn't have

1    been joined to the Gibson & Behman server.  Mr. Gibson,

2    although no longer a lawyer, has an agreement on

3    confidentiality.  Your Honor can include it in a protective

4    order.  Mr. Behman is not the only lawyer with a right to

5    access privileged materials.

6              MR. LOVETT:  And if I may address that.

7              THE COURT:  And then this is it.  It's 2:31.

8              MR. LOVETT:  Most of the clients from Gibson Behman

9    went to Behman Hambleton.  So the claim that Mr. Gibson is

10   two-thirds owner in this data, the client owns the data and --

11             MR. WEINBERG:  There's time limits when the firms went

12   from one to another that can be imposed, your Honor.

13             THE COURT:  All right.  And I'm sorry we don't have

14   more time, but thank you.

15             MR. LOVETT:  Thank you, your Honor.

16

17             (The hearing was concluded.)

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

I, Karen M. Aveyard, Approved Federal Court Transcriber, do hereby certify that the foregoing transcript, consisting of 25 pages, is a correct transcript prepared to the best of my skill, knowledge and ability from the official digital sound recording of the proceedings in the above-entitled matter.


/s/ Karen M. Aveyard

Karen M. Aveyard


June 26, 2016

Date