UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

****************************

UNITED STATES OF AMERICA,
        Plaintiff

vs.                             Case No. 1:15-cr-10323-IT

DANIEL GIBSON et al,
        Defendants

****************************


TRANSCRIPT OF THIRD INTERIM STATUS CONFERENCE
BEFORE THE HONORABLE DONALD L. CABELL
AT BOSTON, MASSACHUSETTS
ON JUNE 8, 2016


APPEARANCES:

For the Government:
Stephen P. Heymann, Assistant United States Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, Massachusetts 02210
617-748-3100

For Daniel Gibson:
Martin G. Weinberg, Esquire
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
617-227-3700


Transcriber:  Karen M. Aveyard,
              Approved Federal Court Transcriber

    -----------------------------------------------------

**TRANSCRIPTION PLUS**
**1334 ELM STREET**
**LEOMINSTER, MASSACHUSETTS 01453**
**(978) 466-9383**
**www.transcriptionplus.com**

APPEARANCES (continued):

For Mark Kesner:
Joshua L. Solomon, Esquire
Pollack Solomon Duffy, LLP
133 Federal Street, Suite 902
Boston, Massachusetts 02110
617-439-9800

For Scott Behman:
William J. Lovett, Esquire
Collora, LLP
100 High Street, 20th Floor
Boston, Massachusetts 02110
617-371-1000

1                        P R O C E E D I N G S

2

3            THE CLERK:  The United States District Court for the

4    District of Massachusetts is now in session, the Honorable

5    Donald L. Cabell presiding.  Please be seated.  The case of the

6    United States versus Daniel Gibson and Mark Kesner, Criminal

7    Action No. 15-10323, will now be heard before this Court.

8            Will counsel please identify themselves for the

9    record.

10           MR. HEYMANN:  Your Honor, Steve Heymann on behalf of

11   the Government.

12           THE COURT:  Good morning.

13           MR. SOLOMON:  Good morning, your Honor.  Joshua

14   Solomon on behalf of Mark Kessner.

15           THE COURT:  Good morning, Mr. Solomon.

16           MR. WEINBERG:  Good morning, your Honor.  Martin

17   Weinberg on behalf of Daniel Gibson.

18           THE COURT:  Good morning.

19           MR. LOVETT:  Good morning, your Honor.  William Lovett

20   on behalf of Scott Behman and Behman Hamilton.

21           THE COURT:  And good morning to you too.

22           All right.  This is the third interim status

23   conference and there's just a number of things to address, and

24   I thought it might make the best sense, especially with

25   Mr. Lovett and the issue before, to deal with the issue

1    regarding the server.

2            So I've had a chance to review the parties' proposed

3    protective order.  I do have just a couple questions, one about

4    the scope, maybe, of the protective order, but also just about

5    a couple of factual questions.  So if anybody wants to bring me

6    up to speed.

7            Mr. Heymann, I do see in the joint memo that you

8    indicate that there were e-mails that you ultimately came to

9    recognize were not imaged.  So does that mean whatever we're

10   talking about here with respect to the server, we're not

11   talking about those e-mails, and if so, what is the status with

12   the e-mails in terms of whether there's going to be an issue

13   regarding a disclosure or the like?

14           MR. HEYMANN:  So let me take that one step at a time.

15           THE COURT:  Yes, please.

16           MR. HEYMANN:  In the 60 days since we last saw you, we

17   were following the Court's protocol, first identifying subset

18   that were clearly not requested and could be taken off the

19   server, and then in turn, and I can go into this now or later

20   as the Court prefers, sort of two different time periods that

21   involve different issues of attorney-client privilege, and

22   therefore require a different resolution by the Court.  I went

23   ahead and made drives that allowed me to produce them today,

24   but still have them satisfy whatever the Court ordered by

25   separately encrypting the different folders.  So only by -- in

1    whatever form the Court gives its final order here, I can give

2    the encryption password for that particular folder to that

3    particular person and we're all set.

4              THE COURT:  Okay.

5              MR. HEYMANN:  In the process of doing this, we

6    learned, or I learned, to be specific there, that we had not

7    imaged that part of the Gibson & Behman servers that contained

8    the vast majority of e-mails.  I understand that there may be

9    .pst files on these drives, but the e-mail server had been

10   stored in either a separate drive or on a separate computer and

11   we hadn't e-mailed that -- hadn't imaged that.

12             Early along in the case, early along in the

13   investigation, we had requested Mr. Lovett and his law firm and

14   his clients to preserve everything.  My understanding is that

15   they remain preserved, but that they are -- to whatever extent

16   e-mails have not been produced by the Government and one or the

17   other of the defendants request them, they are preserved in the

18   hands of Mr. Lovett's client.

19             THE COURT:  All right.  Does that mean you don't have

20   them?

21             MR. HEYMANN:  It means I don't have them, other than

22   ones I've produced.  I have e-mails, but I produced those.

23             THE COURT:  Right.  Okay.

24             MR. HEYMANN:  But I don't have a -- we didn't have on

25   our image images of the stored e-mail files.

1          THE COURT:  All right.  Now, it wasn't clear to me

2    whether what you were saying was when we image the server, we

3    neglected to or inadvertently failed to image the e-mails.  So

4    we have the e-mails, but we --

5          (There was a break in the audio.)

6          THE COURT:  -- just never made a copy of them.  But

7    you're not saying that, you're saying you don't actually have

8    the e-mails.  Those are retained by Mr. Lovett --

9          MR. HEYMANN:  That's correct.  Without speaking to the

10   adjective or adverb that precedes what the forensic analyst did

11   in making a copy, when we made a copy and later searched that

12   copy, the copy we made did not include the folder storing the

13   vast proportion of e-mails.  Those, however, are preserved, but

14   they're simply preserved in the hands of Mr. Lovett's law firm

15   and his client.

16         THE COURT:  Okay.  What I'm asking you is when you say

17   "when we made a copy", the thing that you used, the original

18   source that you used to make a copy of it, where is that

19   original source now?

20         MR. HEYMANN:  In the hands of Mr. Lovett and his

21   client.

22         THE COURT:  All right.  Thank you.

23         MR. LOVETT:  So, your Honor, please, on this point,

24   can an inquiry be made as to, I think, a followup to your

25   Honor's question, which is when the Government received the

1  server from the law firm before it was returned, did that

2  server contain the e-mails that were not imaged.  In other

3  words, was the -- did they image a hundred percent of what they

4  received or did they image only one drive and return multiple

5  drives with one having been in their possession, but not

6  copied.

7          THE COURT:  What's the significance of whatever the

8  answer might be?

9          MR. LOVETT:  Well, I think there's double

10 significance.  The first significance is it's another

11 reflection of the inconsistent positions taken by the law firm

12 which has produced, we know, e-mails in civil litigation, then

13 produced e-mails to the Government, has produced them,

14 therefore to us from the Government, which are filled with

15 attorney-client references.  So the idea that we can go back

16 five years and say we the law firm intend to preserve the

17 privilege, that train has gone.  There's been a selective

18 waiver.

19         Mr. Gibson's e-mails, for instance, which I properly

20 got from Mr. Heymann under Rule 16, are filled with discussions

21 about client matters, confidential matters, between he and

22 other lawyers, he and his secretary.  It's not a perfect world.

23 We're not back in 2011 deciding what the Bar tells us we should

24 do in an ideal world.

25         But second, if the Government had these e-mails and

1    didn't copy them, whether, I presume, because I know and trust

2    Mr. Heymann, through inadvertence, that I think it could affect

3    how your Honor would ultimately rule on a motion, whether it's

4    under Rule 16 or Rule 17, for those e-mails to now be produced.

5            Again, the Government doesn't have possession, control

6    or custody now.  It's more of a Rule 17 issue.  But if they had

7    possession, custody and control and returned them, I think

8    whether their past control would affect which rule and which

9    standards, at minimum it would affect your Honor's decision on

10   a Rule 17 motion to reacquire from the law firm what they had

11   once disclosed to the Government.

12           MR. WEINBERG:  Your Honor, may I address --

13           THE COURT:  Yeah, let me just let that percolate for a

14   minute.  I'm just not sure I agree with everything you're

15   saying.  I mean, I've tended to approach this issue about

16   whether something is in the Government's possession or control

17   very literally; if it's upstairs, then it's in their custody,

18   possession and control, and if it's not upstairs, then it's

19   not.

20           MR. LOVETT:  Yeah.

21           THE COURT:  So I think, you know, and I like how what

22   you said presumes that if the Government had it and it was

23   returned, it was inadvertence, it wasn't deliberate, and so I

24   think I would be inclined to say there that that would be

25   Rule 17 land rather than Rule 16 land.

1          Mr. Lovett?

2          MR. LOVETT:  Just a point of clarification.  The

3    Government never had physical possession of the server.  What

4    happened is the Government sent a forensic technician out to

5    the law firm with Behman Hambleton's IT vendor.  They were

6    given access to the server.  They copied the portions that they

7    wanted.  That did not include the portion of the server with

8    e-mails.

9          My recollection at the time is the Government was

10    looking for specific documents --

11          THE COURT:  Right.

12          MR. LOVETT:  -- and in order to preserve a forensic

13    image of those documents, they wanted a forensic image of the

14    server.

15          THE COURT:  Right.

16          MR. LOVETT:  Ultimately, we followed the protocol

17    outlined in the agreement.  I looked at documents that --

18          (There was a break in the audio.)

19          MR. LOVETT:  -- were produced after search terms were

20    run, the documents were identified, and they were produced

21    pursuant to a Grand Jury subpoena.

22          So the Government never had physical possession of the

23    server.

24          THE COURT:  Okay.  And with that representation,

25    Mr. Weinberg, I'll treat this as the Government never had the

1     e-mails in its possession or custody or control.

2          MR. WEINBERG:  I understand.

3          So it leads to the second inquiry, and I'm not sure

4     that Mr. Heymann -- that your Honor will make that inquiry

5     through you.  But the Government's purpose, at least one of the

6     purposes, in imaging the server was to preserve it for forensic

7     analysis that would support their proposition that certain

8     pivotal e-mails were in fact from Mr. Gibson's computer, were

9     authentic, were proper.  Here's some key evidence that happens

10    to be e-mails.

11         So now for the first time, and I don't mean for the

12    first time today because we learned of the -- that there was

13    not a hundred percent copying, you know, when it was disclosed

14    sometime after the April 21 conference, if the Government is

15    going to now seek what they didn't copy, because I presume that

16    what they didn't copy is really what needs to be forensically

17    tested to determine the authenticity and origin of these

18    pivotal e-mails, then it could become a Rule 16 issue because

19    the Government might be the party to issue a Rule 17 subpoena

20    to the firm rather than the defense.

21         But I think one way or the other, there's going to be

22    Rule 17 litigation as a result of today's (inaudible).

23         THE COURT:  That may be, and right.  And everything

24    else you were kind of framing in the conditional, so I'm not

25    sure it's something that is ready for me to dive in on today.

1          MR. WEINBERG:  Correct.  But what I think is relevant

2     is the other part of my statement to the Court about the fact

3     that the Government's possession of the e-mails which came from

4     apparently a source other than the copying of the server were

5     deliberately produced by Mr. Behman's counsel not only in civil

6     litigation, but to the Government, which I received in Rule 16,

7     and I think that should affect the extent to which the Court

8     now is responding to the recent filings of Mr. Behman seeking

9     to erect an attorney-client or a confidential barrier to the

10    Government's discharging its Rule 16 obligations.

11          THE COURT:  Well, I'm hoping I can work through that

12    today and to moot it.  I'm beginning to get a sense of how I

13    think things should proceed and it's probably going to be maybe

14    a middle-of-the-road.  It's probably not going to give

15    Mr. Lovett everything he wants, but at the same time I am

16    trying to be mindful of some of the concerns he's raised.

17          So with that, I had a couple of questions about the

18    protective order and I understand the three different groups,

19    Mr. Heymann.

20          One question I have for everybody collectively is

21    should I assume, or should we assume, that there is not likely

22    to be a high amount of privileged information in the data

23    before March of 2011, because I see that in two and three you

24    took pains to segregate that data where there's a high

25    likelihood of it being privileged, but I don't see that with

1    respect to pre-March?

2           And if that were produced, what safeguards are there,

3    if any, that if Mr. Lovett felt there was information in there

4    that shouldn't be seeing the light of day or that at least he

5    should have an opportunity to speak to before it was used, and

6    there was -- there could be fair debate over whether the

7    document is privileged to begin with, what safeguards are there

8    that he would have the chance to see it and to comment on it,

9    because as I understand the protective order, the protective

10   order says that if you guys want to use anything that is

11   privileged, there's a mechanism in place for Mr. Lovett and his

12   client to be heard, but I don't see anything that says well, if

13   you guys determine something is not privileged, but he might if

14   he had exposure to it, that he have a chance to?

15          Mr. Weinberg.

16          MR. WEINBERG:  I think your Honor is quite correct.

17   That does put on the defendants, and we're both represented by

18   lawyers --

19          (There was a break in the audio.)

20          MR. WEINBERG:  -- that are not insensitive to

21   privilege issues since we're often fighting on the other side

22   of the privilege, that we have the responsibility, just as

23   Mr. Lovett would have the responsibility under other

24   circumstances, if there was a subpoena, for instance, if

25   there's a Rule 17, I'm sure Mr. Lovett would move to quash or

1   limit it and do a privilege log.  It's on us to be generous in

2   terms of what we want to disclose in terms of identifying it as

3   privileged or arguably privileged, and I think it's

4   appropriate.

5          I think the point your Honor is making is it's one

6   thing if we, from the server, are extracting a QuickBook

7   financial document of a check that's clearly not privileged.

8   Certainly, if it's a document that was a memo to file regarding

9   a client is privileged.  But there is this gray area, you know.

10  In other words, maybe it's a motion on behalf of a client that

11  was a draft that one would argue has some work product that is

12  not within the core of the attorney-client privilege.

13         I'm glad to amend -- to have the Court amend the

14  protective order to obligate us to provide anything that's

15  clearly -- any document that is not clearly not privileged to

16  the review of Mr. Behman's counsel rather than just matters

17  that we have clearly determined are privileged.

18         I hope I was clear on that.

19         THE COURT:  No, you are clear, and Mr. Heymann, all

20  right, now I'll hear you, because I'll tell you we were dancing

21  around this, and last night I had convinced myself that I had a

22  solution to that.  This morning I convinced myself that you'd

23  scream bloody murder if I proposed it, which is not just

24  identifying not clearly privileged, but identifying anything

25  that you think is relevant or material, or that you might

1    consider using and wanting to be placed in the public record or

2    used in a pretrial proceeding.  In essence, preparing a log of

3    anything you might want to use.

4         MR. WEINBERG:  Here is why I don't think that works,

5    at least in the unique circumstances of this case, which is

6    that Mr. Lovett, who I respect, is an advocate, and he's an

7    advocate for a biased party, and there's monetary issues with

8    the biased party seeking whistleblower rewards, and there's a

9    history of animosity between Mr. Lovett's client and my own.  I

10   would certainly do that with your Honor's review for your Honor

11   to make a determination as to whether or not the documents that

12   we intend to use that come from the server should be disclosed

13   to Mr. Lovett, but I would object to my having to show him

14   clearly nonprivileged materials and, therefore, provide him

15   with a roadmap to what I consider to be material and relevant.

16        THE COURT:  I could show you my notes where I actually

17   wrote the word "roadmap" and put it in quotes and said that's

18   what he's going to say.

19        MR. WEINBERG:  I hate being so predictable.

20        (Laughter.)

21        THE COURT:  All right.  So I understand that.

22        Let me ask you this.  Volume, sheer number, are we

23   talking about a lot of stuff or are we talking about hundreds

24   of documents?  Does anybody have a sense?

25        MR. HEYMANN:  Your Honor, I only have a sense of a

1      separate subset.  I can't recall whether it's in our

2      notification to the court, but the reason that March 9th was

3      chosen was that was the date that Mr. Lovett and his law firm

4      was retained in this split among the parties --

5                 THE COURT:  Right.

6                 MR. HEYMANN:  -- and that created a separate privilege

7      issue of his representation of the firm.  Based on our

8      understanding of where we were following the last hearing, the

9      reason there's simply one folder for everything up until

10     March 9th -- March 11th is actually the day of the split, but I

11     talked to Mr. Weinberg beforehand.  March 9th is the day of the

12     representation and, therefore, potential conflict.

13                My understanding was that that was going, based on the

14     Court's preliminary order, all to be produced to the defendants

15     subject to a protective order for review, and that there then

16     was a dispute, of which I take no position whatsoever, between

17     at least Mr. Weinberg and Mr. Lovett about whether there should

18     be an approximately 90-day period afterwards that should also

19     be produced that might capture what Mr. Weinberg argues is

20     potentially relevant --

21                (There was a break in the audio.)

22                MR. HEYMANN:  -- information, and Mr. Lovett would say

23     no, there's a firm line there, the time he's out of the firm.

24                What I do know is simply the rough figures for that

25     90-day period, because we aren't examining -- we aren't looking

1    at any of the data while we're doing this.  I was told by the

2    case agent that with respect to the 90-day period, what we were

3    doing was running a lengthy list of names associated with

4    Mr. Lovett's law firm and also people with whom the law firm,

5    he said, were working on the lawsuit; that the number of

6    occasions that a lawyer's name from Mr. Lovett's law firm

7    popped up was in the order of magnitude of a handful.  You

8    know, I don't know whether it was five or ten or fifteen, but

9    it's a modest number; that the number of times that anybody on

10   the list appeared is in the several hundred.  Less than a

11   thousand, more than a hundred, but in the several hundred range

12   for that three-month period.

13            Now, it's a --

14            THE COURT:  And that's with respect to all of the

15   documents on the server, except for e-mails.

16            So if you say that -- well, let me ask you this.  Is

17   it more likely that a high percentage of the firm's data is

18   going to reflect some sort of privileged communication or that

19   that's likely to be a smaller percentage of what is on the

20   server?

21            MR. HEYMANN:  I don't think I can address that

22   question and give you a good answer for two reasons.  First of

23   all, we haven't looked, so I don't know the volume of data or

24   the percentage to apply to it; and second of all, I continue to

25   have no sense whatsoever as to where the claim of privilege

1    line is going to be argued by Mr. Lovett, where his concerns

2    are.  So without knowing either the size or the line, there's

3    no way for me to make that assessment.

4            THE COURT:  All right.

5            MR. HEYMANN:  I was only going to say one thing with

6    respect to the earlier conversation.  I recognize that there is

7    a discussion going back and forth as to whether or not the

8    defense should be able to pull documents and not let the

9    Government know what they are before trial.  It's a subtext

10   that's going on there in terms of roadmaps.  But the language

11   in Paragraph 6 of the proposed order was intended to give

12   breadth to what had to be disclosed to Mr. Lovett for review --

13           THE COURT:  Right.

14           MR. HEYMANN:  -- even if we don't go to the full list

15   of anything that you're going to use.  By putting in the "may"

16   rather than "is" --

17           THE COURT:  That's what I assumed.  Right.

18           MR. HEYMANN:  -- it was taking out -- it was

19   putting -- it was intended to put an accepted substantial

20   burden on defense counsel to give it a broad sway, and also to

21   the extent that the word "confidential", as well as

22   "privileged" information was in there, it was intended to give

23   it the broader scope that the rules apply in different

24   circumstances.

25           THE COURT:  Mr. Weinberg, if we were going to endorse

1    this, would you be willing to represent that the word "may" can

2    be a proxy for the not clearly privileged type of gray area

3    documents that you were talking about might emerge after

4    following the review, in which case those would also be shown

5    to Mr. Lovett on behalf of Behman's clients?

6         MR. WEINBERG:  Yes.

7         THE COURT:  Okay.  Mr. Lovett, you were going to say

8    something.

9         MR. LOVETT:  Yes.

10        THE COURT:  And then Mr. Solomon, I'll get to you.

11        MR. SOLOMON:  Yes, that's fine.

12        MR. LOVETT:  So, your Honor, you asked about the

13   period prior to May 9th and what those documents --

14        THE COURT:  March.

15        MR. HEYMANN:  March.

16        MR. WEINBERG:  March.

17        MR. LOVETT:  Excuse me.  So I have not looked at the

18   documents, but what I did look at, I had an IT vendor, Behman &

19   Hambleton's IT vendor, give me a spreadsheet with just a list

20   of the file names.  There's a lot of documents just based on

21   the file names.

22        But based on my review, these are case-related

23   materials.  They're pleadings, they're communications with

24   clients and status reports, those types of things.  That's the

25   vast majority of the documents.  Those are privileged.  They're

1    confidential client information and I don't know how it all, if

2    at all, it would be relevant to this case.  But that's what's

3    contained on the server.

4              THE COURT:  Okay.

5              MR. LOVETT:  With respect to the period post-March

6    9th, I struggle to understand why that's at all relevant.

7    March 11th is the date that the Superior Court entered a

8    restraining order and Mr. Gibson was effectively gone from the

9    firm.  I can't imagine what information would be on the server

10   in that time period that's relevant.

11             The charges, as I understand it --

12             (There was a break in the audio.)

13             MR. LOVETT:  -- involve tax years '8 and '9.  What

14   happened in that period that could impact this case, I have no

15   idea.

16             THE COURT:  Before you go on, what's the short answer

17   to that question, Mr. Weinberg.

18             MR. WEINBERG:  The short answer is (a) Mr. Lovett

19   ought not to be able to be here as an intervener arguing --

20             THE COURT:  I understand that, but just in terms of

21   the logic that there wouldn't be anything of relevance after

22   that date.

23             MR. WEINBERG:  Well, two is the law firm was in the

24   process of turmoil during that period.  There's predictably

25   many discussions and many e-mails regarding the past.  There's

1  no bar on communications on March 11 about March 8.  And so I

2  tried to be conservative in only seeking a 90-day period as a

3  period where I could rationally predict that there would be

4  meaningful material communications.

5       THE COURT:  Okay.

6       MR. LOVETT:  And just a final point, the proposed

7  order by the parties creates a situation where Mr. Kesner's

8  counsel, the Government and Mr. Gibson have access to

9  privileged information, because there's no question that even

10  if the Court were to limit this to the pre-March 9th period,

11  there's privileged information.  It puts the Government in a

12  position, if they have access to privileged information, you

13  know, that puts them in a position, can they continue to

14  prosecute the case.

15       My proposal, which I have filed with the court, would

16  treat this like any other case where the Government is in

17  possession of potentially privileged information.  As is

18  typical, there's a taint team.  The taint team reviews the

19  information besides what's privileged and what's not

20  privileged, and the not privileged information is turned over

21  to the prosecution, and that's typically the way the Government

22  handles it's Rule 16 obligations and I don't see why this case

23  should be any different.

24       So that's my position.

25       THE COURT:  Okay.  Mr. Solomon, I was going to get to

1    you because you --

2         MR. SOLOMON:  It's been addressed, your Honor.  Thank

3    you.

4         THE COURT:  All right.

5         MR. HEYMANN:  Your Honor, I don't know whether the

6    Court needs me to readdress the point of the tainting here, but

7    this is not -- it is not a typical situation.  It's not one

8    where we either know what the defense claims is relevant, what

9    the defense claims is exculpatory.  It's, you know, a vast body

10   of information.  It is just a trap waiting to be -- whatever

11   the rest of the metaphor is.

12        THE COURT:  Right, and I do remember that from last

13   time.

14        So I --

15        MR. WEINBERG:  Your Honor, please, if I could -- it

16   is -- Gibson would not argue against further modification of

17   Paragraph 6, a modification where before the Government

18   receives discovery, Mr. Lovett receives it first, can make his

19   privileged objections, because the truth is it's the Sixth

20   Amendment that is driving -- and the Rule 16 obligations which

21   is driving this process, and I'm neutral about whether or not

22   the Government would get at the same time as Mr. Lovett these

23   documents that are on -- that we've identified as maybe

24   privileged.  Your Honor could make a determination that a list

25   provided by the defense, receiving it under Rule 16, and the

1    Sixth Amendment goes to Mr. Lovett. He can make objections.

2    If your Honor rules on the objections and decides they're

3    privileged and cannot be used, you'd have to then weigh the

4    Sixth Amendment against privilege. The Government should not

5    get them and that they should remain sealed.

6         So it's another nuance to this kind of uniquely

7    difficult proceeding.

8         MR. HEYMANN: Two things. One, your Honor, this is

9    probably a major crossroad in the sense that the Government

10   firmly believes that it ought to have equal access to whatever

11   the materials are subject to exactly the same protocol and

12   concerns. This is not a law firm that has, to the best of my

13   knowledge, any federal criminal proceedings going on. If there

14   are, we could segregate that. This is a law firm that was

15   doing state insurance work in which we have no role.

16        So three is no justification for treating the

17   Government's access any different than the defendant's access

18   to a third-party piece of information here.

19        (There was a break in the audio.)

20        MR. HEYMANN: It would be wrong.

21        THE COURT: And to be honest, I'm not even sure what

22   we're arguing about at this point.

23        So we're talking about -- because as I'm -- how does

24   this come to pass that there's an issue, because as I

25   understand it, you would be providing information to the

1  defendants that you have access to it right now.

2          MR. HEYMANN:  We would be providing -- we have

3  provided all the records that we -- I don't want to get into

4  parsing what access means.

5          THE COURT:  Oh, I'm sorry.

6          MR. HEYMANN:  We have -- we've provided --

7          THE COURT:  You, I think, sitting right there.

8          MR. HEYMANN:  Right here.

9          THE COURT:  That you're going to be --

10          MR. HEYMANN:  Keep a copy of.

11          THE COURT:  Right.

12          MR. HEYMANN:  And give a copy to Mr. Lovett, copy to

13  Mr. Solomon.

14          THE COURT:  Right.

15          MR. HEYMANN:  A copy to Mr. Weinberg.

16          THE COURT:  That's right.

17          MR. HEYMANN:  When the Court rules as to whether to

18  include or not include the March 9th to June 11th period, we

19  will either give out one, two or three encryption passwords

20  that everybody will have --

21          THE COURT:  Right.

22          MR. HEYMANN:  -- and everybody will be able to use,

23  and the Court will simply determine what that is.  But it will

24  not be a situation where the Government is not allowed to

25  access the same part that Mr. Solomon and Mr. Weinberg --

1          THE COURT:  No, I'm not contemplating that.

2          MR. HEYMANN:  Okay.

3          THE COURT:  I'm not contemplating that.

4          MR. WEINBERG:  I was dealing instead not with the

5    Government's having physical possession, and therefore

6    implicitly being able to review the discovery that's been given

7    to them and then they give it to us, it's when the defense

8    decides -- let's say there's 10,000 documents and Mr. Solomon

9    and I together, just to make it easy, select 60 of them that

10   may be privileged --

11         THE COURT:  Right.

12         MR. WEINBERG:  -- and 50 of them that we're going to

13   use that clearly are not privileged.  So we're going to -- the

14   50, we'll be able to keep, and if we have reciprocal discovery

15   obligations, they'll be met.  The 60 may or may not end up as

16   part of the criminal trial.

17         THE COURT:  Right.

18         MR. WEINBERG:  That depends on your Honor's review of

19   the privilege log that Mr. Behman's counsel will provide.

20         Let's say 30 of them never see the light of day.  Your

21   Honor makes a privilege determination.  Your Honor can either

22   have that as a triangular process where the Government is a

23   participant, or could have it as a process where the defense

24   selects the 60, the Government doesn't learn which 60 the

25   defense thinks are relevant, and provides notice to Mr. Lovett,

1    who may or may not object.  If he doesn't object, then we have

2    30 more documents that the Government may not see.

3              THE COURT:  Right.

4              MR. WEINBERG:  That's the only little subset I'm

5    dealing with when I'm saying what the Government's role in that

6    part of the process is an issue for the Court to decide.

7              THE COURT:  And I think it's good to think about that.

8    I'm not sure we need to resolve it today, but I think that at a

9    minimum, if we get to that point where you've identified some

10   that might be privileged, you think there might be some

11   litigation over it, as long -- I think once you give notice to

12   the Court of that without sharing what the actual documents

13   are, then we can figure out how to best proceed.  But I do

14   think -- I think you're probably right, that that might best

15   take place outside of the presence of at least the Government

16   seeing the documents.  But I don't think we need to resolve

17   that today.

18             I'm also musing that at that point it may also involve

19   Judge Talwani, but again, I don't think we need to resolve that

20   today.

21             So here's my thinking.  It seems that even though we

22   can't quantify the amount of data that's at issue here, it

23   appears there's a substantial amount, and it's unwieldy in its

24   own way.  And so I am persuaded, Mr. Lovett, that the taint

25   team concept that you're proposing, while in many cases you're

1        right, that it's standard and it makes sense, I just don't see

2        it working here.

3                I'm not convinced that even if the Government did it,

4        it would capture everything it was intended to capture, and I

5        do think ultimately when the pool of potentially privileged

6        documents are identified that might be used in this case, it

7        would be best for everybody to be able to focus on just that

8        small pool and for you to then participate in a process as to

9        whether those documents should see the light of day.

10               So I don't think the taint team works.  I think,

11       therefore, that producing the data pursuant to the protective

12       order is the best way to proceed, with -- in that regard, I'm

13       not sure I need to modify Paragraph 6, but I do think on the

14       record, I think we --

15               (There was a break in the audio.)

16               THE COURT:  -- all need to understand that the word

17       "may" in that paragraph is laden with a lot.  It's going to

18       include anything that could possibly be privileged.  So err on

19       the side of if there's a possibility, it should be included on

20       that list so that Mr. Lovett and his client can have a voice in

21       how that material should be treated.

22               I think that anything -- Mr. Weinberg, again, tell me

23       how you feel, you and Mr. Solomon, how do you feel about this,

24       you talked in that hypo you just gave.  Let's say there were 30

25       documents that were clearly not privileged.  Maybe these are

1    documents that are relevant that you do plan to use.  Anything

2    that's like that, if you could create a log of those and

3    provide that to the Court for the Court's review, we can then,

4    and I hope we're not taking on a burden that we'll come to

5    regret, but we can then look at that and see whether we agree

6    there's nothing privileged here, and that way, Mr. Lovett,

7    you'll be getting the benefit of having an opportunity yourself

8    to see and speak about and fight about any documents that the

9    defendants say they want to use that everybody agrees are

10   privileged, as well as knowing that the Court is going to look

11   at the remainder of the documents that the defendants are

12   thinking of using with an eye towards whether there's a

13   possible privilege argument with those too.

14          MR. WEINBERG:  May I ask that that category of the

15   documents that we (a) intend to use, that we do not believe are

16   possibly privileged, that go to the Court really as an

17   insurance policy for the appearance that Mr. Lovett and his

18   side are getting two levels of review; that to the extent that

19   your Honor confirms our judgment and finds that they should not

20   go to Mr. Lovett for his review, that they would remain sealed

21   as a ex parte submission because they are, to use the word

22   again, a "roadmap" to the defense thinking.

23          THE COURT:  Yes.  Yes, that would be my intention.

24          MR. SOLOMON:  And your Honor, I don't think your Honor

25   said anything consistent with this, but just for clarity, that

1    would apply to both sides.  So the Government would have to do

2    the same with respect to the documents it may use that it

3    believes are not clearly privileged.  It has the same burden as

4    we do to put this log together and present it to the Court.

5            THE COURT:  Well, I have to admit I wasn't thinking

6    about that because I guess I was thinking that most of the

7    fights have been -- were going to be from documents identified

8    by the defense.

9            But let me ask you, how do you feel about that,

10   Mr. Heymann?

11           MR. HEYMANN:  Let me just get one other thing off the

12   table and then come to this.  Everything the Court said thus

13   far has referred to privilege.  It is the --

14           THE COURT:  Confidential, privileged, yeah.

15           MR. HEYMANN:  I want to include, if I may, the word

16   "confidential" --

17           THE COURT:  I'm sorry, yes.

18           MR. HEYMANN:  -- simply because the way that the

19   ethics opinions have been with respect to Mr. Lovett and I --

20           THE COURT:  Right.  So let's broadly, spiritually --

21           MR. HEYMANN:  Is it the Court's --

22           THE COURT:  -- anything that you think that they would

23   say whoa, whoa, whoa, that shouldn't be used and here are the

24   reasons why, anything like that, whether it's privileged,

25   confidential, you know, work protected by some other commonlaw

1    doctrine out there, anything.  You know, I don't have a list in

2    front of me, but yes.

3              MR. HEYMANN:  Understood.

4              To the extent that the documents and records that

5    we're talking about are those limited to anything that the

6    Government may obtain from this particular server, just as they

7    pertain only to documents and records pertaining to this

8    particular server to the defendants --

9              THE COURT:  Right.

10             MR. HEYMANN:  -- the Government understands the

11   reciprocal -- not reciprocal, but the parallel nature and --

12             THE COURT:  Yeah.  In fact, it's not really asking too

13   much more because the items you're going to use in your case in

14   chief, you're going to have to disclose anyway.

15             MR. HEYMANN:  We have to produce anyway, that's right.

16   Anything we're going to use in our case in chief, we have to

17   produce anyway.

18             THE COURT:  Right.

19             MR. HEYMANN:  What I didn't want to do is by

20   inadvertence have what we're discussing here move over to an

21   obligation or maybe other case.

22             THE COURT:  We're just talking about the server, yes.

23             MR. HEYMANN:  We're just talking about any additional

24   Government -- any additional document or record that the

25   Government may choose from the server will go through the same

1    privilege/confidentiality protocol with the same ceiling that

2    the defense has.

3             THE COURT:  Yes.

4             (There was a break in the audio.)

5             MR. HEYMANN:  Obviously, we then have additional

6    obligations to produce.

7             And then just as a matter of record, the Court has

8    inquired of Mr. Weinberg in adopting this breadth, and if the

9    Court would inquire of Mr. Solomon as well just so we all have

10   it on the table.

11            THE COURT:  Okay.  Mr. Solomon?

12            MR. SOLOMON:  I agree, your Honor.

13            THE COURT:  All right.

14            MR. SOLOMON:  And your Honor, if I may, this kind of

15   reminded me of another point that I think we all agree on.

16   Mr. Heymann said anything that's additional on these servers

17   and I think the qualification was because there may be

18   documents that are on these servers that were also in prior

19   productions that the Government got other than through the

20   servers they're giving us now.  The mere fact that it's on the

21   server does not make it subject to this protective order, if

22   it's on the server and it has not been produced before.  I

23   think the parties have agreed that we're not subjecting to this

24   protective order documents that have already been produced to

25   the Government, even if --

1          THE COURT:  That's correct.  I saw that language.

2     That's right.

3          MR. HEYMANN:  We had a lot produced --

4          THE COURT:  Beforehand, right.

5          MR. HEYMANN:  -- subject to the review of counsel

6     beforehand, and all we're talking about is the sort of complex

7     of anything new that may pop up.

8          THE COURT:  That's right.

9          Mr. Lovett?

10          MR. LOVETT:  So, your Honor, I have a request and I

11    would like to cover something.  One, I'd like to see the order

12    in writing.  I would request that (inaudible) may be defined

13    along the lines of what was discussed here.

14          THE COURT:  Well, I'm not going to promise it.  I'll

15    hear you.  But I think this is what we're doing now and I -- so

16    I'll hear you.

17          MR. LOVETT:  Right.  And also, that the order can make

18    it clear that it's both privileged and confidential client

19    information.

20          THE COURT:  Well, that's actually in the proposed

21    protective order.

22          MR. LOVETT:  Okay.  The other thing that we have not

23    addressed is the subset of documents that were identified by

24    the search terms that I provided to the Government and how

25    we're going to handle those.

1          THE COURT:  Right.  I'm sorry, so which would --

2          MR. LOVETT:  So there were the pre-March 9th

3    documents.  I understand the Court's order is that those

4    documents would go over under this protective order.  Then

5    there are documents that fall within the category of March 9th

6    to June 11th.  There are two subsets of documents within that

7    category.  There are documents that are responsive to search

8    terms that I provided to the Government.

9          THE COURT:  Right.

10          MR. LOVETT:  My position is those should not go over

11    to anyone.

12          And then there's other documents --

13          THE COURT:  Well, why is that, is it because the

14    search terms were such that it's a hundred percent likelihood

15    that those are going to be privileged?

16          MR. LOVETT:  Well, during that period I was

17    representing Gibson Behman and Scott Behman.  The search terms

18    were designed to identify documents that were produced in

19    connection with the litigation.  They could be privileged, they

20    could be work product.  I don't know what they are, I haven't

21    seen them.

22          THE COURT:  But that's exactly the conundrum because

23    you might see some of them and say oh, this one slipped in.

24    This actually isn't a document that I'm worried about.

25          MR. LOVETT:  Certainly, but --

1          THE COURT:  So why shouldn't the defendants at least

2     get the opportunity to see whether there might actually be

3     something in there that is permissible for them to use?

4          MR. LOVETT:  Because what they're potentially looking

5     at is privileged communications with my client --

6          THE COURT:  I understand that, but that's exactly what

7     I'm trying to get to.  The question I'm trying to answer is if

8     you tell me, if everyone tells me, that that segregated data,

9     the segregated files, were segregated based on identifiers that

10    you provided that make it almost a hundred percent certainty

11    that these are communications that everybody agrees are not

12    relevant and are privileged, and in fact are kind of so

13    uber-privileged that they really should be exempted from the

14    otherwise general disclosure of what's on the server.  But I

15    haven't heard anybody say that.

16         MR. LOVETT:  Without looking at the documents, I can't

17    represent to the Court it's a hundred percent certainty.  I can

18    represent that those documents are likely to contain

19    information relevant to the litigation and attorney work

20    product and communications with my client.

21         THE COURT:  What's the possibility that something

22    falling into that category would have any relevance to this

23    case?

24         MR. LOVETT:  Well, my position, it would have no

25    relevance, but I can understand that the Government or defense

1    may have a different view.

2         THE COURT:  And we don't know the size of this -- the

3    quantity of this --

4         MR. LOVETT:  Well, as I understand it, it's several

5    hundred, less than a thousand.

6         MR. HEYMANN:  Your Honor, if I can address this, I

7    think I can clarify the issue a little bit.

8         First of all, with respect to the order, this subtext

9    is that --

10        (There was a break in the audio.)

11        MR. HEYMANN:  --  Mr. Lovett and I simply need a

12   (inaudible) a clear statement by the Court that the Court has

13   heard our objections to producing material that may be

14   privileged or confidential per the arguments primarily from me

15   last time, Mr. Lovett both last time and here, and ordered what

16   has been done today.  The Court's order then becomes the

17   controlling factor.  But in the absence of a written document,

18   we simply need to hear -- have heard (inaudible) overruled.

19        THE COURT:  Well, all right.  Then let me say this

20   because I think hopefully this will help guide the

21   conversation, and it may not be as much as you want to hear.

22   The order is a very simple one.  The Government is required to

23   comply with its discovery obligations and I've always taken the

24   position throughout this that you're in the best position to

25   determine what you're required to produce, what is potentially

1   material to the defense, what is potentially Brady, what is

2   relevant, what's under Rule 16, what's under 116.  We don't

3   want to sit in judgment of you and the material and speculate

4   as to, therefore, what among these categories you should be

5   producing.  So we think that's your call.  Beyond that, then

6   it's left to the Government.

7         So I have said before, and I still maintain, that as

8   between the defendants' constitutional rights to discovery and

9   Behman's and the firm's right to not have privileged material

10  disclosed, I know it seems crass, but I think the defendants'

11  rights outweigh the rights of the firm in that regard.  And

12  what I've been trying to do -- and I'm also mindful of the

13  arrangement that you and Mr. Lovett have and I think this is

14  exactly the scenario you were hoping wouldn't come to pass.

15        So I've just been trying to come up with a process

16  that respects the integrity of the agreement and what your

17  interests were beforehand with my sense now that no matter

18  what, we all have to be able to say that at the end of this

19  process, if there was any material on the server that the

20  defendants were entitled to, they had a chance to go for it,

21  that they had a chance to see it and they had a chance to fight

22  for its use in the proceeding, and this is the only way that I

23  can see that happening.

24        So that's why I think the fairest thing is to provide

25  the material and that's why, Mr. Lovett, I was probing you on

1  this.  Unless you can tell me, or unless you can come up with a

2  process where Mr. Heymann -- I guess I should be looking at

3  you.  Unless you can tell me that there's a way for you to take

4  that subset of information and really go through it and kind of

5  do the work that Mr. Lovett would otherwise be doing and take

6  on the burden of telling the defendants why you don't think

7  they should have it.

8       MR. HEYMANN:  I do not believe there's an alternative

9  and I did not mean to be sort of revisiting the decision, but

10 rather simply identifying --

11      THE COURT:  No no, I know.  You need clarity, right.

12      MR. HEYMANN:  -- what was there.

13      With respect to the second question which the Court

14 has been going back and forth of with Mr. Lovett, for the

15 90-day period, it's actually I think 92 days or something like

16 that, but for a 90-day period, I don't believe that the subset

17 that has been pulled or segregated has any clarity as to

18 whether or not it has this second privilege of being generated

19 in some form by the interaction that Mr. Lovett and his firm

20 and the people.  The list included a number of people at

21 that -- I think it's still Gibson & Behman then, but whatever

22 the active law firm is then who are doing other business, and

23 all the Government did was with respect to the whole pile of

24 names, if their name was in any way associated with the

25 document, we pulled it out and segregated it.

1          We obviously didn't review it, we're not looking at

2     anything yet, but it's dealing with ongoing business deals as

3     well as any communication that may be going back and forth, any

4     document.  So it's not a subject that's anywhere near a hundred

5     percent different.

6          The reason it was segregated, or the reason one could

7     say it was segregated, was that if there was a set of documents

8     which should be give -- for which Mr. Lovett and his firm

9     should have the opportunity for a first review, it's ones where

10    his law firm and his --

11         (There was a break in the audio.)

12         MR. HEYMANN:  -- client were in litigation with --

13    Mr. Weinberg I don't think represented Mr. Gibson at the time,

14    but Mr. Gibson and Mr. Kesner's firm, and that only can be

15    generated during that 90-day period.

16         So it was an opportunity where everything else was

17    going straight to the defendant --

18         THE COURT:  Right.

19         MR. HEYMANN:  -- for him to pull out anything that

20    might be related to his litigation with the defendant.

21         THE COURT:  So it's in there, but it's not --

22         MR. HEYMANN:  It's in there, but it's

23    not immediately -- there's no red flag for a hundred percent

24    clear, a yellow flag for -- there's nothing that's anything

25    like that.  And it will be a mix, a very much mix.

1          THE COURT:  Okay.

2          MR. LOVETT:  And your Honor, for that reason, I can

3     tell you during this period of time there wasn't a lot of

4     business going on at Gibson Behman.  The firm was in turmoil.

5     You know, Gibson had been restrained.  He was in the process of

6     resigning from the firm.  The individuals that I identified

7     were the individuals whom I was working with during that period

8     of time during the litigation.

9          So I disagree with Mr. Heymann's characterization it

10    was business as usual.  This is pretty much all that was going

11    on during that time.  It's highly likely that those individuals

12    were creating documents, having communications with myself and

13    other people at my firm, and there are hits with my name on

14    them.  I don't think the defense is entitled to that.

15         So one way around that would be, you know, produce the

16    documents to me and, you know, I'll look at them.  If they're

17    privileged, we'll put out a privilege log.  If not, they can go

18    over.

19         THE COURT:  Well, let me ask this.  How hard would it

20    be to do one additional search to pull out any documents with

21    Mr. Lovett's name?

22         MR. HEYMANN:  You know, that -- well, there are two

23    answers to that question.  There's a practical answer to the

24    question and a --

25         THE COURT:  Right.

1          MR. HEYMANN:  The number that I was told by the agent

2     involved, Mr. Lovett's name or another lawyer's name from that

3     firm are literally a handful.  So pulling them out, subject to

4     being able to do the search, is not a difficult thing.  The

5     problem is that they've got this all front ended and for two

6     reasons:  One, so we can have it here and just be done with

7     this and move on in the case; but the second is, as a practical

8     matter, we are about to go into a black hole of forensic access

9     because we are -- we lost last week the forensic agent that the

10     IRS had for New England.  The replacement isn't in.  The

11     replacement hasn't been trained.  There's going to be a long

12     period of time before I can do what would otherwise be a simple

13     straightforward additional request, as a pragmatic matter.

14          THE COURT:  All right.  So then here's how we're going

15     to proceed.  I mean, I think given the uncertainty of what is

16     included on each of those, I don't even know what you call

17     them, those disks, for lack of a better term, but including

18     even the subset, as well as the possibility, as Mr. Weinberg

19     notes, that there might be some relevant information on them, I

20     think weighs in favor of disclosing everything.

21          Mr. Lovett, I hope the process that we're also

22     contemplating where on the back end, before anything is used,

23     you'll have a chance to speak, and the Court will review

24     anything that is being presented as not privileged, but

25     relevant, will ultimately provide the protections that you're

1   seeking, even though I know you're not comfortable with this.

2   But that's going to be my order as to how to proceed.

3           MR. LOVETT:  So, your Honor, could I get --

4           MR. WEINBERG:  I'll go --

5           THE COURT:  Wait, wait.  Mr. Lovett is just going

6   to --

7           MR. LOVETT:  If I could ask you, if the Court would

8   issue the order and the Government not produce until I've had a

9   chance to review the order with my client to determine how he

10  wants to proceed, because this order contemplates under at

11  least that third category of documents privileged materials

12  with my name on it being provided to the defense and, you know,

13  that's not going to be acceptable to my client.  It's not

14  acceptable to me.  I'm not waiving my work product and --

15          THE COURT:  Here's the problem I have, the practical

16  problem.  Let's say I did that and you reviewed it with your

17  client and you found 20 documents on there that you thought

18  should be off limits.  I'm not going to -- I'm not about to

19  have them go and make a new set.

20          So how do you keep those from getting in the hands of

21  the defendant?  They're going to get these and be able to do a

22  review.

23          MR. LOVETT:  Well, I'm sure the Government has other

24  forensic computer people that could do this.  I mean --

25          THE COURT:  You're right, but this is an issue and,

1    you know --

2            (There was a break in the audio.)

3            THE COURT:  -- I take some responsibility.  It's been

4    dragging on for a while.  I think we've all been trying to work

5    through it.  But I think we have to kind of end it now so the

6    case can move on to the next phase.

7            MR. LOVETT:  So if I could ask the Court to issue the

8    order so I can discuss it with my client before the hard drives

9    are given over.

10           THE COURT:  Well, when you say -- issue the protective

11   order?

12           MR. LOVETT:  Yes.

13           THE COURT:  All right.  Fair enough.

14           MR. LOVETT:  So --

15           THE COURT:  So we'll issue the protective order, but

16   I'm not going to agree that no disclosures are made until you

17   kind of get back to me and tell you what we're going to do.

18           MR. LOVETT:  Well, what I'm referring to is if my

19   client wants to take the issue up to Judge Talwani, you know, I

20   think he should have the opportunity to do that, because what

21   this is contemplating, again, is --

22           THE COURT:  All right.  Here's what I'm going to do.

23   We'll issue an order, we'll issue a protective order, and I'm

24   going to put a stay on the disclosure for one week.  One week,

25   all right.  So you'll have one week to review it and discuss it

1      with your client, and if you want to take any action with Judge

2      Talwani, you can do that within one week, okay.

3                  MR. LOVETT:  Thank you, your Honor.

4                  MR. WEINBERG:  I would say one other thing.  If your

5      Honor wanted to either add a protective order or to accept my

6      representation, and I hope and think Mr. Solomon will join on,

7      when looking at the 90-day production where I disagree with

8      Mr. Lovett saying that it's filled with attorney-client, it

9      seems like it's a handful of hundreds of documents.  So

10     attorney-client -- this firm was going through a major

11     competition between Behman and Gibson, and there were all kinds

12     of client issues, all kinds of monetary issues, but I will not

13     look, however your Honor wants to memorialize it, when I

14     receive the 90-day disk that contains a handful of e-mails or

15     two dozen e-mails containing communications between Mr. Lovett

16     and anyone else at the firm, I as a lawyer will inform the

17     Court as an offer of the court I will set those aside, not look

18     at them, and return them in a sealed envelope so that

19     Mr. Lovett at least has that level of comfort.

20                 THE COURT:  Will it be possible, when this is provided

21     and decrypted, for somebody to do a search of file and folders

22     and free select any files or any communications that have

23     Mr. Lovett's name so that they could be removed, excised,

24     deleted, before anything is actually reviewed?

25                 So if I didn't make you make a new one and somebody

1    just had this up on their system, they could actually go

2    through and take those out before they're even seen?

3              MR. HEYMANN:  So in two steps.  First, there's no

4    reason for a stay of the vast majority of the production

5    because it's in three separate encrypted folders.

6              THE COURT:  Right.  We're talking about the subset.

7              MR. HEYMANN:  So the Government can produce.  The

8    defense can start having access to everything that has already

9    been ruled on and for which there is no additional claim.  And

10   if the Court's stay was narrowly designed for that one -- that

11   subset where we have pulled out the materials, we can give and

12   get started on most of it.

13             THE COURT:  Right.

14             MR. HEYMANN:  And I would encourage the Court to

15   modify its proposed stay for that purpose.

16             THE COURT:  All right.

17             MR. LOVETT:  And --

18             THE COURT:  Wait, wait, wait, Mr. Lovett.

19             MR. HEYMANN:  Then with respect to what is, we'll call

20   it a thousand other things, they were created by simply running

21   a forensic program against them that said, you know, pull

22   everything with this name, this name, this name out, and

23   whether it's Mr. Lovett's IT vendor or Mr. Weinberg's IT

24   vendor, they can run the same piece of -- you know, the same --

25   it won't be necessarily the same piece of software, there are a

1     couple around, but they can run the same kind of software that

2     says if you see one of these words, pull it out and don't let

3     me look at it, because that's what we did.

4           MR. LOVETT:  And just, your Honor, to be clear, I'm

5     asking for a stay of the entire order.  I mean, we have an

6     ethics opinion.  I'll provide it to the Court.  We're required

7     to object.  And I appreciate the Court's ruling on this, but

8     ultimately it's my client who bears the responsibility for

9     protecting this information, and I think it's fair that he

10    should have a chance to review the order and --

11          THE COURT:  Well, why don't you catapult ahead to the

12    last thing Mr. Heymann just said.  If the IT vendor can pull

13    out anything that's objectionable, why doesn't that take care

14    of the problem?

15          MR. LOVETT:  Because the order is broader than just my

16    communications with my client.  It's his communications with

17    his clients and Gibson Behman's clients.  So I'm objecting to

18    it.  I'm not agreeing to any of it.

19          THE COURT:  I see.  You're objecting to the actual

20    disclosure at all?

21          MR. LOVETT:  Correct, yes, and I think I'm --

22          THE COURT:  As opposed to its use.

23          MR. LOVETT:  Yeah.  And I --

24          (There was a break in the audio.)

25          MR. LOVETT:  -- think I'm required to.

1          THE COURT:  All right.

2          MR. HEYMANN:  I was just going to say, once again,

3     your Honor, we don't have communicate -- you know, to the best

4     of our knowledge, we do not have any significant number of

5     communications that's going on in a separate place, but,

6     rather --

7          THE COURT:  Right, but he's raising a broad one.

8          MR. HEYMANN:  Rather the documents that are created --

9          THE COURT:  He's not just talking about the subset.

10         MR. HEYMANN:  Right.  Yes.

11         THE COURT:  He's talking about it all.

12         So here -- okay.  Mr. Weinberg?

13         MR. WEINBERG:  I just want the record to be clear,

14    your Honor, that there has been a waiver by Mr. Behman.

15    There's been a selective waiver.  He has given e-mails that

16    include client confidential matters, work product matters, you

17    know, Lawyer A talking to Lawyer B about what client told

18    Lawyer A.  He's disclosed them in civil litigation when

19    Mr. Behman's monetary interests were at stake.  He has

20    disclosed them to the Government without a privilege log,

21    without an objection.  We are not back in 2011 when Mr. Behman

22    can argue I want a different process.

23         THE COURT:  Okay.  Here's --

24         MR. WEINBERG:  There's a selective waiver and that

25    should be in any court order that will be a subject to --

1          THE COURT:  Well, as I say, that point is well taken.

2          MR. LOVETT:  But --

3          THE COURT:  Wait, wait.  No, no, stop.  Stop.

4          MR. LOVETT:  I --

5          THE COURT:  All right.  Listen, final word and I'm

6    going to backtrack on one thing I said.  The stay is going to

7    be for everything for one week, but if you file anything,

8    Mr. Lovett, in court, you're going to have to include the

9    history of any facts that would tend to undermine your claim of

10   privilege or of any argument that the item should not be

11   disclosed, and what that means, as Mr. Weinberg was just

12   alluding to, if there are any acts in the past that you've

13   taken or anybody has taken that would, as somebody might say,

14   amount to a waiver, or to an understanding that these items

15   could be reviewed by others, the like, it's going to have to be

16   included, and that's whether it's going to be for my review or

17   Judge Talwani's, all right.

18          MR. LOVETT:  I understand, and that's the first I've

19   heard that.  The issue never came up in the civil litigation.

20          THE COURT:  Well, I'm just saying I don't know the

21   facts.  That's why I'm saying it.

22          So I'll give you the week once we issue the protective

23   order.  We'll also issue a stay.  So you can talk about it with

24   your client, you can raise whatever you want to raise, but it's

25   your one shot, and it's got to be a full summary of the history

1   so that anybody who is looking at it can make a determination,

2   should you be allowed to claim this stuff, should not be seeing

3   the light of day, all right.

4           MR. LOVETT:  Thank you, your Honor.

5           THE COURT:  All right.  So for the time being, take

6   those back with you.

7           MR. LOVETT:  May I be excused if there's --

8           THE COURT:  Yeah.

9           MR. LOVETT:  I assume you have other business.

10          THE COURT:  Yeah.  We just have a few other things.

11          MR. HEYMANN:  Your Honor, before Mr. Lovett leaves,

12  just one thing that may relate to him.

13          Everybody is interested in moving the case along at

14  this point, and if we could define a period during which we now

15  know that there were certain things that were being requested

16  by the motion that the Government doesn't have.  If we could

17  define the period and a calendar for whatever Rule 17 subpoenas

18  may be filed, responses by Mr. Lovett, so that we can move that

19  aspect forward.

20          THE COURT:  I think I can't.  I just think that's

21  driven by the defense and the way they want to defend the case,

22  and I think they have to decide in the first instance do they

23  want the stuff, what's the argument for it and the like.

24          And I'm just basing that off of my past experience of

25  having been engaged in Rule 17 litigation, because it's outside

1    of, really, the process that we're dealing with here.  And if

2    they don't make the argument for it, they're not going to get

3    it, and I just -- maybe I'm being paranoid, but I think it

4    would just start to encroach on their turf if we were to kind

5    of tell them if you want to get this from a nonparty, you've

6    got to do it by X date.  I can see somebody saying it's forcing

7    them to reveal their strategy sooner than they want to or the

8    like.

9            MR. HEYMANN:  The downside to the Court's approach is

10   that, as Mr. Weinberg indicated, you know, we can anticipate

11   that there's going to be, you know, an extensive piece of

12   litigation that will end up being, in all likelihood, referred

13   back down to the Court, and the question is whether it should

14   be resolved in the first instance by the Court.

15           I guess I should refine it in this way.  To the extent

16   that Mr. Weinberg is seeking the broad categories of

17   information they previously sought in the Motion to Compel --

18           (There was a break in the audio.)

19           MR. HEYMANN:  -- it makes sense for that piece of

20   litigation, if it's going to go forward, to be done promptly

21   and, you know, on a time schedule that incorporates a response

22   that Mr. Lovett may make and is resolved by the Court before it

23   goes to the District Court.  It is not intended -- my

24   suggestion is not intended to further limit any subsequent

25   Rule 17 subpoena that may be appropriate, lawful, in

1   furtherance of the trial, but we do have a broad category for

2   which there has been a prior request in a Motion to Compel

3   which now cannot be satisfied by the Motion to Compel.  It is a

4   logical one and obvious one to be resolved.

5           THE COURT:  I mean, I agree.  If it is going to be

6   done, it should be done sooner rather than later while we're

7   all kind of here and living in the moment.  And I think he's

8   right.  As a practical matter, Judge Talwani would probably

9   punt it back down only because she's going to say I don't even

10  know what's going on here.

11          MR. WEINBERG:  Well, I do think it's interrelated with

12  the Rule 16 discovery issues.  I was hoping to get the vast

13  majority of the server and at least take preliminary looks to

14  see what's there and not there so that I can fashion a more

15  particularized Rule 17.  I intend to consider whether I should

16  make an application to the Court as an ex parte matter so I can

17  more fully brief the Court on defense strategy that I don't

18  wish Mr. Heymann to learn prematurely as a condition of my

19  exercising Rule 17 rights, and I certainly -- you know, if your

20  Honor -- we can't predict what your Honor's ruling will be when

21  Mr. Lovett, if he files a motion for your Honor to extend the

22  stay or take an appeal, then that's the only reason I would

23  urge the Court not to set a hard deadline.

24          But it is my --

25          THE COURT:  Yeah.  I won't, but I am just continuing

1    to muse and -- I don't even know what you would be objecting to

2    if you do object to something after talking with your client.

3    You're not a -- this is all in the context of a Motion to

4    Compel, so I'm allowing a Motion to Compel to compel production

5    of documents pursuant to a protective order.

6          So I don't know what it is you would be filing within

7    that week after talking with your client.  I've never seen an

8    objection by a nonparty to a protective order, a joint

9    protective order endorsed by the Court.

10         And I'm only saying this because I don't know whether

11   whatever you file, we'll have to see what form it takes if you

12   file something, whether it's going to go to Judge Talwani or

13   whether it's going to go to me, and then it would have to be

14   acted on by me and then appealed to her.  So I'm just thinking

15   out loud.  I guess we'll have to wait.

16         MR. LOVETT:  Yeah.  I --

17         THE COURT:  I'll still leave the week-long stay in

18   effect.

19         MR. LOVETT:  Right.

20         THE COURT:  So once we issue the protective order, and

21   I think at this point we'll modify the protective order to

22   reflect some of what we're talking about, who knows.  Maybe

23   they'll end up objecting to what it looks like at that point,

24   and then you could figure out how you want to respond to that.

25         But --

1        MR. LOVETT:  I appreciate the procedural issue that

2   you've just presented, so we'll address that.  Although I

3   assume for the purposes of this hearing, although the Court may

4   have not entered an order, you've allowed us to intervene.

5        THE COURT:  Well, it's funny you say that.  I was

6   actually looking at the docket yesterday and I was saying I

7   don't know how he pulled it off, but, you know, somewhere

8   somehow he's a party here in the case.  So you're here now for

9   better or for worse, so I'm not worried about that part of it.

10        MR. LOVETT:  Thank you.

11        THE COURT:  All right.  Then going on into the few

12   remaining things, I do -- we had a number of things in the

13   pipeline that we were working through.  So the Motion to

14   Dismiss, we are dealing with.  We hope to resolve soon.  I'll

15   tell you my inclination at this point is we do plan to

16   recommend that the Motion to Dismiss be denied in its entirety.

17   Obviously, you don't have to take an official position on that

18   until you get it, but just so you have a sense of where we're

19   going, all right.  And we'll try to get that issued as soon as

20   possible.

21        MR. SOLOMON:  Your Honor, that's going to take the

22   form of a report and recommendation, if I remember correctly

23   the procedural posture on that?

24        THE COURT:  Yes.  Yes, it is.

25        And we were okay with deferring --

1          (There was a break in the audio.)

2          THE COURT:  -- any additional discovery requests until

3     after 60 days of the electronic materials being provided,

4     whenever that may be.  And let me, before we go further then,

5     try to get a date about 60 days out for us to come back.

6          THE CLERK:  How about August 10th at ten o'clock in

7     the morning?

8          MR. HEYMANN:  Your Honor, I will be out of town that

9     week.  Sorry.

10          THE CLERK:  How about the 17th at two o'clock in the

11     afternoon?

12          MR. HEYMANN:  Bear with me one second, if you would.

13          (Pause.)

14          MR. HEYMANN:  That's fine.  August 17th at 2:00 is

15     fine by me.

16          THE COURT:  How's that, Mr. Weinberg?

17          MR. WEINBERG:  It's good.  Thank you.

18          THE COURT:  Mr. Solomon?

19          MR. SOLOMON:  I've just -- I've got my calendar.  I

20     apologize.

21          (Pause.)

22          MR. SOLOMON:  That works for me, your Honor.  Thank

23     you.

24          THE COURT:  All right.  And we'll enter an order

25     excluding the time from today to then.

1       The expert witness discovery we've just kind of

2   continued to kind of agree to talk about later, and I don't see

3   any need to try to set those dates today, but maybe in late

4   August when we convene we can think more seriously about that.

5       Mr. Heymann?

6       MR. HEYMANN:  Your Honor, if just speak to one other

7   lingering point, Mr. Gibson requested the ability to travel out

8   of the country for the purpose of attending a wedding, and in

9   the process of doing so, Mr. Weinberg, on behalf of Mr. Gibson,

10  offered to provide an extradition waiver of some form.  I'm

11  aware of -- the Office of International Affairs is unaware of

12  any country that will honor one and I simply wanted to inform

13  the Court, first of all, of that fact, that we're unaware of

14  any country that will honor one, but also that the Government

15  is not, in light of that, asserting a new objection to his

16  travel under the conditions that have been set.  It obviously

17  increases the risk, but the Government is not here to further

18  object, but simply notify the Court of the change of

19  circumstances.

20      THE COURT:  Okay.  Thank you.

21      MR. HEYMANN:  So Mr. Weinberg won't be submitting one

22  or I won't be approving one, or we're simply not going to have

23  that document.

24      THE COURT:  All right.  Thank you.

25      MR. WEINBERG:  So may I inform Mr. Gibson, who will

1    inform Probation, that the waiver of extradition (inaudible)

2    ever essential element of the conditions of his travel is no

3    longer?

4              THE COURT:  You may.

5              MR. HEYMANN:  Yeah.

6              MR. WEINBERG:  Thank you, sir.

7              THE COURT:  All right.  Is there anything else that we

8    need to address at this status conference today?

9              All right.  So today is Wednesday.  By the end of the

10   week we'll get the protective order out; we'll get the stay

11   out.  That way it will start the week.  So then by the end of

12   next week, if Mr. Lovett is going to do anything, he will have

13   done it, and then we can hopefully get this issue resolved.

14             MR. WEINBERG:  Thank you, Judge.

15             MR. HEYMANN:  Thank you, your Honor.

16             MR. SOLOMON:  Thank you, your Honor.

17             THE COURT:  All right.  Thank you, everybody.

18

19             (The hearing was concluded.)

20

21

22

23

24

25

C E R T I F I C A T I O N

      I, Karen M. Aveyard, Approved Federal Court Transcriber, do hereby certify that the foregoing transcript, consisting of 54 pages, is a correct transcript prepared to the best of my skill, knowledge and ability from the official digital sound recording of the proceedings in the above-entitled matter.

/s/ Karen M. Aveyard

Karen M. Aveyard

June 26, 2016

Date