# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>DANIEL GIBSON and MARK KESNER,<br><br>    Defendants. | Criminal Action No. 15-cv-10323-IT |

## REPORT AND RECOMMENDATION ON DEFENDANT MARK KESNER'S MOTION TO DISMISS THE INDICTMENT OR ALTERNATIVELY FOR DISCOVERY AND AN EVIDENTIARY HEARING
### (Dkt. No. 33)

### August 11, 2016

CABELL, U.S.M.J.

The government has charged defendant Mark Kesner with two counts of aiding, assisting and advising the preparation of false tax returns, in violation of 26 U.S.C. § 7206(2), and one count of conspiring to defraud the United States and impede and impair the Internal Revenue Service (IRS), in violation of 18 U.S.C. § 371. Kesner is a certified personal accountant who performed accounting services for co-defendant Daniel Gibson (Gibson) individually, and for Gibson's former law firm, Gibson & Behman P.C. The charges against Kesner relate to accounting services he performed for Gibson, and the indictment alleges that Kesner assisted and conspired with Gibson to falsely report Gibson's income to the IRS. Kesner avers that the government originally planned to use him only as a witness but then vindictively chose at the tail end of its investigation to charge him as a defendant because he intended to invoke the Fifth Amendment and refuse to testify before the grand jury. Kesner seeks dismissal of the indictment or in the alternative

discovery bearing on his claim.  After consideration of the parties' submissions and following a

hearing on the motion, I recommend that the motion be denied, in its entirety.

## I.      RELEVANT BACKGROUND

This case, indicted in October 2015, arises from an investigation that began in May of

2012.  The IRS began a probe into alleged false tax returns prepared by Kesner and his accounting

firm Kesner, Godes & Morrissey (KGM), and thereafter filed by Gibson and his former law firm,

Gibson & Behman, P.C. (GB).  On May 11, 2012, IRS agents interviewed Kesner, and on June 1,

2012 interviewed a KGM accountant named Meradee Jowder.  Both answered questions for the

agents voluntarily.  At some point thereafter, Kesner retained present counsel Attorney Joshua

Solomon.

Shortly after being retained, Attorney Solomon began having conversations with the IRS

Special Agent he believed to be the lead case agent on the matter (the Agent). (Declaration of

Joshua L. Solomon in Support of Mark Kesner's Motion to Dismiss the Indictment or alternatively

for Discovery ["Solomon Dec."]) (Dkt. No. 35), ¶ 4.  The Agent reportedly advised Attorney

Solomon that the IRS investigation centered on Gibson's alleged criminal conduct; Kesner by

contrast was viewed only as a witness.  (Solomon Dec., ¶ 5).  The Agent also informed Attorney

Solomon that he would be notified if Kesner's status as a witness were to change, because the

Agent's Office's practice was to provide an advice of rights to any individual suspected of having

engaged in criminal activity.  (*Id.*).  The Agent reiterated on a number of occasions thereafter that

the IRS viewed Kesner only as a witness.  (Solomon Dec., ¶ 6, 7).  Based on those representations,

and believing that both Kesner and Jowder were similarly situated as witnesses, Attorney Solomon

committed to represent Kesner, Jowder, and KGM itself.  (Solomon Dec., ¶ 8).

The IRS conducted several investigatory interviews during the spring and summer of 2012, including one of Kesner in May, and two of Jowder in June and August.  No one from the U.S. Attorney's Office was present for any of these interviews.  From August of 2012 through 2014, there was virtually no interaction between the IRS Agent and Attorney Solomon save for one conversation in May of 2013.

Then, in or around early 2015, the IRS apparently presented the case to the U.S. Attorney's Office for consideration.  Subsequently, in March 2015, the U.S. Attorney's Office, through the Agent, delivered grand jury subpoenas to Attorney Solomon seeking records and testimony from Kesner and Jowder.  (Solomon Dec., ¶¶ 9 and 10, at Ex. C).  The subpoenas were also accompanied by an "Advice of Rights."  Among other things Kesner and Jowder were advised that: (1) the grand jury was investigating a possible violation of 26 U.S.C. § 7206 (preparation of false tax returns); (2) they could refuse to answer any question if a truthful answer would tend to incriminate them; and (3) anything they did or said could be used against them.  (*Id.*).  Shortly after receiving the grand jury subpoenas, Attorney Solomon began communicating with the United States Attorney's Office through Assistant United States Attorney Stephen Heymann (the prosecutor).  According to Attorney Solomon, when he informed the prosecutor that he represented both Kesner and Jowder, the prosecutor stated that he did not see any conflict.[1]  (Solomon Dec., ¶ 10).

Attorney Solomon informed the prosecutor during the same conversation that Kesner and Jowder were likely to invoke their Fifth Amendment right against self-incrimination if called to appear before the grand jury.  (Solomon Dec., ¶ 11).  The prosecutor responded that he did not see

---

[1] For purposes of the present motion, the Court accepts Attorney Solomon's representation concerning the details of this conversation but notes that the government does not agree with it.  In an email from the prosecutor to Attorney Solomon dated April 2, 2015, the prosecutor stated that his "recollection of [their] conversation with respect to [Attorney Solomon's] representation of both Mr. Kesner and Ms. Jowder differ[s] in material respects…"  (Solomon Dec., at Ex. D).

a basis for Jowder to invoke the Fifth Amendment given his understanding of the facts. (*Id.*). Attorney Solomon and the prosecutor discussed the possibility of a proffer by each individual subject to a proffer letter. (Solomon Dec., ¶ 12). On April 1, 2015, the prosecutor sent Attorney Solomon proposed proffer letters for Kesner and Jowder and noted that he was now "growing concerned that [Attorney Solomon] may have a conflict in representing them both." (Solomon Dec., ¶ 13, at Ex. D.) Attorney Solomon responded that he did not see a conflict given his understanding of the investigation and he asked the prosecutor to articulate a basis for fearing a conflict might exist. (Solomon Dec., ¶ 13, at Ex. D). On April 2, 2015, the prosecutor responded by email that "whether Mr. Kesner facilitated, participated in, encouraged or conspired with Mr. Gibson to file false tax returns is an open question in our investigation. Ms. Jowder's knowledge in this regard is potentially material, and her interest in proffering and taking other steps may well be in conflict with Mr. Kesner's." (Solomon Dec., ¶ 14, at Ex. D).

Attorney Solomon expressed his surprise and frustration with this development in a letter. He wrote that "[f]or the last three years, while obviously no guarantees have been made, I have been told that Mr. Kesner is viewed as a witness and not a focus of the government's investigation." Attorney Solomon wondered what had changed, and he noted that the only aspect of the investigation that had changed in his view was that he had told the prosecutor that Kesner was likely to invoke the Fifth Amendment. Attorney Solomon asked the prosecutor to reconsider this approach if indeed the prosecutor was now viewing Kesner differently than Jowder as retaliation for Kesner choosing to invoke his rights. (Solomon Dec., ¶ 15, at Ex. E). The prosecutor did not respond, and Kesner and Jowder both ultimately rejected the government's proffer letter and maintained their intent to invoke the Fifth Amendment if called to testify before the grand jury. (Solomon Dec., ¶¶ 13, 15).

4

As the case, now with the U.S. Attorney's Office, continued along, the prosecutor took a more visible role.  In April of 2015 the prosecutor and Agent interviewed three witnesses. (Solomon Dec., at Exs. K, L, and M).  In light of the government's understanding that both Kesner and Jowder intended to invoke their Fifth Amendment rights, the prosecutor provided Attorney Solomon with an immunity order for Jowder on May 26, 2015.  (Solomon Dec., ¶ 16, at Ex. F).  It is unclear exactly when Jowder appeared before the grand jury but she did so some time after May 26, 2015.  (Solomon Dec., ¶ 16).

Attorney Solomon and the prosecutor thereafter apparently had little communication over the next four months or so, until October 2, 2015.  On that day, the prosecutor emailed Attorney Solomon and asked whether he would accept service of a subpoena for Kesner to appear before the grand jury on October 21, 2015.  (Solomon Dec., ¶ 17, at Ex. G).  Attorney Solomon attempted to call the prosecutor to discuss how to respond to the subpoena given that he had previously indicated that Kesner intended to invoke the Fifth Amendment if called to testify. (Solomon Dec., ¶ 18).  On October 5, 2015, and after receiving no response to his phone calls, Attorney Solomon emailed the prosecutor and responded that he would accept service of the subpoena but still wanted to discuss the matter.  The prosecutor responded that he would call Attorney Solomon if he had the time.  (Solomon Dec., ¶ 18, at Ex. H).

The prosecutor never served the subpoena.  Instead, on October 8, 2015, the prosecutor informed Attorney Solomon in a telephone call that Kesner was now a target of the grand jury investigation.   (Solomon Dec., ¶ 20).  The prosecutor reportedly did not explain what had transpired since his October 2nd email to prompt the change in the government's position regarding Kesner.  (*Id.*).  Attorney Solomon subsequently attempted to reach the prosecutor in order to

discuss when charges might be expected but the prosecutor did not respond.  (Solomon Dec., ¶ 21).  The indictment was subsequently returned on October 28, 2015.

Against this backdrop, Kesner contends that the government viewed him as a witness throughout the government investigation, from 2012 to on or about October 2, 2015, and never intended to charge him as a defendant until he indicated in early October that he would invoke the Fifth Amendment if called to testify before the grand jury.  Kesner contends that this amounts to vindictive prosecution and he seeks dismissal of the indictment or alternatively discovery that would tend to prove his claim.  The government denies the allegations and counters that the prosecutor always viewed Kesner as a "question mark" and continued to assess his potential prosecution from the spring of 2015 to early October when, faced with a pending deadline, it was decided to seek an indictment.  The government argues that Kesner has in any event failed to meet the standard for vindictive prosecution.

## II.    DISCUSSION

### a.    Legal Framework

"In the normal course of events, a facially valid indictment returned by a duly constituted grand jury calls for a trial on the merits."  *United States v. Stokes*, 124 F.3d 39, 44 (1st Cir. 1997).  An indictment is generally sufficient if it "sketches out the elements of the crime and the nature of the charge so that the defendant can prepare a defense and plead double jeopardy in any future prosecution for the same offense."  *United States v. Guerrier*, 669 F.3d 1, 3 (1st Cir. 2011).  In contrast to civil actions, an indictment is generally not subject to dispositive motion practice. *United States v. Li*, 206 F.3d 56, 62 (1st Cir. 2000) (*quoting Stokes*, 124 F.3d at 44) ("[D]ismissing an indictment is an extraordinary step.").  Indeed, the First Circuit has observed that a federal court using its supervisory power to dismiss an indictment "directly encroaches upon the fundamental

6

role of the grand jury." *Whitehouse v. U.S. Dist. Ct. for Dist. of RI*, 53 F.3d 1349, 1360 (1st Cir. 1995). Thus, that power is reserved for "extremely limited circumstances." *Id.*

Moreover, a prosecutor enjoys broad discretion in determining whom to prosecute for what crime, and such pretrial charging decisions are presumed legitimate. *Bordenkircher v. Hayes*, 434 U.S. 357 (1978). As the Supreme Court has noted, "in the absence of clear evidence to the contrary, courts presume that [prosecutors] have properly discharged their official duties." *United States v. Armstrong*, 517 U.S. 456, 465 (1996); *see also United States v. Serafino*, 281 F.3d 327, 331 (1st Cir. 2002) ("[T]he government is presumed to have exercised its prosecutorial responsibilities in good faith…"). Even so, a prosecutor runs afoul of due process and violates the Fifth Amendment when he penalizes an individual by charging him for exercising a statutory or constitutional right. *United States v. Jenkins*, 537 F.3d 1, 3 (1st Cir. 2008). Such vindictive prosecution can result in the dismissal of an indictment. *United States v. Lanoue*, 137 F.3d 656, 664 (1st Cir. 1998).

      b.   <u>The Defendant has not Shown a Likelihood of Vindictiveness</u>

"Vindictive prosecution can be shown by (1) producing evidence of actual vindictiveness or (2) establishing a sufficient likelihood of vindictiveness to warrant a presumption of prosecutorial vindictiveness." *United States v. Dwyer*, 287 F. Supp. 2d 82, 87 (D. Mass. 2003) (*citing United States v. Marrapese*, 826 F.2d 147, 147 (1st Cir. 1987); *Lanoue*, 137 F.3d at 664)). Generally, a "finding of actual vindictiveness requires 'direct' evidence, such as evidence of a statement by the prosecutor, which is available 'only in rare cases.'" *Id.* at 89 (*quoting United States v. Johnson*, 171 F.3d 139, 140 (2nd Cir. 1999)). With respect to a presumption of vindictiveness, the First Circuit has cautioned that "courts should go very slowly in embracing presumptions of prosecutorial vindictiveness in pretrial settings." *Stokes*, 124 F.3d at 45. Where

a presumption does arise, however, the government can overcome it by offering "'objective evidence justifying the prosecutor's action.'" *Dwyer*, 287 F. Supp. 2d at 87 (*quoting United States v. Goodwin*, 457 U.S. 368, 376 n.8 (1982)).

The defendant invokes the latter ground here and argues that the record demonstrates a likelihood of vindictiveness warranting such a presumption. In that regard, and as noted above, the defendant views early October as a critical and revealing moment in the context of this case because, in his view, the government consistently treated him as a witness up until that time, but then suddenly shifted its position and treated him as a target. The defendant contends that this abrupt change came about when Attorney Solomon told the prosecutor that the defendant would invoke his right against self-incrimination rather than comply with a grand jury subpoena the prosecutor planned to serve. The defendant asserts that no other case related events occurred around that time to explain the government's change in position. Accordingly, he argues, a presumption of vindictiveness is warranted. The Court does not find this argument persuasive.

In order to demonstrate a "realistic likelihood of vindictiveness" warranting a presumption of vindictiveness, some courts consider 4 factors: "(1) [the defendant's] exercise of a protected right; (2) a prosecutorial stake in the exercise of that right; (3) unreasonableness of the prosecutor's conduct; and (4) the intent to punish the defendant for exercise of the protected right."[2] *United States v. Lawson*, No. CRIM.A. 08-21-KSF, 2009 WL 1939045, at *3 (E.D. Ky. July 6, 2009) (*citing United States v. Suarez*, 263 F.3d 468, 479 (6th Cir. 2001)). Where the first 3 elements are present, "this may help establish grounds to believe the fourth is present." *Id*.

The first factor is met here because there is no question that Kesner had a protected right to express his intent to invoke his Fifth Amendment right against self-incrimination. The

---

[2] To be clear, these elements are not required in the First Circuit in order to establish a likelihood of vindictiveness. They are helpful in considering the merits of such a claim, however, and are considered here for that purpose.

defendant fails to establish the presence of the remaining factors, however.  There is no suggestion or evidence that the prosecutor had any particular stake in preventing Kesner from asserting his Fifth Amendment right.  The Supreme Court has recognized that "a defendant before trial is expected to invoke procedural rights that inevitably impose some 'burden' on the prosecutor." *Goodwin*, 457 U.S. at 381.  In that regard, "[i]t is unrealistic to assume that a prosecutor's probable response to such [invocations] is to seek to penalize and to deter."  *Id*.  There is, moreover, no suggestion in the record that Kesner's cooperation was so critical to an indictment of Gibson as to provide the government with a motive to prevent him from refusing to testify.

The defendant has also failed to show that the prosecutor acted unreasonably or with an intent to punish Kesner for expressing an intent to invoke his Fifth Amendment rights.  Kesner urges the Court to focus on the prosecutor's conduct between October 2-8, 2015.  The benefit to the defendant's argument of focusing on this particular narrow slice of time is fairly obvious; one certainly could argue based just on that specific, seven-day period that the prosecutor was hoping to get Kesner to testify, then learned that he would not testify, and then quickly determined to indict him, giving rise to the concern that the prosecutor's decision to indict was in retaliation for the defendant's decision not to testify.  There is a superficial appeal to this argument but it is ultimately unpersuasive, for two reasons.

First, the events of that week cannot be viewed in a vacuum and must be considered in the context of other matters going on at the same time.  As the government argued, the first week of October 2015 was a rather unique time period in the context of the case because it fell close to the end of the grand jury investigation, and significant case-shaping issues that had been under consideration for some time now needed to be decided before a looming deadline.  To that extent, the prosecutor's acts plausibly could be viewed as part of the effort to explore possible options and

resolve any lingering questions before charges were brought.  At a minimum, it would not be reasonable to just automatically assume that the prosecutor's decision to treat Kesner as a target was in retaliation for his decision not to testify.

Second, the events of that first week of October must also be viewed in the context of salient events occurring outside of that time period.  Among other things, the record shows that the prosecutor had since March of 2015 taken a sort of dual track approach with respect to the defendant, viewing him as both a possible witness and a possible target.  As noted above, the prosecutor tried as early as March of 2015 to get the defendant to testify before the grand jury, but notably also advised him of his right against self-incrimination.  Similarly, on April 1, 2015, the prosecutor, having been told that the defendant would not testify before the grand jury, sent Attorney Solomon proposed proffer letters for Kesner and Jowder, but signaled counsel that the defendant had criminal exposure.  Further, when counsel challenged this notion, the prosecutor responded, in writing, that "whether Mr. Kesner facilitated, participated in, encouraged or conspired with Mr. Gibson to file false tax returns is an open question in our investigation." Thereafter, the prosecutor and counsel had little communication regarding the defendant until that first week of October, when the prosecutor resumed his efforts to obtain the defendant's testimony. In this light, the events of that first week appear much less sensational; the prosecutor had little reason to be surprised that the defendant would decline to testify, and the defendant had little reason to be surprised that the prosecutor might view him as a potential target.  If anything, the parties merely resumed where they had left off, with the principal difference being that the prosecutor now had to make a firm decision as to how to proceed in light of charging deadlines. Viewed in this broader context, there is no basis to conclude that the prosecutor's conduct was vindictive.

c.   The Government has Rebutted any Arguable Presumption of Vindictiveness

Even assuming for the sake of argument that the defendant could show a likelihood of a vindictive prosecution, the government has adequately rebutted any presumption of vindictiveness. When determining whether the government has rebutted this presumption, a court must decide whether there exists in the record "objective evidence justifying the prosecutor's action." *Goodwin*, 457 U.S. at 376 n.8.   "The showing required to overcome the presumption of vindictiveness is admittedly minimal—any objective evidence justifying the prosecutor's actions will suffice." *United States v. Safavian*, 649 F.3d 688, 694 (D.C. Cir. 2011).   As an initial matter, the defendant does not contend that the prosecutor had no factual basis upon which to charge Kesner.  "It thus defies common sense to say that the government had no 'objective reason'" for deciding to treat Kesner as a target and ultimately charge him.  *Jenkins*, 537 F.3d at 5.  In any event, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher*, 434 U.S. at 364.

Here, the government proffered that many important determinations are normally made in the final weeks of an investigation, regarding matters such as who should be immunized, who might be offered a deal, who might be a target, and what the ultimate charges will be.   The government explained that this process is all the more involved and deliberate where, as here, the case involves tax related crimes which must be evaluated and reviewed by the Department of Justice's Tax Division.  As such, where the question as to how to treat someone like the defendant might not be resolved until the last minute in the normal course, and might result in treatment

different than that which was originally contemplated, the Court cannot conclude that no objective evidence supported the prosecutor's decision to proceed as the government did here.

In short, the defendant has not shown a realistic likelihood of vindictiveness warranting a presumption of vindictiveness.  Even if he could, the government has adequately rebutted any presumption.[3]

## III.   CONCLUSION

For the foregoing reasons, it is respectfully recommended that the defendant's motion to dismiss the indictment or alternatively for discovery and an evidentiary hearing be DENIED. (Dkt. No. 33).  The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72(b) or Fed. R. Crim. P. 59(b), any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Fed. R. Civ. P. 72(b), will preclude further appellate review of the District Court's order based on this Report and Recommendation.  *See Keating v. Secretary of Health and Human Services*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *United States v. Vega*, 678 F.2d 376, 378-

---

[3] The defendant moves in the alternative for discovery and an evidentiary hearing to collect additional evidence to further explore his claim of vindictive prosecution.  In support, the defendant relies essentially upon the same acts and events referenced in support of his claim of vindictive prosecution, *e.g.,* his understanding from the Agent and the discussion of a proffer that he was only a witness, and the chronology of events during the first week of October 2015. For the foregoing reasons, however, the Court finds that these things, in context, do not tend to show a likelihood of vindictiveness.  *See e.g., Dwyer,* 287 F.Supp.2d 82.  Even were the Court to find differently, the government has adequately rebutted any presumption of vindictiveness.  Accordingly, there is no basis or need to conduct any discovery on this issue and the request should be denied.

379 (1st Cir. 1982); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *see also, Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466 (1985).


                                        /s/ Donald L. Cabell
                                        DONALD L. CABELL, U.S.M.J.


DATED:  August 11, 2016